1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
2                    CENTRAL DIVISION AT LEXINGTON

3                              - - -
    UNITED STATES OF AMERICA,       .   Case No. 5:19-CR-00178
4                                   .
              Plaintiff,            .
5                                   .   Lexington, Kentucky
         - v -                      .
6                                   .   Monday, June 1, 2020
    WILLIAM MICHAEL FIELDS JUNIOR, .
7                                   .   JURY TRIAL DAY 1 OF 2
              Defendant.            .   WITNESS TESTIMONY ONLY
8                              - - -

9          EXCERPT OF TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                BEFORE THE HONORABLE DANNY C. REEVES
10             UNITED STATES DISTRICT COURT JUDGE

11                             - - -

12

13   For the United States:      ERIN ROTH, ESQ.
                                 MARY LAUREN MELTON,ESQ.
14                               Assistant U.S. Attorneys
                                 United States Attorney's Office
15                               260 West Vine Street, Suite 300
                                 Lexington, Kentucky  40507
16
     For the Defendant:          CHRISTOPHER A. SPEDDING, ESQ.
17                               Spedding Law Office
                                 271 West Short Street, Suite 402
18                               Lexington, Kentucky  40507

19   Court Reporter:             LINDA S. MULLEN, RDR, CRR
                                 Official Court Reporter
20                               101 Barr Street
                                 Lexington, Kentucky  40507
21

22   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
23

24

25

2

E.Y. - DIRECT

1      (Voir dire was conducted on 6/1/2020 and a jury was

2  impaneled and sworn; opening statements given; transcript not

3  requested.)

4      (Proceedings in open court, June 1, 2020, 12:57 p.m.)

5      THE COURT:  Thank you.  The record will reflect that all

6  members of the jury are present, defendant and counsel are all

7  present at this time.

8      Ladies and gentlemen, we will proceed with presentation of

9  proof.

10      Ms. Roth, are you ready to call your first witness, or

11  Ms. Melton?

12      MS. MELTON:  Yes, Your Honor.  Our first witness is going

13  to be E.Y.

14      THE COURT:  Throughout this proceeding, Counsel, you will

15  be directed to refer to the individual, you can use those

16  initials or you can use the first name.

17      MS. MELTON:  Yes, Your Honor.

18  **E.Y., GOVERNMENT WITNESS, SWORN**

19      THE COURT:  Ms. Melton, you may proceed.

20      MS. MELTON:  All right.

21                        E.Y.

22                 DIRECT EXAMINATION

23  BY MS. MELTON:

24  Q.   Ma'am, could you please introduce yourself to the jury?

25  A.   My name is Grace.

E.Y. - DIRECT

1   Q.   All right.  What are your initials, Grace?

2   A.   E.Y.

3   Q.   All right.  Grace, can you tell the jury a little bit

4   about yourself?

5   A.   I just graduated from Harrison County, enlisted in the

6   National Guard and I just started at Toyota.

7   Q.   When you enlisted in the National Guard, what was your job

8   that you signed up for?

9   A.   12M firefighter.

10   Q.   Firefighter?  What are your interests and hobbies?  I know

11   you started a new job, so you might not have time for much.

12   A.   My interest and what?

13   Q.   Hobbies.

14   A.   Oh, I mainly just do Guard.  I don't really do much.

15   Q.   Okay.  When is your birthday, Grace?

16   A.   11/24/01.

17   Q.   Can you tell us why you're here today?

18   A.   For the incidents that happened at the EMT building and

19   the ambulance.

20   Q.   Who was involved in those incidents?

21   A.   Me and Mike Fields.

22   Q.   Okay.  Is Mike Fields in the courtroom today?

23   A.   Yes.

24   Q.   Could you please point to him and identify him for the

25   jury?

E.Y. - DIRECT

1   A.   Right there (indicating).

2        MS. MELTON:  Your Honor, may the record reflect that the

3   witness has just pointed to Mr. Fields, who is seated at

4   counsel table?

5        THE COURT:  Yes, ma'am.

6        Could you describe some item of clothing that he may be

7   wearing?

8        THE WITNESS:  Black face mask, black shirt.

9        THE COURT:  Black shirt, I'm sorry?

10       THE WITNESS:  Correct.  I think it's black.

11       THE COURT:  I'm sorry?

12       THE WITNESS:  Black pullover.

13       THE COURT:  Yes.  The record will reflect that the witness

14   has identified the defendant, Michael Fields.

15   BY MS. MELTON:

16   Q.   So you just told us about a couple of incidents involving

17   Mr. Fields.  I think you call Mr. Fields Mike, right?

18   A.   Correct.

19   Q.   Okay.  When did those incidents occur?

20   A.   Like 2018, early -- I mean early 2019.

21   Q.   All right.  And the two incidents, the ambulance incident

22   and the EMT training facility incident, do you remember what

23   month that was?

24   A.   March.

25   Q.   Of 2019?

E.Y. - DIRECT

1   A.    2019.

2   Q.    Can you tell the jury what type of phone you had during

3   that time?

4   A.    An iPhone SX Max.

5   Q.    What happened to that phone?

6   A.    It was confiscated by Detective Jett.

7   Q.    I'm going to ask the CSO to hand you a couple of items,

8   I'm going to get you to look at those.  You've just been handed

9   what's been premarked Exhibit 5, specifically 5a and 5b.

10       Do you recognize those items?

11  A.    Yes.

12  Q.    Can you tell us what they are?

13  A.    It's my iPhone.

14  Q.    The one that you just told us about?

15  A.    Correct.

16  Q.    When did you use that particular iPhone?

17  A.    Pretty much whenever I got it back in, I think in August

18  of 2018.

19  Q.    Okay.

20  A.    Until it got taken.

21  Q.    Until it got taken?

22  A.    Yes.

23  Q.    That's the cell phone you mentioned that you provided to

24  Detective Jett, correct?

25  A.    Correct.

6

E.Y. - DIRECT

1      MS. MELTON:  Your Honor, at this time we would move to
2  introduce Exhibit 5, that is 5a and 5b, and publish those items
3  to the jury.
4      THE COURT:  All right.  See if there is any objection?
5      MR. SPEDDING:  No objection, Your Honor.
6      THE COURT:  Exhibits 5a and b, United States Exhibits 5a
7  and b, will be admitted.  They may be displayed.
8          (Government Exhibits 5a - 5b were admitted.)
9  BY MS. MELTON:
10  Q.   Grace, we're going to publish those to the jury.  Can you
11  tell the jury what they're looking at?
12  A.   The front screen of my iPhone.
13  Q.   And then moving on to 5b?
14  A.   The back screen of my iPhone.
15  Q.   Grace, we're going to ask the CSO to hand you another
16  document.
17      The document that I've just handed you has been premarked
18  as Government Exhibit 6.
19      Do you recognize that item?
20  A.   Yes, it's the box of my iPhone.
21  Q.   Which iPhone?
22  A.   iPhone SX Max.
23  Q.   The one you told us about that you gave to Detective Jett?
24  A.   Correct.
25      MS. MELTON:  Your Honor, at this time we would move to

E.Y. - DIRECT

1    admit Government Exhibit 6 and publish it for the jury.

2          THE COURT:  Any objection?

3          MR. SPEDDING:  No objection.

4          THE COURT:  Exhibit 6 will be admitted and may be

5    published.

6                (Government Exhibit 6 was admitted.)

7    BY MS. MELTON:

8    Q.    Grace, as that's being published, can you describe what

9    you're seeing on there?

10   A.    It's the bar codes on the i, serial number, and it also

11   has "made in China" on it.

12   Q.    Grace, we're going to be talking about Snapchat a lot

13   during your testimony today.  And I know you're not an expert,

14   I'm not asking you to give any type of expert testimony, but

15   can you just tell us generally what Snapchat is and how you, as

16   an end user, used it?

17   A.    It's an app for like taking photos and videos, you can

18   basically text on it, like an iPhone -- not a iPhone, like

19   regular text messages.

20         The good thing about it, it deletes afterwards, which is

21   why a lot of teenagers use it.  It's got like four different

22   tabs that shows your stories, which is the photos you publish;

23   and then it shows your camera from your phone; and it has like

24   a "my eyes only," which is where you can hide secret photos on

25   it.

8

E.Y. - DIRECT

1    Q.    Thank you.  You said it was an app.  You were describing

2    different things you can do with it on a phone.  So it's an app

3    for like a smart phone, right?

4    A.    Yes.

5    Q.    So at the very beginning of your testimony, I asked you to

6    tell the jury a little about yourself.  That was kind of Grace

7    today.  Going back to early 2019, can you tell us what you were

8    up to during that time?

9    A.    I was in Police Explorers, which is like an introduction

10   into law enforcement for younger kids.  We get like hands-on

11   training and we learned the basics of law enforcement.  And

12   then I was also in ROTC, which is an entry into the military,

13   but you learn the basics.  And that's about what I did, all I

14   did when I was in high school.

15   Q.    So how old were you in March of 2019?

16   A.    17.

17   Q.    What grade were you in?

18   A.    Eleventh.

19   Q.    You just told us about some of your extracurricular

20   activities, you know, involving law enforcement and maybe the

21   military.  What did you want to do with your life back then?

22   A.    At the time I wanted to be a police officer.

23   Q.    Okay.  Did you have any interest in firefighting as well?

24   A.    Kind of, I was kind of iffy on it.

25   Q.    It sounds like you were interested in the military too,

E.Y. - DIRECT

1  right?

2  A.   Correct.

3  Q.   Tell us a little bit about your home life back then.  Who

4  did you live with?

5  A.   I lived with my mom and my brother at the time.

6  Q.   I think we're going to be talking about your mom a little

7  bit today, so can you tell the jury what your relationship was

8  like with your mom back then?

9  A.   Like most teenagers, it's like a hate-love relationship.

10  She wasn't like super strict, but she was the type of parent

11  that wanted to know where you were at, you had a curfew.

12      But she kind of let me do, for the most part, what I

13  wanted, but I also didn't want to disappoint her at the same

14  time.

15  Q.   When you did, you know, cross the line or maybe break

16  curfew, what were the consequences like?

17  A.   I would either get grounded or get yelled at a lot.

18  Q.   How did you meet Mr. Fields?

19  A.   Through my friend Jacob.

20  Q.   Tell us a little bit about Jacob.

21  A.   He was trying to get on the county fire at the time.  And

22  I've been friends with him since like middle school.  He was a

23  pretty nice guy for the most part.

24  Q.   Okay.  You said you met Mr. Fields through Jacob.  Can you

25  tell us how that happened?

10

E.Y. - DIRECT

1   A.   Jacob had messaged me one morning right after I woke up,

2   and he asked me what I was doing.  And I was like nothing,

3   obviously, because I just woke up.

4        Then he told me to come out to county fire and hang out.

5   And that's when I got an ad from Mike, I didn't know who it was

6   at first.  And then I went to county fire.

7        I got there, we hung out.  I was obviously shy, I didn't

8   know him at the time.  I'm not a talker.  And that's when we

9   helped him put decals onto like the scout car, because he does

10  decals.

11  Q.   Mike does?

12  A.   And so he got the vehicle finished.  We all kind of hung

13  out for a minute.  He asked me to take him to the guy's house

14  to drop the vehicle off.  I asked Jacob to come with me, he

15  said no because there wasn't any room in the truck.

16       So whenever we got it dropped off and ended up coming

17  back, it was kind of quiet, he was trying to get to know me.  I

18  obviously didn't want to talk, I didn't know him that well.

19       And then whenever we ended up getting back to the fire

20  station, he ended up grabbing my thigh.  I let it slide because

21  I didn't want to say nothing, and I ended up going home after

22  that.

23  Q.   I'm going to back up just a couple of steps and just ask a

24  couple of follow-up questions about that.

25       You said that Mr. Fields had asked you to go with him to

E.Y. - DIRECT

1    drop the vehicle off that you all had just done the decals on,

2    right?

3    A.    Correct.

4    Q.    And I believe you said you asked if Jacob could come and

5    you said he said no.  Can you tell us who said no?

6    A.    Mike.

7    Q.    So when you all went to go drop this vehicle off, I guess

8    you drove out there separately; is that right?

9    A.    Yes.

10   Q.    Tell us in a little bit more detail what happened in the

11   car ride on the way back to the fire station.

12   A.    He just asked me basic questions to get to know me.  I

13   don't remember the exact questions.  He asked me about another

14   individual and asked if I was basically into older guys, that's

15   how the conversation went.  And then when we got there, that's

16   when he kind of grabbed my thigh and was like, "text me later

17   with Snapchat."

18   Q.    Any connection with Mr. Fields prior to that day when you

19   met him at the fire station?

20   A.    No.

21   Q.    What did you think about the attention that he was giving

22   you when you guys were still at the fire station before you

23   left to go do that errand?

24   A.    I mean, honestly, he was trying to get to know me like a

25   normal person would.  He seemed really nice when I first met

E.Y. - DIRECT

1   him, because I kind of trusted him, you know, as a firefighter.

2   So I wasn't really like full-on creeped out, but a little bit

3   whenever we got back.

4   Q.   Why did you feel like that when you got back?

5   A.   He grabbed my thigh, that was a little weird to me,

6   especially since I just like met him.

7   Q.   What did you think when he told Jacob not to come?

8   A.   I was kind of like freaked out a little bit, but I mean, I

9   kind of wanted somebody I knew to go with me, and obviously I

10  just met him, didn't really know him.  But I ended up trusting

11  him because he was a firefighter, first responder, so I didn't

12  think anything would happen.

13  Q.   And then you said when you all got back that Mr. Fields

14  had asked you to message him.  Was that on Snapchat?

15  A.   Correct.

16  Q.   So after that first sort of interaction with Mr. Fields at

17  the fire station and that errand that you went to run together,

18  when was the next time that you interacted with Mr. Fields?

19  A.   Later that night, he had Snapchatted me.

20  Q.   Do you remember what you all talked about on Snapchat that

21  night?

22  A.   I don't remember the exact conversation.  I mean, if I had

23  to guess, it was probably just getting to know me still, but

24  it's been so long.  But I do remember receiving a picture of --

25  an inappropriate picture, basically a dick pic that night.

E.Y. - DIRECT

1    Q.   You said "dick pic."  Is that just a picture of a penis so

2    we're clear?

3    A.   Yes.

4    Q.   What was going through your mind when you received that

5    picture?

6    A.   I mean, I didn't really want it on my phone.

7    Q.   Why didn't you want it on your phone?

8    A.   Anybody can see that.  You can get it back, somebody could

9    screen shot it or anything like that.

10   Q.   So again, what we were just talking about with him sending

11   you the picture, was that still the first day that you had met

12   him?

13   A.   Yes.

14   Q.   After that first day, how often would you interact with

15   Mr. Fields?

16   A.   Like maybe a couple of times a week.  Kind of often.

17   Q.   How would you all normally interact?

18   A.   Normally through Snapchat, but every once in a while in

19   person.

20   Q.   How often would you all communicate with Snapchat versus

21   you seeing him?

22   A.   More frequently on Snapchat.

23   Q.   You told us at the beginning of your testimony that, you

24   know, back at this time you were really interested in law

25   enforcement.  What, if anything, did Mr. Fields know about your

14

E.Y. - DIRECT

1   interest in law enforcement?

2   A.   He knew I was in Explorers.  And from what Jacob told him,

3   he kind of knew I was into anything first responders related.

4   Q.   First responders is like firefighters, EMT, am I missing

5   anything?  And police officers, I guess?

6   A.   Correct.

7   Q.   Got you.

8        Did Mr. Fields ever use those interests as like an

9   icebreaker or something to talk about?

10  A.   I mean personally, I kind of felt that way, yes.

11  Q.   Okay.  Tell us about that.

12  A.   I mean, I just kind of felt like he used it to his

13  advantage to kind of get to me, which I basically just wanted a

14  friendship, I didn't really want it to go any farther.

15  Q.   Why were you interested in a friendship with Mr. Fields?

16  A.   I mean, he seemed like a really nice guy.  And he had the

17  same interests I had, like law enforcement-wise and all that.

18  Q.   When, if at all, did Mr. Fields ever, you know, show you

19  anything about law enforcement or give you anything about law

20  enforcement or first responders?

21  A.   I mean, we kind of like talked about all kinds of law

22  enforcement events, firefighting and all that.  He gave me a

23  radio at one point and I kind of just listened to it and

24  listened to some of the calls.  I mean, you can kind of learn

25  stuff from that.

E.Y. - DIRECT

1   Q.   Was there any discussion of like an EMT class that you

2   might sign up for?

3   A.   Yes.

4   Q.   Tell us about that.

5   A.   Like you can sign up for an EMT class when you're 17, but

6   you have to be 18 by the time you complete it.  I was just, I

7   guess, interested in EMT training, medical.

8   Q.   What was Mr. Fields' involvement with the EMT training?

9   A.   He taught it.

10  Q.   Would you tell us a little bit more about seeing

11  Mr. Fields in person?  You know, just for starters, would you

12  normally see him alone or would you be with friends?  You know,

13  private or public?

14  A.   Most of the time I was with friends.  I was at the Walmart

15  a lot, hanging out with the buddies.  It was kind of rare at

16  first when I seen him one on one, because I liked hanging out

17  with my friends a lot back then.

18  Q.   The encounters that you had when your friends were there,

19  what were those like?  Were they pretty casual or were they

20  sexual?

21  A.   I mean, most of the time they were pretty casual.

22  Q.   How about your one-on-one encounters with him?

23  A.   A lot of them were casual.  And then I started drinking

24  and that's when they kind of got sexual.

25  Q.   You mentioned earlier that you were in a program called

E.Y. - DIRECT

1   Police Explorers.  What type of involvement did Mr. Fields have

2   in that program, if any?

3   A.   Like at first, none.  But like around April 2019, he had

4   messaged me and was like, "I think I'm going to start like

5   coming to the meeting and helping teach."  And I told him just

6   to contact one of the -- like officers that are obviously like

7   the chief or something.  And then the next meeting he showed up

8   and he went to our like truck pull event.

9   Q.   What did you think about him asking to participate in that

10  program?

11  A.   I kind of didn't really want anybody else.  It was like my

12  go-to place, like I could be left alone pretty much.

13  Q.   Grace, I'm going to ask the CSO to give you a couple more

14  documents, if I can, premarked Government Exhibits 12 and 13.

15  We will go through them sequentially.

16       THE COURT:  Yes, ma'am.

17  Q.   Grace, starting with that one that's been premarked

18  Government Exhibit 12, do you recognize that?

19  A.   Yes.

20  Q.   What is it?

21  A.   It's a photo of me, Mike and Lakota, and Lakota is my

22  other friend.

23  Q.   Do you know when that photo was taken?

24  A.   I want to say it was during the truck pull.

25  Q.   What makes you think it was during the truck pull?

17

E.Y. - DIRECT

1    A.   Because Lakota was on crutches then.

2         MS. MELTON:   Your Honor, at this time we would move to

3    admit Government Exhibit 12 and publish to the jury.

4         THE COURT:   Any objection?

5         MR. SPEDDING:   No objection.

6         THE COURT:   United States Exhibit 12 is admitted and may

7    be displayed.

8              (Government Exhibit 12 was admitted.)

9    BY MS. MELTON:

10   Q.   Grace, I know it feels a little redundant, when it comes

11   up on the screen, can you tell the jury what they're seeing

12   there just to help give them some context?

13   A.   It's a picture of me, Mike and Lakota.  I want to say it

14   was during the truck pull event because my friend was still on

15   crutches.

16   Q.   So Lakota is the one that's on the crutches, right?

17   A.   Yes.

18   Q.   How did you know Lakota?

19   A.   I met her like I think when I was a freshman, because I

20   used to ride with her and my friend Mallory to school.  I

21   didn't know Lakota at the time, but I knew Mallory.  That's how

22   I met her.

23   Q.   At the time of that photo, were you all close friends?

24   A.   Yes.

25   Q.   Do you know who took that photo?

E.Y. - DIRECT

1   A.   He did, Mike did.

2   Q.   Grace, it won't be up on the screen yet, but looking at

3   the document in front of you that's been premarked Government

4   Exhibit 13, do you recognize that?

5   A.   Yes.

6   Q.   What is it?

7   A.   That's my photo of me and Mike at the fire station.

8   Q.   Do you know when that picture was taken?

9   A.   I want to say it was the morning, like me and Lakota went

10  up there before the EMT incident.

11  Q.   You said it was at the fire station?  Did you say fire

12  station?

13  A.   Yes.

14  Q.   Okay.  Which fire station was it?

15  A.   The one in downtown Paris.

16       MS. MELTON:  Your Honor, at this time we would move to

17  admit Government Exhibit 13 and publish it to the jury.

18       THE COURT:  All right.  Any objection?

19       MR. SPEDDING:  No objection.

20       THE COURT:  Exhibit 13, United States Exhibit 13, is

21  admitted and may be displayed.

22           (Government Exhibit 13 was admitted.)

23  BY MS. MELTON:

24  Q.   Grace, can you tell us about the shirt that you're wearing

25  in that picture?

E.Y. - DIRECT

1    A.    It's Georgetown Police Explorers.  I went to an academy

2    over the summertime before that, and that was just like a

3    police academy for cadets.

4    Q.    What is Mr. Fields wearing in that photo?

5    A.    His firefighting uniform.

6    Q.    So we talked today about sometimes that you talked to

7    Mr. Fields over Snapchat and sometimes you saw him in person.

8    How did you feel about the attention that you were getting or,

9    you know, how did you feel about your relationship with him?

10   A.    I kind of felt like it was kind of turning sexual after a

11   while.  At first it went like that, but it started it seemed

12   like.  Other than that, I thought he was a pretty cool dude at

13   the time.

14   Q.    How did you feel or what did you think about when things

15   did seem like they were turning more sexual?

16   A.    Like at the time I didn't really want to say no because I

17   was kind of scared something would happen mainly or something

18   would get out.  And I didn't want my mom finding out and all

19   that.

20   Q.    Why didn't you want your mom finding out?

21   A.    She's the type that will yell at everybody and I was

22   scared she was going to do something that she would probably

23   later regret.

24   Q.    So you were kind of afraid of there being a scene, it

25   sounds like, and you getting yelled at?

E.Y. - DIRECT

1    A.    Yeah.

2    Q.    I want to talk about the two incidents that you mentioned

3    at the very beginning of your testimony when I asked you why

4    you were here today.

5          Starting with the ambulance incident, can you tell us

6    everything you remember about that day from the time that you

7    and Mr. Fields made plans or met up until the time that you got

8    home?

9    A.    I was sitting in the Walmart parking lot, and I'm pretty

10   sure I was still with a bunch of friends at the time.

11         He had messaged me and asked what I was doing, and I told

12   him what I was doing.

13         And then like it was kind of late at night, probably

14   around 10 or 11, if I had to guess, because all of my friends

15   had went home.

16         And I ended up meeting Mike.  And he was in his constable

17   car at the time.  And we ended up riding up to Paris because he

18   wanted to show me some firetrucks and stuff like that, because

19   I'm kind of obsessed with them, at least at the time I was.

20         And when we got up there, he unlocked the door.  And at

21   the time I was intoxicated, I don't know for sure if he knew I

22   was or not, because like when I'm intoxicated, I don't really

23   show it, like it's kind of in my mind, and not really straight

24   in the mind.

25         And whenever we went in, it was about probably like three

21

E.Y. - DIRECT

1   or four minutes, we were walking around, kind of looking at the

2   vehicles.  And he told me to come to the back of the ambulance

3   and I did.  We sat in the back.  Like if you're looking at it

4   from the front and you're looking back to the box part, I sat

5   on the left side.  And like maybe three or four minutes in, my

6   pants were taken off and I was laying on my back.  I had my

7   phone near me.

8       And like vaginal intercourse started happening.  There was

9   photos from it.  And he ended up videoing it.  And then like

10  after we got finished, I started bleeding because at the time I

11  had just lost my virginity, not from him, but from the guy

12  before that and it hadn't been that long.  And I ended up with

13  my pants and stuff back on.

14      And then we left.  We rode back to town, he dropped me off

15  at my car and I went home after that.  And that was about it

16  that night.

17  Q.   Before we talk about the next morning, I'm going to ask

18  you a few follow-up questions.  You mentioned that you were

19  intoxicated.  How had you become intoxicated that evening?

20  A.   Drank some little shots on the way up.  And then like

21  before that, I had been drinking.

22  Q.   Okay.  And you said you took some little shots on the way

23  up.  I assume you mean like between Walmart and Paris?

24  A.   Yes.

25  Q.   Who gave you the alcohol?

E.Y. - DIRECT

1  A.   He had gotten them from some firefighter event whenever he

2  went, I forgot where it was at.  But he ended up buying them

3  for me.

4  Q.   You said that you all got there and looked around at the

5  vehicles for a couple of minutes and then you went into the

6  back of the ambulance.  And you described for us the

7  circumstances leading up to the vaginal intercourse.

8       Where was your phone at the time?

9  A.   It was either laying on my chest or like right next to me,

10 because it was right in my area, basically.

11 Q.   How did Mr. Fields come to have your phone?

12 A.   He had asked if he could video it.  And I mean, I was kind

13 of out of it and I was in that I-don't-care mood basically, so

14 I gave him my phone.  And like on the iPhones you don't even

15 have to have it unlocked to get to the camera.

16 Q.   You told us that you all had got done having the

17 intercourse and you then went back to your house in Cynthiana;

18 is that right?

19 A.   Yes.

20 Q.   Tell us about the next morning.

21 A.   I had gotten on Snapchat because I was going to post

22 something.  And I kind of forgot the video was even taken and I

23 ended up finding it on my camera.  Like on Snapchat, you can

24 see your actual camera roll on it.  When I went to go post, I

25 seen the video and ended up watching it.

E.Y. - DIRECT

1    Q.   What were you thinking when you were watching it?

2    A.   I didn't want -- that freaked me out, I didn't want that

3    on my phone.

4    Q.   Again, why didn't you want that on your phone?

5    A.   It could have gotten out.  Somebody could have hacked my

6    phone or something, anything is possible.

7    Q.   I want to make sure that I'm explaining -- or, excuse

8    me -- understanding what you explained to us about Snapchat and

9    the camera roll.  So the camera roll that is on your phone,

10   that's just like if you take a picture or video with just --

11   just with the default camera app, right?

12   A.   Yes.

13   Q.   And so you can see that in Snapchat, but that doesn't

14   necessarily mean that it was taken through Snapchat, right?

15   A.   Correct.

16   Q.   So you saw it on your camera roll.  What else, if

17   anything, did you see regarding the video in your Snapchat app?

18   A.   That it had been sent to Mike.

19   Q.   How do you know that?

20   A.   Like on Snapchat, it takes up to 24 hours to -- like you

21   can send a chat and see that somebody opened it.  And it takes

22   up to like 24 hours to clear that part out.  And that's kind of

23   just how I knew.

24   Q.   When you say "clear it out," do you mean like delete?

25   A.   Yes, like it deletes on its own.

E.Y. - DIRECT

1  Q.   But because it had been less than 24 hours, you could

2  still see it; is that right?

3  A.   Yes.

4  Q.   What, if anything, did you do with the videos that you

5  found or the video that you found?

6  A.   I ended up deleting them after a while.

7  Q.   Grace, I'm going to ask the CSO to hand you what's been

8  premarked Government Exhibit 1.

9       Do you recognize Government Exhibit 1?

10 A.   Yes.

11 Q.   What is that?

12 A.   It's a disk that has the photos in the ambulance.  It was

13 actually a video but they could only get clip art to pull it

14 up.  And it's one photo, it's me laying on my back and you can

15 see the intercourse in the picture.

16 Q.   How do you know what is on that disk?

17 A.   You had showed it to me in one of our meetings and I

18 initialed it.

19 Q.   Can you read for us your initials on there and anything

20 else that you wrote on there to identify that item?

21 A.   One picture, ambulance, E.Y.

22      MS. MELTON:   Your Honor, at this time we would move to

23 admit Government Exhibit 1, but we would like to wait and

24 publish it through another witness.

25      THE COURT:   All right.   Any objection to its admission?

E.Y. - DIRECT

1      MR. SPEDDING:  May we approach?

2      THE COURT:  Yes, sir.

3      (Bench conference on the record.)

4      MR. SPEDDING:  I don't have any objection to how they're

5   doing it.  Ms. Roth and I talked about it.  I just want to make

6   sure -- well, I would rather not, but I want to make sure that

7   it's going to be played later on so that the jury will see

8   what's actually on the disk.

9      THE COURT:  If I understand, it will be.  If it's been

10  admitted, then you can certainly display it as well.

11     MR. SPEDDING:  Okay.

12     THE COURT:  Thank you.

13     (Bench conference concluded.)

14     THE COURT:  United States Exhibit 1 will be admitted at

15  this time, but I understand the parties intend to play it later

16  or show it later to the jury.  It will not be shown at this

17  point.

18          (Government Exhibit 1 was admitted.)

19  BY MS. MELTON:

20  Q.  Grace, just so that we have a clear record, can you tell

21  us who the individuals are that are in that picture on the disk

22  that you just told us about?

23  A.  Me and Mike.

24  Q.  How do you know it's you and Mike?

25  A.  I can -- I wasn't really messing with anybody else at the

1    time.  And I knew about going up to the ambulance with him.

2    Q.    Is it also consistent with the video that you had watched

3    on your phone?

4    A.    Yes.

5    Q.    Let's switch gears and talk about the night at the EMT

6    training facility or that incident.

7         Before I get you to tell the whole story of that incident,

8    can you tell us what you had been doing earlier that day?

9    A.    I'm pretty sure it was the same day of that Exhibit 13

10   photo, me and Lakota went up there and hung out for a little

11   bit.  He took us down to the EMT building.  We kind of messed

12   with dummies because we were bored, had nothing else to do.  We

13   went into the office and that's when I got the radio.  And then

14   I ended up sitting on his lap that night and Lakota had

15   witnessed it.

16   Q.    I think you told us earlier that most of your, you know,

17   kind of more intimate moments with him were when you were one

18   on one.  What did you think about there being another person

19   there to see that?

20   A.    I kind of was glad somebody else seen it because, I mean,

21   I'm not the type to talk about my personal problems.  I don't

22   like telling people how I feel about stuff.  And I'm just kind

23   of glad she witnessed it.

24   Q.    You also mentioned a radio to us.  Is that the same radio

25   that you talked about earlier, that Mr. Fields had given you?

E.Y. - DIRECT

1   A.   Yes.

2   Q.   What does that radio do?

3   A.   It's like a hand-held scanner to listen in on Bourbon

4   County, Paris fire, EMTs, I think that was all that was on it.

5   Q.   So next tell us the whole story starting from you and

6   Lakota leaving the EMT training building, the fire station, up

7   to you going home that evening after seeing Mr. Fields.

8   A.   After we left the fire station, me and Lakota went to my

9   room, like most teenagers do, we were drinking.  And then I was

10  kind of out of it.  Probably on a scale of 1 to 10, probably

11  around a 6 or 7.  Mike had messaged me and asked if I could

12  come back up to the fire station.  And Lakota told me no,

13  because she didn't want me getting in trouble for like DUI or

14  something.  And I was just kind of in the mood to like say no.

15  I wanted to leave.  So I ended up leaving and going up to the

16  fire station.

17  Q.   Tell us -- well, before you tell us.  Lakota had asked you

18  not to go up there.  Was she ticked at you for leaving?

19  A.   Yeah, it kind of seemed like it, especially when I came

20  back.

21  Q.   But you had left her at your house it sounds like, right?

22  A.   Yes.

23  Q.   Did you drive yourself to the fire station?

24  A.   Yes.

25  Q.   What happened when you got there?

E.Y. - DIRECT

1    A.   We kind of hung out inside the fire station for like a

2    couple of minutes.  He was doing some stickers or something on

3    the computer.  After we got done, we ended up going down to the

4    EMT building, I drove us down there.

5         We went in through the side door on the EMT building.  And

6    when we first got in there, I had to use the restroom, I went

7    to the bathroom.  That was up front.  Whenever we went back to

8    the office, it was kind of just a normal, like casual kind of

9    conversation.  And then things kind of got -- started getting

10   sexual.  That's when I ended up with my pants off, he laid me

11   on the desk and that's when sexual intercourse happened.

12   There's foreplay, and videos were taken.

13   Q.   Who took the videos?

14   A.   Mike did.

15   Q.   With whose phone did he take those videos?

16   A.   Mine.

17   Q.   How did he get your phone?

18   A.   It was laying like right on the desk, because I took it

19   out of my pants basically so it wouldn't get cracked or

20   something when they kind of flew off.

21   Q.   At the time you were having intercourse and foreplay with

22   him, are you aware that he was videoing?

23   A.   Kind of.  But I was like kind of out of it, but when I

24   would drink, I don't really show like most people do, I'm not

25   all wobbly and all that.

E.Y. - DIRECT

1    Q.   What percentage of the time that you were intimate with

2    Mr. Fields that night was there video being taken, if you know?

3    A.   I don't want to say it was the whole time because it

4    probably was like 10 to 15 minutes.  And there was probably --

5    there was like five videos taken in like short clips.  It's

6    probably like maybe three or four minutes' worth of videos.

7    Q.   So you and Mr. Fields finish up having sex, he's done

8    taking the videos, walk us through what happened after that.

9    A.   I ended up dropping him off at the fire station and I

10   ended up going home and I went to bed after that.

11       The next morning when I woke up, that's when I kind of

12   found the videos, freaked me out.  I showed my friend Lakota,

13   because like at the time I didn't really -- I obviously didn't

14   want a sexual relationship, but I didn't really tell him that.

15   But I mean, I was 17, he was 36.

16       Then whenever I found the videos, I showed Lakota, I kind

17   of freaked out and she was like, you need to tell somebody.  To

18   me it was kind of embarrassing.  I was kind of scared of my mom

19   at the time.  I didn't really know what to do.

20   Q.   Did you end up taking your friend's advice and telling

21   anybody about it at that point?

22   A.   No.

23   Q.   With respect to the ambulance incident, you told us that

24   you had seen some, you know, indicator on Snapchat that

25   Mr. Fields had sent it to himself.

E.Y. - DIRECT

1      Did you see anything like that the morning after the EMT

2   training incident?

3   A.   No, not that I know of, but I don't recall because it's

4   been so long.

5   Q.   Do you know if Mr. Fields did send it to himself?

6   A.   Yes.

7   Q.   How do you know that?

8   A.   Because most of the time he kept videos on his phone in

9   the photo vault.  They got sent to him at some point.

10  Q.   I've never used a photo vault before, and I'm sure the

11  jury hasn't, so can you give us a general idea what that is?

12  A.   It's kind of Snapchat eyes only, you can hit hide it.

13  There's calculator apps, you type in a certain code and that's

14  how you access them, but nobody else can unless they know that.

15  It's just to hide videos and photos.

16  Q.   It sounds like at some point you saw Mr. Fields' photo

17  vault?

18  A.   Yeah, I've seen it before.

19  Q.   Tell us how you saw it and what you saw in there.

20  A.   Most of the time he would either have his phone unlocked

21  or I knew how to get on it.  I mean, he showed them to me

22  because, I mean, he hid the stuff from his wife, he didn't want

23  her finding out.

24  Q.   Grace, I'm going to ask the CSO to hand you what's been

25  marked as Government Exhibit 2.

E.Y. - DIRECT

1        Do you recognize Government Exhibit 2?

2   A.   Yes.

3   Q.   What is it?

4   A.   It's a disk with the five videos that were pulled up.  And

5   then there's two photos, it was at the EMT training building

6   and I had initialed it.

7   Q.   How do you know what's on that disk?

8   A.   You all showed it to me our last meeting we had, and I

9   initialed off on it.

10  Q.   Can you read what you wrote on there, including your

11  initials and anything else?

12  A.   E.Y., five videos, two pictures, EMT training.

13  Q.   Okay.  Thank you.

14       MS. MELTON:  Your Honor, at this time the United States

15  moves to admit Government Exhibit 2, but again, we would like

16  to publish that to the jury through another witness.

17       THE COURT:  All right.  See if there's any objection to

18  the admission of Exhibit 2.

19       MR. SPEDDING:  No objection, Judge, just based on the same

20  conversation we had.

21       THE COURT:  Yes, sir.  Exhibit 2 will be admitted at this

22  time and it need not be displayed to the jury, however.

23            (Government Exhibit 2 was admitted.)

24  BY MS. MELTON:

25  Q.   Grace, so we've got a clear record, you told us about five

E.Y. - DIRECT

1   videos and two photos.  Who were the individuals that were in

2   those visual depictions?

3   A.   Me and Mike.

4   Q.   Before we started talking about what was on Government

5   Exhibit 2, you told us that you were feeling freaked out and

6   how your friend wanted you to tell someone.  Even though you

7   were feeling freaked out, did you still keep seeing Mr. Fields

8   after that?

9   A.   Yeah.  I mean, he was law enforcement, I was kind of

10  scared something would happen.  I mean, anything can happen.

11  That's about it.

12  Q.   So you did keep talking to him and seeing him for a little

13  while it sounds like?

14  A.   Yes.

15  Q.   Was one of the times that you saw Mr. Fields again related

16  to Police Explorers?

17  A.   What time?

18  Q.   After the EMT training facility incident, was one of the

19  times that you saw Mr. Fields again at a Police Explorers

20  event?

21  A.   Yes.

22  Q.   Can you tell us about that?

23  A.   We went to a truck pull, which is like a 15,000-pound

24  truck.  There was like ten of us that pulled it, and it was a

25  huge competition to raise money for a fundraiser.  And we got

E.Y. - DIRECT

1  last place.  That was -- I mean, that was a pretty decent

2  event, nothing sexual happened that night.  It was casual.

3  Then we all went to B-Dubs after that.

4  Q.   Was there a bonfire at Mr. Fields' house?

5  A.   Yes, afterward.

6  Q.   Tell us about that.

7  A.   Me and a couple of Explorers had went up to Mike's, and

8  another officer had.  And originally it was just supposed to be

9  like a casual fire.

10      MR. SPEDDING:  Your Honor, may we approach, please.

11      THE COURT:  Yes, sir, you may.

12      (Bench conference on the record.)

13      THE COURT:  Yes, sir.

14      MR. SPEDDING:  I don't understand --

15      MS. MELTON:  I'm sorry?

16      MR. SPEDDING:  I'm going to object to the line of

17  questioning about the bonfire.  It has absolutely nothing to do

18  with whether or not he produced any sexually explicit video on

19  March 17th or the 23rd of 2018.

20      Now, what it is relevant to is an investigation got

21  started that ultimately led to them learning about these

22  videos.  But I mean, all that's already been developed.

23      MS. MELTON:  Actually, at this point with the first

24  witness it has not been developed.  Grace is starting to

25  develop that and I will develop it through Detective Jett, but

E.Y. - DIRECT

1  this is really just the way she wrapped up her testimony, ask

2  her how it came to light.

3       THE COURT:  I'll overrule the objection.

4       MR. SPEDDING:  All right.

5       (Bench conference concluded.)

6       THE COURT:  Thank you.  I'll overrule the objection.  You

7  may proceed.

8  BY MS. MELTON:

9  Q.   Grace, you were telling us about the bonfire at

10 Mr. Fields' house.  Can you continue telling us about that?

11 A.   It was supposed to be like a casual bonfire with me and a

12 few of the other Explorers, and then there was another officer

13 there.  One of the females that was joking said -- I mean, you

14 can hear the sarcasm in her voice, like, "Where's the alcohol?"

15 Just jokingly.  And Mike had went in his house and brought two

16 bottles out.

17      We had all started drinking, which I mean, none of us

18 really should have been, we were all driving.  Half that night,

19 bonfire was over, everybody was kind of out of it.  We went

20 inside and just kind of chilled in the living room until we all

21 kind of calmed down.  One of the individuals who did not have a

22 license had drove one of the 19-year-olds home, and because he

23 was apparently too out of it.  Which wasn't a great idea, she

24 didn't have a license.

25      And then I had also been driving and so had the other

1   individual.  When we got to town, we had all ended up at

2   Speedway.  And we kind of hung out for the most part.  I talked

3   to another officer when I got there.

4        And then pretty sure we all ended up going home that

5   night.

6   Q.   What can you tell us about how your relationship with

7   Mr. Fields came to light?

8   A.   Like what do you mean?

9   Q.   How did anybody find out about it?

10  A.   Oh.  I mean, most of the time whenever I met him it was

11  normally in public.  Jacob, which is one of my friends I

12  mentioned in the beginning, he's the type of guy that you tell

13  him something, he'll tell somebody else.  And I just kind of

14  feel like it kind of got out that way.

15       And maybe the officer we were talking to that night kind

16  of figured out we were just drinking, you could smell it on us.

17  Q.   So you said the officer that you were talking to that

18  night might have smelled some alcohol on you.

19       Did that prompt some sort of investigation?

20  A.   I would assume that's what prompted it, yes.

21  Q.   And you said that Jacob can't keep a secret.  Was Jacob

22  one of the people involved in that alcohol incident?

23  A.   Yes.

24  Q.   At the very beginning of your testimony, you told us about

25  an interaction with Detective Jett where your phone was taken.

E.Y. - DIRECT

1   Can you tell us, you know, approximately when that happened and

2   how that happened?

3   A.    It was sometime in April 2019.   Originally, Detective Jett

4   had just come into my house to like ask me questions about the

5   party.   And then Mike got brought up, and that's when it kind

6   of all escalated.   He ended up taking my phone for evidence.

7   And then a bunch of stuff was found on it.   And that's when the

8   investigation kind of started.

9   Q.    During the course of that conversation that you had with

10  Detective Jett when he took your phone, did you admit to having

11  a physical relationship with Mr. Fields?

12  A.    Like it was kind of iffy on the admitting, because I was

13  kind of scared to say anything.   I told the truth on most

14  parts, and then I tried to cover myself, for him and anybody at

15  the first meeting, because I didn't really want to get anybody

16  in trouble.

17  Q.    You ultimately did tell Detective Jett about it, correct?

18  A.    Yes.

19  Q.    After you told Detective Jett about that and the

20  investigation started, did you see Mr. Fields again?

21  A.    No.

22  Q.    How did you feel about not seeing him again?

23  A.    Kind of relieved because I didn't have to really deal with

24  anything anymore.

25  Q.    Grace, Mr. Spedding is probably going to have questions

E.Y. - CROSS

1   for you, but that's all I've got right now.  Thank you.

2        THE COURT:  Thank you.

3        Mr. Spedding, you may question the witness.

4        MR. SPEDDING:  Yes, Your Honor.

5                          CROSS-EXAMINATION

6   BY MR. SPEDDING:

7   Q.   Grace, we haven't met.  My name is Chris Spedding and I

8   represent Mr. Fields.  I have a few things I want to go over

9   with you.

10       I guess the first thing is, can you tell us how many times

11  you've met with Detective Jett?

12  A.   Probably like -- maybe in the past year, when it actually

13  has -- like when he took my phone, probably ten or 12 times.

14  Q.   Okay.  Would you agree with me that in several of those --

15  well, let me back up.

16       Several of those interviews were recorded, correct?

17  A.   Correct.

18  Q.   And then some of them were written, correct?

19  A.   Correct.

20  Q.   And he asked you to take notes and write down your

21  recollection of the various things as this investigation

22  proceeded, correct?

23  A.   Yes.

24  Q.   Would you agree with me that the majority of the time you

25  maintained that you don't remember what happened on those two

E.Y. - CROSS

1    nights that you testified about?

2    A.    At the time I didn't really want to talk about the whole

3    story, especially during my interviews, because I don't like

4    talking about my personal problems.

5    Q.    Okay.

6    A.    So I kind of just said I forgot.  But in reality I really

7    didn't, I just didn't want to talk about it.

8    Q.    Okay.  Did you ever take any video of you all?

9    A.    They had showed me a video the other day that I didn't

10   even know it was taken.  And I did take it in the video.

11   Q.    Okay.  Now, you indicated that you hang out -- or you did,

12   I'm referring back to that time period whenever I ask you a

13   question -- but you used to hang out at Walmart quite a bit,

14   correct?

15   A.    Correct.

16   Q.    That's where all your buddies would hang out?

17   A.    Yes.

18   Q.    You all would go up there, you would drink, correct?

19   A.    No, we did not drink at Walmart.

20   Q.    You didn't drink in the parking lot?

21   A.    Not with my friends, no.

22   Q.    On the March 17th date, and I believe that's the night

23   that you testified about something occurred in the ambulance;

24   is that correct?

25   A.    Correct.

E.Y. - CROSS

1   Q.   That night, you met Mr. Fields in the parking lot of

2   Walmart, correct?

3   A.   Correct.

4   Q.   You testified that you were intoxicated prior to him

5   getting there, correct?

6   A.   Yes.

7   Q.   Okay.  And then you indicated that -- this is just for my

8   knowledge, I guess -- you indicated that you could tell that he

9   sent the pictures or the videos or whatever to himself in your

10  phone, correct?

11  A.   Yes.

12  Q.   How do you do that?

13  A.   So, I mean, I didn't have a passcode on my phone at the

14  time, anybody could get on it.  Basically you just get on

15  Snapchat and look for the user name and send it.  And I can

16  tell like if somebody sent something overnight, and then I know

17  I wasn't about to send that, I don't want that getting out.

18  I'm not that type of person that's going to send a video like

19  that out.

20  Q.   Okay.  So the next day, I think you testified you looked

21  and you saw that he had sent it to himself; is that correct?

22  A.   Correct.

23  Q.   And you just described how you do that.  You can look at

24  the phone, you can actually tell that it was sent?

25  A.   Yes.

E.Y. - CROSS

1   Q.   Okay.  There's no way for you to determine whether or not

2   it was sent by you or by him, correct?

3   A.   Correct.

4   Q.   Okay.  It was just -- your testimony is that it obviously

5   was sent to his phone?

6   A.   Yes.

7   Q.   Okay.  There's no way for you to look on your phone and

8   tell by any type of app or anything else who took the actual

9   video the night in question, correct?

10  A.   Correct.

11  Q.   Now, you testified that -- at the outset, you testified

12  that these events occurred in late 2018 and early 2019; is that

13  what you said?

14  A.   Correct.

15  Q.   But in reality, you didn't meet Mike until March of 2019,

16  correct?

17  A.   It was before that.

18  Q.   Okay.  Where did you meet him exactly?

19  A.   At the county fire station.

20  Q.   Before March of 2019?

21  A.   Correct.

22  Q.   Okay.  And then did he add you on Snapchat or did you add

23  him on Snapchat?

24  A.   He added me by user name.

25  Q.   Okay.  Did you know him prior to doing that?

E.Y. - CROSS

1   A.   No, I didn't know who it was.  Like I had asked Jacob.

2   Q.   Were you not friends on Facebook prior to that?

3   A.   I'm not sure on that one.

4   Q.   So you don't know?

5   A.   Not on that, no.

6   Q.   And then you testified that Jacob was -- let me back up.

7        Jacob was already in the Explorers program, correct?

8   A.   Pretty sure he was in Police Explorers at the time, yes.

9   Q.   But he's how you met Mike?

10  A.   Yes.

11  Q.   You didn't meet Mike when you went out there and said,

12  hey, I'm interested in the Explorers program and I want to

13  belong to this, et cetera, and then meet Mike.  You met him

14  prior to that, correct?

15  A.   He wasn't even a part of the Explorers when I first met

16  him.

17  Q.   Right.

18  A.   I just met him because Jason had texted me and told me

19  about the fire station and that's when I met Mike.

20  Q.   And then that was -- I think your testimony was that was

21  the night that he had done the lettering, and you ended up

22  following him to drop the truck off, et cetera, correct?

23  A.   Yes.

24  Q.   Now, I'm just trying to get my head around this.  You

25  followed him in the truck that he had lettered, correct?

E.Y. - CROSS

1    A.    No.  He had drove the lettered truck out there.   I drove

2    his personal vehicle.

3    Q.    Right.  But you weren't in the same vehicle?

4    A.    Oh, no.

5    Q.    Okay.  So it wasn't something where you were forced to do

6    it, correct?

7    A.    Correct.

8    Q.    And then this conversation about you and the older man

9    that you testified about, you guys had a pretty fairly

10   substantial or lengthy discussion about why you like older men,

11   et cetera, didn't you?

12   A.    Yes.

13   Q.    Okay.  And you made it known to him that you liked older

14   men and why, right?

15   A.    Yes.  But not past 30.

16   Q.    Well, I understand.  I'm just asking you the question

17   about older men.

18   A.    Yes.

19   Q.    You also testified about your demeanor when you are

20   intoxicated.  And from what I gathered, you were saying that

21   people can't really tell when you are; is that right?

22   A.    Yeah, like my intake is different.  Like I don't stumble

23   and all that like most people do.  I just kind of relax, my

24   mind's at ease.

25   Q.    So if I were to meet you on the street and you were

E.Y.  -  CROSS

1   intoxicated, I probably wouldn't be able to tell?

2   A.   Probably not.

3   Q.   On these encounters that you had with Mike, were you ever

4   physically forced to do anything?

5   A.   No.

6   Q.   Okay.  You engaged in the activity voluntarily?

7        MS. MELTON:  Your Honor, may we approach?

8        THE COURT:  Yes, ma'am, you may.

9        (Bench conference on the record.)

10       THE COURT:  Ms. Melton.

11       MS. MELTON:  Your Honor, both of these questions, the one

12  that was just asked and answered and the one that Mr. Spedding

13  was about to pose, both involve consent, which again, the Court

14  has ruled that consent is not an issue in this case.

15       And, in fact, the Court and counsel advised the jury pool

16  during voir dire today that it was not a defense.  Therefore, I

17  think this line of questioning is irrelevant and also it

18  contradicts the Court's order about this issue.

19       THE COURT:  Mr. Spedding.

20       MR. SPEDDING:  Your Honor, the problem that I have is the

21  relevance, I think, does apply to the mistake of age.  And I

22  think that's what the in limine issue was all about.

23       THE COURT:  Two issues.  One was mistake of age and the

24  other was consent.  And I sustained as to both issues or

25  granted the motions to both issues.

E.Y. - CROSS

1          MR. SPEDDING:  When I came up here a few minutes ago,

2     that's what I was trying to get some clarification on.  Because

3     you told me not to get into any kind of legal issue or anything

4     like that.  What I'm trying to do is -- the impression has been

5     created by the United States that she was forced to do this.

6          THE COURT:  No.  I had not gotten that impression at all

7     from any of the questions that were asked.

8          MS. MELTON:  Nor the testimony that was given.

9          THE COURT:  I will sustain the objection and give the jury

10    a cautionary instruction as to force and as to mistake at this

11    time.

12         MS. MELTON:  Thank you, Your Honor.

13         THE COURT:  Thank you.

14         (Bench conference concluded.)

15         THE COURT:  Ladies and gentlemen, I have sustained the

16    United States' objection to the last questions that were posed

17    to the witness.

18         I will give you a cautionary instruction at this time as

19    to two issues.  First, on the issue of consent, consent is not

20    a defense to the specific federal charges that are pending

21    against the defendant.

22         Likewise, mistake of age is not a defense to the pending

23    charges.  And so those matters are not relevant to this

24    proceeding.  And I have sustained the objection to those

25    questions.

E.Y. - REDIRECT

1        You may proceed.

2        MR. SPEDDING:  Thank you, Judge.

3        One moment, please, Your Honor.

4        THE COURT:  Yes, sir.

5        MR. SPEDDING:  Your Honor, that's all I have for this

6   witness.  Thank you.

7        THE COURT:  All right.  Thank you.

8        I'll let counsel confer for a moment, see if we have any

9   redirect of the witness.

10       MS. MELTON:  Yes, Your Honor, I do.

11       THE COURT:  Yes, ma'am.

12                        REDIRECT EXAMINATION

13  BY MS. MELTON:

14  Q.   Grace, Mr. Spedding asked you a couple of questions about

15  the night of the 17th or the night of the ambulance incident.

16       Who gave you alcohol that day?

17  A.   On the ambulance incident?

18  Q.   Yeah.

19  A.   It was Mike from when he had gotten back from his event

20  that he went to, the FBIC event or something.

21  Q.   Earlier you provided testimony to us about your

22  recollection of what happened in the back of that ambulance.

23  And even though you said you were out of it, it sounds like you

24  could remember quite a bit; is that right?

25  A.   Like I knew -- I remember like bits and pieces from this.

E.Y. - REDIRECT

1    Q.   Okay.  What, if anything, do you remember about who took

2    the videos that night?

3    A.   I knew he had taken the videos.  I mean, I don't have

4    proof that he took them, but I know I didn't take them and he

5    had asked for my phone.

6    Q.   He asked for your phone and he started taking the video?

7    A.   Yes.

8    Q.   And then the next morning, I believe you testified you

9    also watched the video; is that right?

10   A.   Yes.

11   Q.   What, if anything, could you tell from watching the video

12   about who took it?

13   A.   I mean, the way it was angled, I mean, I was on my back.

14   I didn't really -- there wasn't really a way to tell, but I

15   mean I just kind of knew.

16   Q.   And regarding the incident on the 23rd, the EMT training

17   facility incident, who took the videos or photos that evening?

18   A.   Mike had taken them.

19   Q.   Okay.  How do you know that?

20   A.   You couldn't -- obviously my hands were in the video,

21   there's no way I could have held it.  My face was also in the

22   video.  I mean, I had no other way of taking it myself.

23   Q.   Mr. Spedding was asking you if -- when you met Mr. Fields,

24   and asked if it was in March of 2019.  You don't recall the

25   exact date of when you met him, do you?

E.Y. - REDIRECT

1    A.    No.

2    Q.    What do you remember about the weather?

3    A.    About what?

4    Q.    About the weather, when you met him?

5    A.    It was super cold outside and I'm pretty sure it was

6    snowing a little bit.

7    Q.    Mr. Spedding asked you about some of your interactions

8    with Mr. Fields, you know, seeing him in the parking lot and

9    other places.  Where were you working at the time?

10   A.    I think McDonald's.

11   Q.    Okay.  When, if ever, did Mr. Fields come visit you there?

12   A.    I don't think he ever like personally came to me, but I

13   know he had come in there one day whenever I was working.  And

14   somebody had said, well, he had said he used to come to my work

15   and just to see who I was basically.  I guess he had seen me

16   out or something, kind of figured out who I was, and I didn't

17   know him.

18   Q.    Okay.  So this is before you guys started talking on

19   Snapchat and seeing each other?

20   A.    Yeah.  I never even seen him before, but that's what I was

21   told from Jacob and a few other people.

22   Q.    During your cross-examination, I think you said that you

23   did not meet Mike through the Police Explorers program because

24   he was not doing the program when you were in it initially,

25   right?

E.Y. - RECROSS

1    A.    Yes.

2    Q.    Can you explain that to us again?  How did Mr. Fields

3    become involved with the Police Explorers?

4    A.    It was like a week before the truck pull event, or it

5    might have been that week, I can't remember exact dates, it was

6    our last meeting.

7         He had come in there, we were doing like DUI tests for

8    training.  And then they went over the details on the event we

9    were going to.  And then Saturday, that was the last time we

10   had Explorers.

11   Q.    Can you tell us -- it sounded like in your testimony

12   earlier that he had actually asked you if he could participate;

13   is that right?

14   A.    Yeah.  Like he had asked if he wanted -- if I wanted him

15   there.

16   Q.    Did you get the impression that he came to Police

17   Explorers to spend time with you?

18   A.    Pretty much, yes.

19        MS. MELTON:  That's all I have.  Thank you, Grace.

20        THE COURT:  See if there's any recross.

21        MR. SPEDDING:  Yes, Your Honor.

22        THE COURT:  Yes, sir.

23                          RECROSS-EXAMINATION

24   BY MR. SPEDDING:

25   Q.    Grace, I'm going to -- one follow-up question about the

                                                                    49
                              E.Y. - RECROSS

1    night in question.  You indicated on redirect just now that you

2    don't know for sure that Mike took them, but you know you

3    didn't; is that what you testified to?

4    A.   Yes.

5    Q.   So you never saw him take them?

6    A.   No, I've seen him take them.  I just don't have proof that

7    he took them.

8    Q.   You saw him take them that night?

9    A.   Yes.

10   Q.   Okay.  Now, on the Police Explorers issue, do you remember

11   an Officer Boswell that used to run that program?

12   A.   Yes.

13   Q.   And do you remember Officer Boswell inviting Mike to come

14   and participate in the program?

15   A.   I don't -- I didn't engage in their conversations so I

16   wouldn't know.

17   Q.   Okay.  But you wanted Mike to participate, correct?

18   A.   I didn't really care.  But I mean, personally, I didn't

19   really want anybody else there.  We had enough.

20   Q.   You didn't ask him to come?

21   A.   No.

22   Q.   Okay.

23        MR. SPEDDING:  That's all I have, Judge.  Thank you.

24        THE COURT:  Thank you.

25        Any further questions of the witness?

E.Y. - RECROSS

1          MS. MELTON:  No, Your Honor.

2          THE COURT:  All right.  Thank you, ma'am.  You may step

3    down.

4          Is this a good time to break before the next witness is

5    called?

6          MS. ROTH:  Yes, Your Honor.

7          THE COURT:  Ladies and gentlemen, we'll take about a

8    15-minute recess at the time.  Please keep in mind the

9    admonitions that you were given previously.  Please don't

10   discuss the case among yourselves while we are in recess.  We

11   will bring you back in 15 minutes.  You'll be excused to go

12   into those two rooms.

13          (Jury left courtroom at 2:10 p.m.)

14          THE COURT:  Do we have any issues to take up outside the

15   presence of the jury?

16          MS. ROTH:  No, Your Honor.

17          THE COURT:  All right.  We will be in recess for

18   15 minutes.

19          (A recess was taken from 2:11 p.m. to 2:32 p.m.)

20          THE COURT:  Thank you.  The record will reflect that all

21   members of the jury are present; defendant and counsel are

22   present.

23          We will continue now with further presentation of proof.

24   Ms. Roth.

25          MS. ROTH:  United States would call Sergeant Nathan

NATHAN LINVILLE - DIRECT

1    Linville.

2         **NATHAN LINVILLE, GOVERNMENT WITNESS, SWORN**

3         THE COURT:  You may proceed.

4         MS. ROTH:  Thank you, Your Honor.

5                        NATHAN LINVILLE

6                        DIRECT EXAMINATION

7    BY MS. ROTH:

8    Q.   Can you please tell the jury your name?

9    A.   Sergeant Nathan Linville.

10   Q.   How do you spell that?

11   A.   Nathan, N-a-t-h-a-n, last name L-i-n-v-i-l-l-e.

12   Q.   How are you employed?

13   A.   I'm employed by the City of Cynthiana as a police

14   sergeant.

15   Q.   What are some of your responsibilities as a sergeant with

16   the Cynthiana Police Department?

17   A.   Currently, I'm over patrol day shift.  I oversee a shift.

18   And at the time of this case, I was involved in the Police

19   Explorers program.

20   Q.   Can you tell the jury a little bit more about that?  What

21   is the Police Explorers program?

22   A.   It's through the Boy Scouts of America.  And it's where

23   kids of a certain age group can come in and see what we do.

24   And normally it's like a recruiting tool, people that want to

25   be cops or that are interested in the job.

NATHAN LINVILLE - DIRECT

1   Q.   And what was your role with the program of Police

2   Explorers?

3   A.   I ran it with our sergeant, Detective Alan Judy.  And we

4   had a third helper that was Officer Kyle Boswell.  So there

5   were three of us that kind of ran the program.

6   Q.   And can you just describe some of the activities that you

7   would do with the kids through Police Explorers?

8   A.   Yeah.  Just they had -- like they would come in and we

9   would do like certain parts of the job.  Kind of like the

10  academy.  We have traffic stops one day, search and seizure the

11  next, handcuffing.  Just different things kind of broken down,

12  our job broken down and just show them how we do things.

13  Q.   Did they get to do hands-on activities?

14  A.   Yes, they got to do things.  You know, like say traffic

15  stops, they would initiate traffic stops on each other and

16  stuff like that.  Some of them aren't of age to drive, so it's

17  just a staged thing.  And then they can also, with parent

18  permission, actually do ride-alongs with the department.

19  Q.   Now, at the time of this case, which I'm going to take you

20  back to early 2019, was the victim in this case -- Grace, you

21  know who I'm referring to?

22  A.   Yes, ma'am.

23  Q.   Was she a participant in the Police Explorers program?

24  A.   Yes, ma'am.

25  Q.   And that's the Police Explorers program that you helped

NATHAN LINVILLE - DIRECT

1   run?

2   A.   That's correct.

3   Q.   And can you tell me a little bit about Grace in that time

4   period?  What was she like?

5   A.   Just Grace.  You know, she's a younger girl, super

6   interested in anything law enforcement.  You know, just I would

7   consider like a shy, like a timid type of girl.

8        Other than that, you know, she was there -- I don't think

9   there's anybody else that was there at every meeting like she

10  was.

11  Q.   Fair to say that she was very involved and active --

12  A.   That's correct.

13  Q.   -- in the program?

14  A.   That's correct.

15  Q.   Are you familiar with the defendant in this case, Mike

16  Fields?

17  A.   Yes, ma'am.

18  Q.   How do you know him?

19  A.   Me and Mike were friends, have been for some time.  He

20  became a constable, I can't remember the year, but very active

21  in the community.  He was actually bringing that office back to

22  life, I felt like.

23  Q.   Let's talk about that for a minute.  What is a constable?

24  A.   I like to explain it as like a deputy sheriff, but they're

25  elected.  They can -- Harrison County's a little different.

54

NATHAN LINVILLE - DIRECT

1   They don't like them to be very active.  They don't like them

2   to do a whole lot.  But you know, they can make arrests.  They

3   can serve paperwork.

4        In the other counties, they even have cruisers with lights

5   and everything like that, and they can actually use that.  But

6   I think there were, you know, things that they didn't like a

7   constable to do in Harrison County.  And I felt like if anybody

8   at the time could bring that stuff back or be involved, it was

9   going to be Mike because he's doing a really good job.

10  Q.   You said he brought that position "back to life."  What do

11  you mean by that?

12  A.   We had a bunch of constables that didn't really, like, do

13  much.  I mean, when Mike took over he was -- he was having

14  meetings.  He would invite me to their meetings.  I think I

15  ended up making it to one.  Sometimes I just don't get the

16  phone call or text messages back to him in time.

17       But I mean, he was -- he was bringing it back up, the

18  constable thing.

19  Q.   Was he actively engaged in law enforcement-type

20  activities?

21  A.   Yes.  And that's why, you know, when he asked to come help

22  with the Explorers thing, I was like, yeah, sure, come on.

23  Q.   I want to get to that in just a minute, but I want to set

24  the stage for the jury a little bit first.

25       When you say he was out doing law enforcement-type

NATHAN LINVILLE - DIRECT

1   activities, can you give us some examples of what you mean?

2   A.   You know, as I said, he would be out sometimes in the

3   community patrolling or whatever.  I know a couple of times,

4   night shift said he had been on scene to try to help the

5   backup.

6        To explain that, it's kind of difficult to explain that,

7   because like in Harrison County, they don't really want the

8   help, but the constables are always willing to give help if you

9   needed them.  If that makes sense.

10  Q.   So he's showing up at traffic stops, he's patrolling the

11  County?

12  A.   Yes.

13  Q.   Those types of things?

14  A.   Yes.

15  Q.   Now, you mentioned when he became involved in Police

16  Explorers.  Can you tell the jury how that came to be?

17  A.   We had talked about it before and he was like, "Hey, if

18  you ever need help, let me know."  And then I think it was

19  actually the day of March 14th, he mentioned to me and asked me

20  if he could come help.  And I said, "Yeah, show up.  If you

21  like it, we can do the proper paperwork."  There's an

22  application for an adult that has to be done, stuff like that.

23  And he showed up and he helped.

24  Q.   Okay.  So you mentioned March 14th, this would be 2019?

25  A.   Yes, ma'am.  Sorry.

NATHAN LINVILLE - DIRECT

1   Q.   So March 14th, 2019, he messaged you and said, "Can I be

2   involved?"

3   A.   Yes.

4   Q.   And you said "yes"?

5   A.   Yes, ma'am.

6   Q.   And then did he become involved?

7   A.   Yes.  I believe he was at one more -- I was running late

8   to another one that he showed up to.  He was there.  And then

9   what I didn't know is that he went to a -- some kind of truck

10   pull or something like that.

11   Q.   Okay.

12   A.   That they had in another county.

13   Q.   What do you know about that event, the truck pull?

14   A.   It's -- I think they do it every year or something like

15   that.  It's like a fundraiser and groups of Police Explorers

16   show up and they'll -- they'll have a big military-style

17   vehicle and they will pull it with a rope.

18   Q.   So it's actually an event for Police Explorers?

19   A.   That's correct.

20   Q.   Specifically for them?

21   A.   Yes, ma'am.

22   Q.   You came to learn that Mike went on that trip?

23   A.   Yes.  I was in Florida at the time so I wasn't there

24   running it.  And like I said, Officer Boswell had helped, and

25   I'm assuming that it was Officer Boswell and Mr. Fields that

NATHAN LINVILLE - DIRECT

1   went.

2   Q.   Was there supposed to be anybody else attending that?

3   A.   There was supposed to be a George Rhodes, he was actually

4   a member of our program.

5   Q.   He was supposed to be another adult attending?

6   A.   Yes.

7   Q.   Did he?

8   A.   No, not to my knowledge.

9   Q.   Now, back in March, just to be clear, March of 2019 when

10  he asked to become involved in the program, was Grace a

11  participant in the program at that time?

12  A.   Yes, ma'am.

13  Q.   Did you have any idea that there was a relationship --

14  A.   No, ma'am.

15  Q.   -- between them?

16  A.   No, ma'am.

17  Q.   You mentioned this truck pull event.  Did something happen

18  around that time that led to an investigation of Mr. Fields?

19  A.   It was alleged that after that event, that -- I'm not

20  aware of who went -- but a couple of members went out to Mike's

21  house.

22  Q.   Okay.  And what was alleged to have happened?

23  A.   A party.

24  Q.   All right.  What kind of party?

25  A.   I'm not really sure, but there was supposed to be alcohol

NATHAN LINVILLE - CROSS

1   involved and multiple juveniles.

2   Q.   So that's what was originally being investigated?

3   A.   That's correct.

4   Q.   And then during that, are you aware of whether allegations

5   related to this case came to be known?

6   A.   That's correct.

7   Q.   Did you, again, have any idea of any of that conduct at

8   the time you were in charge of Police Explorers?

9   A.   No, ma'am, not before that.

10  Q.   Is there still a Police Explorers program in Cynthiana?

11  A.   No, it's been suspended.

12  Q.   Why is that?

13  A.   The chief that retired, he suspended the program until

14  further notice.

15  Q.   Was that in part due to this incident?

16  A.   Yes.  Everything that happened with all that, they just

17  suspended it.

18       MS. ROTH:   If I may have just a moment, Your Honor?

19       THE COURT:   Yes, ma'am.

20       MS. ROTH:   I have no further questions of the witness.

21       THE COURT:   Mr. Spedding.

22                        CROSS-EXAMINATION

23  BY MR. SPEDDING:

24  Q.   How are you doing?

25  A.   Pretty good.

NATHAN LINVILLE - CROSS

1   Q.   My name is Chris Spedding, I represent Mr. Fields.

2        Did you encourage Mike to get involved in the program?

3   You all -- let me back up.   You guys were buddies?

4   A.   Yes.

5   Q.   Did you encourage him to get involved in the program?

6   A.   I encouraged Mike to help with anything he could get into,

7   so....

8   Q.   Okay.

9   A.   You know, when he asked, I was like, "Sure.   You should do

10  it.   You know, if you like it, then you can do the application

11  for the adult thing."   And that's something, I mean, people can

12  do.

13       Normally it's like the parents of the kids.   And then like

14  other officers could step in and help sometimes if we needed

15  it.

16  Q.   They were kind of short-handed at the time, weren't they?

17  A.   Who is that?

18  Q.   The Explorers.

19  A.   Well, it was -- we were starting a new -- I had just taken

20  it over with a Detective Judy.   And I wouldn't say we were

21  short-handed, because we had three people, but we always

22  enjoyed having the help.

23  Q.   Okay.   Then there's some -- the age parameters for the

24  Explorers, what is it?

25  A.   They range from, pretty sure early high school age until

                    NATHAN LINVILLE - REDIRECT

1   the oldest we had was 21, possibly.

2   Q.    Okay.  Does 14 to 21 sound right to you?

3   A.    Something like that.  I would have to look at the Boy

4   Scouts of America thing.

5   Q.    So it's not something where you guys are trying to bring

6   in middle schoolers and -- I mean, targeting, for lack of a

7   better word?

8   A.    Correct.

9   Q.    In other words, there are adults that are actually

10  participating in that program as well as high schoolers, et

11  cetera, right?

12  A.    Not many.  If I recall correctly, there are stipulations

13  in reference to the age.  But the adults that participated in

14  it were chaperones, I would call them.

15  Q.    Okay.

16       MR. SPEDDING:  One moment, please, Your Honor.

17       THE COURT:  Yes, sir.

18       MR. SPEDDING:  That's all I have, Your Honor.

19       THE COURT:  Any redirect?

20       MS. ROTH:  Yes, Your Honor.

21       THE COURT:  Yes, ma'am.

22                        REDIRECT EXAMINATION

23  BY MS. ROTH:

24  Q.    I just want to clarify.  You said that most of the

25  participants were high school age in your program?

NATHAN LINVILLE - RECROSS

1    A.   In my time with the Police Explorers program, we had

2    one -- Mr. Rhodes, I mentioned earlier, we had one male

3    participant that I think was 20, but he was phased out.  It's

4    something to do with graduation and all that, like their age,

5    so....

6    Q.   I think on direct you referred to the participants as

7    kids?

8    A.   Yes.

9    Q.   Is that how you viewed them?

10   A.   Yes.

11   Q.   As kids?

12   A.   Yes.

13        MS. ROTH:  Nothing further, Your Honor.

14        THE COURT:  Thank you.

15        Mr. Spedding, anything else of this witness?

16        MR. SPEDDING:  Just one question.

17                         RECROSS-EXAMINATION

18   BY MR. SPEDDING:

19   Q.   Sergeant, you would agree with me when I refer to an

20   adult, that means anybody over 18, correct?

21   A.   That's correct, yes, sir.

22   Q.   When you use the term "kids," you're using that

23   generically, correct?

24   A.   Yeah.  If they were in the program, I would consider them

25   kids, yes.

RONALD ALAN JUDY - DIRECT

1    Q.    Okay.

2          MR. SPEDDING:   Thank you.

3          THE COURT:   Anything else of the witness?

4          MS. ROTH:   No.

5          THE COURT:   Thank you, sir, you may step down.

6          You may call your next witness.

7          MS. ROTH:   Yes, Your Honor.   United States would call Alan

8    Judy.

9          **ALAN JUDY, GOVERNMENT WITNESS, SWORN**

10         THE COURT:  All right.   Thank you.

11         Ms. Roth, you may proceed.

12         MS. ROTH:   Thank you.

13                          RONALD ALAN JUDY

14                          DIRECT EXAMINATION

15   BY MS. ROTH:

16   Q.    Can you please tell the jury your name?

17   A.    Ronald Alan Judy.

18   Q.    How do you spell that?

19   A.    Full name?

20   Q.    Both.   First and last, please.

21   A.    Okay.   Ronald, R-o-n-a-l-d, Judy, J-u-d-y.

22   Q.    All right.   How are you employed?

23   A.    I'm employed with the Cynthiana Police Department.

24   Q.    What is your job there?

25   A.    I am a detective sergeant assigned to the Bluegrass

RONALD ALAN JUDY - DIRECT

1  Narcotics Task Force.

2  Q.   Okay.  Can you tell the jury what some of your job

3  responsibilities are in that role?

4  A.   One of my responsibilities is performing the Cellebrite

5  phone extractions.

6  Q.   Okay.  And can you explain to the jury what is a

7  Cellebrite phone examination?

8  A.   Okay.  It's a tool that we have that it's almost a plug

9  and play.  It's software that's downloaded through a computer.

10  You go through and you format an area for the extraction to be

11  placed.

12      You type in the cell phone -- or the cell phone model

13  number, and it will tell you, plug this up to the computer,

14  plug this cable up to the UFED adapter, plug it to the phone

15  and then it tells you exactly what to do to the phone, what

16  buttons to push.  And then it will copy all that data to the

17  target drive.

18  Q.   I'm going to ask you some more questions about that.  But

19  can you explain, what is the purpose, why are you asked to

20  perform these Cellebrite examinations on cell phones?

21  A.   The examination copies all the data into a -- basically a

22  download, a dump.  And then you create a report in that that

23  officers can use to view the information that's on the phone

24  without changing any of the data.

25  Q.   So it basically puts the user's phone information into a

RONALD ALAN JUDY - DIRECT

1    viewable format?

2    A.   Correct, yes.

3    Q.   So you're not looking at the person's phone, you're

4    looking at a copy of information made from the phone?

5    A.   Correct.

6    Q.   You mentioned the word "extraction."  What does that mean?

7    A.   Extract or copy, it takes -- it extracts the data but it

8    leaves the original on the phone, but it will extract a copy

9    over to the other drive.

10   Q.   So when you perform one of these cell phone extractions

11   using Cellebrite, it's not erasing or taking the information

12   off of the phone that you're examining, correct?

13   A.   Correct.

14   Q.   You're just making a copy basically?

15   A.   Correct, yes.

16   Q.   Were you asked to do that process on the victim's phone in

17   this case?

18   A.   Yes, I was.

19   Q.   Did you, in fact, do that?

20   A.   Yes, I did.

21   Q.   Before we get to the process you used on her phone, do you

22   have to get any specialized training and experience to be able

23   to perform a Cellebrite data extraction?

24   A.   I am a certified Cellebrite operator, as well as a

25   certified Cellebrite physical analyst.

RONALD ALAN JUDY - DIRECT

1   Q.   What does that mean?

2   A.   You've gone through the training.  It's a plug and play,

3   but they have certifications available, and it means that I

4   went through a program designed by the company.

5        They send you cell phones, they give you different

6   activities.  There are lectures, I did mine online, I didn't go

7   to the in-person class.  And you've got exams that you have to

8   take to pass the test.  They teach you exactly how to do

9   everything.

10  Q.   And you said that you have taken those trainings?

11  A.   That's correct.

12  Q.   Did you pass the test that you took?

13  A.   Yes, I did.

14  Q.   And so you got your certification in performing this

15  process?

16  A.   Yes.

17  Q.   Okay.  And then we talked about you were asked to perform

18  this extraction on the victim's phone in this case.  Did you

19  perform that extraction using and according to the training and

20  methodology you learned from Cellebrite?

21  A.   Yes, I did.

22       THE COURT:  Ms. Roth, can I stop you for just a moment?

23  The two individuals that came in the courtroom not wearing a

24  mask, you'll need to leave the courtroom or put on the mask.

25  Thank you.

RONALD ALAN JUDY - DIRECT

```
1          Ms. Roth, I am sorry.  I apologize.

2          MS. ROTH:  That's okay.  Thank you, Your Honor.

3    BY MS. ROTH:

4    Q.   Again, did you perform that extraction pursuant to the

5    training and the methods that you learned in that training?

6    A.   Yes, I did.

7    Q.   Okay.  When did you perform that extraction on the

8    victim's cell phone?

9    A.   The extraction was April 24th of 2019.

10   Q.   Okay.  April 24th of 2019.  And I take it at that time

11   there was a police investigation happening?

12   A.   Yes.

13   Q.   Were you aware of the general nature of the allegations?

14   A.   Yes.

15   Q.   And what were those?

16   A.   That there was a -- there had been a sexual performance

17   recorded, possibly photos, videos, with a minor.

18   Q.   That's why you were getting this information from the

19   phone?

20   A.   Yes.

21   Q.   Okay.  What kind of phone did the victim have at that

22   time?

23   A.   It was an iPhone XS Max.

24   Q.   And did that phone contain a particular identifying

25   number, called an IMEI number?
```

RONALD ALAN JUDY - DIRECT

1   A.   Yes.

2   Q.   Just generally, what is an IMEI number?

3   A.   That number is a -- it's a number that's associated with a

4   specific device.  It's an identification number.  Each one is

5   unique to each device.

6   Q.   So that number is unique to that phone?

7   A.   Correct.

8   Q.   And do you have with you the IMEI number of the phone that

9   you performed the extraction from?

10  A.   Yes, I do.

11  Q.   Okay.

12       MS. ROTH:   I'm going to ask at this time if we could show

13  the witness what's already been introduced as Government's

14  Exhibit 6.

15  Q.   Do you see that on your screen?

16  A.   Yes.

17  Q.   Okay.  I would like to point up to the bottom, it looks

18  like a bar code on that picture.  What is that?

19  A.   That's the IMEI number.

20  Q.   Okay.  And I would like for you to look at it, if you

21  could, compare it to the IMEI number of the phone from which

22  you extracted data.

23  A.   It's the same.

24  Q.   It's the same number?

25  A.   Yes, the same number.

RONALD ALAN JUDY - DIRECT

1   Q.   Once you extracted the information from the phone in this

2   case, what did you do with it?

3   A.   It's run -- the physical analyzer program puts it in a

4   report format so that you can view it.

5   Q.   And then what did you do with that report?

6   A.   That was given to Detective Jett.

7   Q.   When you talk about the extraction that you performed

8   here, are there different kinds of extractions?

9   A.   Yes.

10  Q.   What kind was performed by you?

11  A.   This one was an advanced logical extraction.

12  Q.   Okay.  We'll learn more through a different witness about

13  what that means.  But it was an advanced logical extraction?

14  A.   Yes.

15  Q.   Now, once you had this report, tell us again, what did you

16  do with it.

17  A.   It got put on a drive and given to the detective doing the

18  active investigation, Detective Jett.

19  Q.   And is that so that they can review it themselves?

20  A.   That's correct.

21  Q.   Did you do any actual review of the evidence in this case

22  that was taken from the cell phone?

23  A.   Not that I recall.  I might have scrolled through just to

24  make sure, because sometimes some of the data doesn't transfer.

25  But this one was put on the same drive.  So if I did, I just

RONALD ALAN JUDY - CROSS

1   briefly looked at something.  I don't recall looking through

2   everything.

3   Q.   Was it your role to try to find evidence --

4   A.   No.

5   Q.   -- on the phone?

6   A.   No, it wasn't.  Just to get all the information off the

7   phone onto the drive into a report form so Detective Jett could

8   go through all data.

9   Q.   Just to be clear, he was the investigating agent?

10  A.   Correct.

11  Q.   So he was the one who then looked through it?

12  A.   Yes.

13  Q.   You didn't do that?

14  A.   Correct.

15       MS. ROTH:  I have no further questions, Your Honor.

16       THE COURT:  All right.  Thank you.

17       Mr. Spedding, any questions of the witness?

18       MR. SPEDDING:  Thank you, Your Honor.

19                       CROSS-EXAMINATION

20  BY MR. SPEDDING:

21  Q.   Detective, my name is Chris Spedding, I represent

22  Mr. Fields.  I just have a couple of questions or a few

23  questions.

24       How many Cellebrite extractions have you done, do you

25  think?

RONALD ALAN JUDY - CROSS

1   A.   I don't have the exact total, but --

2   Q.   Ballpark.

3   A.   Ballpark, 75 to a hundred.

4   Q.   In your experience doing all those extractions, have you

5   ever had errors occur when you download the data?

6   A.   It reports if there's a problem.  If something doesn't

7   take, it will tell you what didn't work or the file won't open.

8   Q.   Okay.  Now, when you -- sorry.  When you perform these

9   extractions, is it possible for you to manipulate any of the

10  data that's pulled off of it?

11  A.   No, it's not.

12  Q.   In an exaction, it's mirrored?

13  A.   Yes.

14  Q.   So there's no mechanism in the software that you use to go

15  in there --

16  A.   Correct.

17  Q.   -- and do anything with anything that's pulled off the

18  phone.  You just --

19  A.   That's correct.  It's a copy.

20  Q.   Okay.  And you were certified in doing this process

21  online; is that correct?

22  A.   Yes.

23  Q.   I think Ms. Roth talked about this, but you weren't able

24  to tell in your examination or your extraction, whatever,

25  anything about any transfer of data between phones, were you?

RONALD ALAN JUDY - CROSS

1  A.   I didn't go in and actually look at the report when it was

2  done.  I didn't examine that.  I just did the extraction, put

3  it into the report form and gave it to Detective Jett.

4  Q.   Okay.

5       MR. SPEDDING:  That's all I have, Judge.  Thanks.

6       THE COURT:  All right.  Thank you.

7       Anything else of the witness?

8       MS. ROTH:  No, Your Honor.

9       THE COURT:  All right.  Thank you, Detective.  You may

10 step down.  You're excused.

11      Counsel, you may call your next witness.

12      MS. MELTON:  Your Honor, may we approach briefly with a

13 housekeeping matter?

14      THE COURT:  Yes, ma'am, certainly.

15      (Bench conference on the record.)

16      MS. MELTON:  Your Honor, I just wanted to make the Court

17 aware and Mr. Spedding aware of what our plan was with the

18 demonstratives that Dr. Littrell will have.  The majority of

19 the exhibits in the demonstrative have already been admitted,

20 there's only one that has not been, and I've put in a blank

21 slide while we get that authenticated and admitted.  Of course,

22 if it's not admitted, then we won't show it.

23      THE COURT:  All right.

24      MS. MELTON:  But I talked to Lisa earlier about leaving

25 the monitors active during his testimony, because I think that

1  would be easier for everyone.  But I wanted to make sure that

2  was kosher with the Court and kosher with Mr. Spedding.

3       THE COURT:  When you say "leaving the monitors active,"

4  you mean it will stay on until we go on to another slide or

5  another photograph?

6       MS. MELTON:  Yes, Your Honor.

7       THE COURT:  Unless there's an objection?

8       MR. SPEDDING:  No.  There's no objection.

9       MS. MELTON:  And there are two points where we have to

10  leave the demonstrative to play the actual child pornography,

11  and I think during those times it would be beneficial to leave

12  it up as well, because Dr. Littrell will read the file name

13  into the record from the screen, and those items will have been

14  admitted already.

15       THE COURT:  Yes, ma'am.

16       MS. MELTON:  Okay.

17       THE COURT:  Is he the next witness?

18       MS. MELTON:  Yes, Your Honor.

19       THE COURT:  All right.  Thank you.

20       (Bench conference concluded.)

21       THE COURT:  I think we're ready to go with our next

22  witness, Ms. Melton.

23       MS. MELTON:  Your Honor, the United States calls

24  Dr. Michael Littrell.

25       **MICHAEL LITTRELL, GOVERNMENT WITNESS, SWORN**

MICHAEL LITTRELL - DIRECT

1      THE COURT:  Thank you.

2      Ms. Melton, you may proceed.

3      MS. MELTON:  Thank you, Your Honor.

4                    MICHAEL LITTRELL

5                    DIRECT EXAMINATION

6  BY MS. MELTON:

7  Q.   Dr. Littrell, can you please state and spell your full

8  name for the record?

9  A.   My name is Michael Littrell, M-i-c-h-a-e-l, last name

10 Littrell, L-i-t-t-r-e-l-l.

11 Q.   What is your occupation, Dr. Littrell?

12 A.   I'm a forensic examiner and detective with the Kentucky

13 Attorney General's Office.

14 Q.   What are your educational qualifications for that

15 position?

16 A.   I have a bachelor's degree and master's degree in criminal

17 justice from EKU, and I have a Ph.D. from the University of

18 Louisville.

19      I also have multiple cell phone and computer forensics

20 certifications through various companies and organizations that

21 offer those trainings and certifications.

22 Q.   Can you tell us about the certifications that you hold

23 that are relevant to some of the programs or the testimony that

24 you'll be providing today?

25 A.   Sure.  So the first certification that I hold is one

MICHAEL LITTRELL - DIRECT

1   through Cellebrite, which is the manufacturer of a program that

2   we use to look at cell phones.  And that certification is a

3   series of classes, and then an examination upon which you are

4   granted the certification.

5        And you do that through in class -- in-person classes, in

6   addition to testing devices and given information to cull out

7   to be able to find certain information that is tested.

8        The second certification that I have is through Magnet

9   Forensics, that is another software suite that we use.  And

10  that certification is both for computers and cell phones.  That

11  certification is a similar testing process, where you attend a

12  class and then they give you some forensic images of computers

13  and cell phones, and you find the data that's relevant to the

14  testing procedure.

15       In addition to that, I hold a couple of different

16  certifications in computer forensics, and those largely are the

17  result of many hours of class and testing process that took

18  about a year in time to go through the testing and

19  certification process.

20  Q.   Thank you.  What are your duties as a digital forensic

21  examiner with the AG's office?

22  A.   So largely my responsibilities there are conducting

23  digital forensic exams, and those are on cell phones and

24  computers.

25       So that means I take a phone in or computer in, I

MICHAEL LITTRELL - DIRECT

1    determine which type of extraction is best suited for that

2    particular device.  I then examine that data that comes from

3    the device and look at it for information related to an

4    investigation.

5         And in some cases, I provide sort of tech support for

6    agencies.  So they will bring me a device, they will go through

7    and find data and then say, hey, how did this data get on this

8    phone?  And I'll go through and look to see where that data

9    came from, where it's stored on the phone, and what that means

10   for their investigation, to help them answer questions about

11   its location on the device.

12   Q.   Can you just tell us generally, what is a digital forensic

13   exam?

14   A.   Sure.  A digital forensic exam is largely just going

15   through a forensic process that prevents us from making changes

16   to the original evidence.

17        So we bring that evidence in, make a copy of it.  And then

18   we go through that evidence, the copy of the evidence, looking

19   for information that's related to the investigation.  So if

20   it's drugs or text messages or photographs or web history or

21   locations, whatever it is as it related to an investigation,

22   then we find those things and then explain where those things

23   came in and why they come to exist on the computer or cell

24   phone.

25   Q.   As a digital forensic examiner, how often do you extract

MICHAEL LITTRELL - DIRECT

1   data from mobile devices?

2   A.   I do approximately 30 to 40 cell phones per month, in

3   addition to computers.  And those vary from time to time.  We

4   typically do three or four computers a month and then 30 to 40

5   cell phones a month.

6   Q.   As a result, are you experienced in the different methods

7   of extracting data from mobile devices?

8   A.   Yes.

9   Q.   As a digital forensic examiner, how often do you examine

10  computer systems or mobile devices with potential child

11  pornography?

12  A.   I would say that approximately 80 percent of the

13  examinations that I do are related to child exploitation

14  offenses, so be it text messages, child pornography, things of

15  that nature.  So about 80 percent of those cases.

16  Q.   Through that work, would you say that you're trained and

17  experienced in locating those types of images on mobile

18  devices?

19  A.   Sure.  There are common locations where those things are

20  located on a device.  And then there are places that users hide

21  those locations, which are also fairly common, so I tend to

22  look in those places first.  And then, you know, go through the

23  phone and try to find media or evidence that's related in other

24  places as well.

25  Q.   As you've described it to us, it sounds like a portion of

MICHAEL LITTRELL - DIRECT

1   the digital forensic exam is sort of analyzing the data

2   associated with those images, I think you said figuring out how

3   those images got on the device, et cetera.

4       Can you tell us a little more about that?

5   A.   Sure.  In some cases, you know, not only do we provide a

6   service to outside agencies, but we also have our own cases

7   that we work.  So a lot of times, you know, we need to figure

8   out how pictures got -- pictures or videos or text messages, or

9   whatever the evidence is, how it got to be where it is on the

10  device.

11      So part of that exam and part of the training and

12  experience is looking through those devices to determine how

13  the evidence got where it is.  So if it's a picture, did it

14  come from a text message, was it sent via airdrop; was it, you

15  know, emailed.

16      How did an image get there?  If it's a text message, was

17  it sent, received?  Was it read by the user?  Things like that.

18      So knowing where to look for those things and how those

19  things come to exist on the device is an important part of

20  looking through to determine what is important and what is not,

21  in terms of the value of the evidence.

22  Q.   What items did you examine for this case?

23  A.   There were two devices that I looked at for this case.

24  One was a Samsung Note 8 and one was an iPhone XS Max or

25  10S Max.

MICHAEL LITTRELL - DIRECT

1    Q.   Starting with the iPhone, which is Government Exhibit 5,

2    already admitted, was contraband located on that device?

3    A.   Yes.

4    Q.   Looking here at the screen, is this the iPhone XS Max

5    that you examined?

6    A.   Yes, it is.

7    Q.   That's the iPhone on which you located contraband,

8    correct?

9    A.   Yes, ma'am.

10   Q.   Based on your education and experience, where are iPhones

11   typically manufactured?

12   A.   Typically iPhones are manufactured in one of two places,

13   either China or India, based on the company and how they do

14   their supply chain.

15   Q.   Looking here, what's already been admitted as Government's

16   Exhibit 6, what can you tell us about this photo?

17   A.   This photo describes the model number and descriptors of

18   the particular phone, showing that this is the iPhone 10S

19   Max, silver, and 250 gigabytes, which is the size of the phone.

20   Provides the serial number and IMEI number, which are specific

21   identifiers to this specific device.  It also indicates that

22   the phone was assembled in China.

23   Q.   Thank you.  Is the IMEI number here in this photograph the

24   same as the iPhone that you examined?

25   A.   Yes, it is.

MICHAEL LITTRELL - DIRECT

1   Q.   Dr. Littrell, I'm going to ask the CSO to hand you what's

2   been previously marked as Government Exhibit 7, specifically 7a

3   through 7c.

4        Do you recognize those items?

5   A.   Yes, these are photographs of a Samsung Note 8 mobile

6   device.

7   Q.   Okay.  Whose Samsung Note 8 is pictured there?

8   A.   The defendant's, Mr. Fields', mobile device.

9   Q.   Is this one of the items that you examined?

10  A.   It is.

11  Q.   Was there contraband located on this device?

12  A.   Yes, there was.

13       MS. MELTON:  Your Honor, at this time we would move to

14  admit what's been premarked as 7a through 7c, and publish them

15  to the jury through the slide show.

16       THE COURT:  Any objection to the admission?

17       MR. SPEDDING:  No objection.

18       THE COURT:  United States' Exhibits 7a, b, c will be

19  admitted at this time and may be displayed.

20           (Government Exhibits 7a - 7c were admitted.)

21  BY MS. MELTON:

22  Q.   Dr. Littrell, while this image is up for the jury, can you

23   walk us through what's pictured there to give us some context

24  for the record?

25  A.   So the first photograph is a front of the phone.  The

MICHAEL LITTRELL - DIRECT

1    second photo is the rear of the phone.  The third picture then

2    is a closeup of that, which indicates the model number, the

3    manufactured location, and the IMEI number.

4    Q.   Is the IMEI number that is pictured there consistent with

5    the IMEI number of the device you examined?

6    A.   It is.

7    Q.   Before we talk about some of the more technical aspects of

8    your testimony today, before we discuss your examination of the

9    phones in question, I think it would be helpful for us to go

10   over some of the terms that the jury is going to hear over and

11   over again.

12       Just starting with some basics, can you help us understand

13   deleted data?  What does that mean and what happens to data

14   once it's deleted?

15   A.   Sure.  So data that lives on a -- I'm talking specifically

16   cell phones.  Data that lives on a cell phone lives there until

17   you remove it and delete it in some way.

18       When you delete that data, a couple of things can happen

19   to it.  The first thing that happens to it, and generally

20   speaking, is the pointers to that data are removed.  The data

21   still exists at rest on the device, but the pointers to it are

22   removed.

23       So it's similar to looking at a book and you remove the

24   table of contents of the book, but the information in the book

25   is still there.  I can still find the information in the book

MICHAEL LITTRELL - DIRECT

 1   that I'm looking for, just the table of contents to say to go

 2   to page 83 is missing.  So I can still see the data in some

 3   cases, but it is sort of hidden from view because the table of

 4   contents pointing to that picture or video or message or

 5   whatever it is has been removed.  So that's the first thing

 6   that happens.

 7        The second thing that happens, on cell phones

 8   particularly, is that there are a couple of processes that the

 9   phones do by their very nature, the way they are designed in

10   order to extend the life of those devices.  Those processors

11   move data around the memory chip in order to wear evenly the

12   chip.  It's a process called wear leveling.  Wear leveling is

13   the chip only has so many number of times it can be written to

14   before it's no longer good.

15        So manufacturers have said, well, if we can make these

16   chips last longer, the phones will last longer.  So this

17   process of wear leveling moves the data around on the device,

18   on the chip, in order to wear evenly the reads and writes on

19   the top of that chip.

20        So during that process, once information has been deleted,

21   moving the data around then overwrites, in some cases, the

22   deleted data.  So some data is then overwritten.

23        Once the data is overwritten, we can no longer recover

24   that data because it has been written over by new data.  So

25   those are a couple of options we have in terms of data.

MICHAEL LITTRELL - DIRECT

1        That's generally speaking with phones.  There are some

2    specifics, in terms of how deleted data is handled.  It

3    generally remains there until it's overwritten by new data.

4    Q.   So fair to say that you can recover some data -- or excuse

5    me -- recover some deleted data and not other types of deleted

6    data, depending on whether it's been overwritten?

7    A.   That's correct.  There's an additional way that data is

8    written.  So in phones, particularly depending on the phone,

9    data is written to a database.  So these databases can grow

10   larger and larger and larger.  When the data is deleted,

11   they -- sometimes the data will remain in that database and can

12   still be recovered and still be read, it's just not viewable by

13   the user.  It still exists on the device in that database, but

14   it's been told, hey, don't show this.  It's been turned off

15   maybe.

16       So then you can still see the data in the raw database,

17   but on the phone, when you look at it, you don't see it because

18   you've said, hey, I deleted this.

19       So until that process is run on the phone, that data is

20   still there.  So yes, sometimes we can recover data, such as

21   pictures and video and text messages, and sometimes we cannot.

22   Q.   So if I delete something on my phone, like pictured here,

23   you know, I, as the user, look at my phone and it's not there

24   anymore, but you could possibly see it during one of your

25   exams, right?

MICHAEL LITTRELL - DIRECT

1    A.    That's correct.

2    Q.    Next, can you generally tell us what we mean when we say

3    extraction?

4    A.    An extraction is a method in which we pull information

5    from a device, be it a cell phone or a computer.  They're

6    similar in nature in the way that we do that.  But it's pulling

7    the information from the device and bringing it onto a computer

8    where it will be examined by a forensic software.

9    Q.    Okay.  And what are the different types of extractions?

10   A.    There are three main types of extractions that we deal

11   with, and there are subtypes of each of these.  But most

12   importantly, there are three major types.

13         The first type of those is called a physical extraction.

14   A physical extraction is a copy, a bit-by-bit copy of the

15   entire chip on the device.  So this would be the entire chip

16   from the beginning to the end of it, including deleted data,

17   unpartitioned space, empty space on the phone, unused space.

18   All that data is copied during a physical extraction.

19         And the reason that's important is that on a physical

20   extraction, we are able to recover more deleted artifacts from

21   a physical extraction because we have the parts of the phone

22   where the data used to reside.  And it is still available for

23   us to recover data from, even when it's been deleted for a

24   longer period of time, and we have access to that.  So that's

25   the most complete.

MICHAEL LITTRELL - DIRECT

1          The next level of extraction, moving to the less complete

2     amount, would be a file system extraction.  And the file system

3     extraction is, if you think about a computer and you look

4     through -- you're scrolling through Windows on your computer

5     and you see all the folders, that's the file system.  It has

6     folders and subfolders.  And there's information within each of

7     those that are nested.

8          The file system extraction from a cell phone is very

9     similar to that.  You have a folder structure, and in that

10    folder structure you have nested subfolders, and those folders

11    contain all of the information that is relevant to the user of

12    the phone.

13         Now, not every -- most users can't see that stuff.  So

14    when you look on your phone, particularly an Android phone or

15    even an IOS phone, you can look at the files and you can see

16    some files that you're given permission by the developer, by

17    the software, to see, so you can see photos and documents and

18    thing of that nature.

19         But there are hidden folders that are system folders that

20    contain information that you're not privy to have access to,

21    because they don't want you to accidentally damage your phone.

22         So a full file system extraction allows us to get those

23    folders that you have access to as well as the folders that you

24    don't commonly have access to that you may not even know exist.

25    But those exist for a purpose, and that is for the

MICHAEL LITTRELL - DIRECT

1    functionality of the device, and for storage of various

2    databases and data within the phone.

3    Q.    And then -- sorry.

4    A.    That's okay.  The last level of extraction we have is

5    called an advanced logical.  This has changed names over the

6    years.  So for an advanced logical or logical extraction, that

7    is basically the data you can see on the phone when you hold

8    it.

9         So this would be your ring tones, text messages, pictures,

10   videos, internet history in some cases.  I'm trying to think if

11   there are others.  Those are the kind of things we get in an

12   advanced logical extraction.

13        Those things you commonly interact with, contact lists,

14   call logs, things like that.  So those are the things that you

15   deal with most frequently on your phone and those are what we

16   get during an advanced logical extraction.

17        Similar to that, an advanced logical is terminology that

18   we use as it relates to an Android phone.  Those also exist for

19   an iPhone.  IPhones are a little different.  Those are what we

20   call an iTunes backup.  This is very similar to when you plug

21   your phone into your computer and back it up.  You're doing an

22   iTunes backup to your computer.

23        What's allowed to be backed up during that backup process

24   are only the things that the developers want to be backed up

25   and are made to be backed up during that time.  So not all of

MICHAEL LITTRELL - DIRECT

1    the data on the phone is backed up because some applications

2    use the Cloud and they have their own Cloud in which they store

3    data or they use your iTunes Cloud to store their data in.

4         There's no sense in backing that data up to take space on

5    your computer when the Cloud -- if that data is stored

6    somewhere else.

7         So that iTunes backup is a limited backup of information

8    that the developers want to be backed up, that can be restored

9    when you plug your phone back in and restore it.  If it goes

10   bad or you buy a new phone and you want to update it, those

11   types of files are located in that particular type of

12   extraction.

13        So as we said from the top, there's the physical to the

14   logical.  And those things are least complete with a logical

15   and the most complete with the physical.

16   Q.   For any of those extractions that are listed there, how do

17   you know that the data you get in the extraction matches what

18   was on the phone?

19   A.   Sure.  So part of the forensic process is called

20   validation.  We want to validate that our tools do exactly what

21   they are supposed to do.  So oftentimes what I would do is I

22   would take my personal phone and I will do a backup, run it

23   through this process and then decode or process all of the

24   information that comes from the extraction of my personal

25   phone.

MICHAEL LITTRELL - DIRECT

1    And I'll go through the software.  And I want to say,

2  okay, these text messages are on my phone so I should expect to

3  see them in this extraction report.  These pictures are on my

4  phone, I should expect to see these here.  This data is here,

5  and I should expect to see this here.  These GPS locations or

6  where I've been, I would expect to see them here.

7    Validating the extraction and looking at that information

8  to make sure that is -- that it matches is a way that I

9  personally do it.  And the developers of the software also do

10  this to ensure that the extracted data that we get is decoded

11  into a format that is an accurate representation of the device

12  that we have seized or we're looking at.

13  Q.   What do you mean when you say "decode"?

14  A.   That's a process whereby the software scans through the

15  extraction.  When I do an extraction, I plug the phone into my

16  computer, I pull all of the data -- depending on the extraction

17  type that we have, pull all the data that's available for

18  extraction and it saves it into a file.

19    I load that file into my software, and that software scans

20  through those folders and files looking for identifiers of

21  particular files.

22    So text messages we know are stored in an SMS database.

23  So when it finds that, it begins to take that information and

24  decode it, parse it out so that it is representative of the

25  data that's in that database.  It puts it into a readable

MICHAEL LITTRELL - DIRECT

1    format that we can see.

2        So as I scroll through this database of text messages,

3    there's going to be thousands and thousands of lines long and

4    not make a lot of sense.  But if we decode that in a way that

5    allows us to look at it graphically, then we can look at it and

6    say, oh, this makes sense.  This is what it looks like on my

7    phone, and that makes sense that it is accurate and it is what

8    we would see on the original device.

9    Q.   You mentioned a couple of software programs that you use

10   to assist with extraction and decoding.  What are the different

11   software programs that you used here?

12   A.   So the two software programs used in this case were

13   Cellebrite, and Cellebrite is a company that has been doing

14   cellphone extractions for many, many, many years.  They started

15   off doing, when you would buy a new phone at a phone store,

16   they would transfer all old contacts from the old phone to the

17   new phone.  And then they got -- from there, they progressed

18   into being one of the largest companies that processes cell

19   phone extractions.

20       The other company's software that I use is Magnet

21   Forensics, that is a program called Axiom.  Axiom is a similar

22   program to Cellebrite.  But each product, each software package

23   decodes data in a similar way and pulls similar data, but some

24   report it in a way that I personally like to look at one over

25   the other.

MICHAEL LITTRELL - DIRECT

1    So it's the same data, but it's just the way that you look

2    at it, that sometimes it's nicer to look at in this format than

3    it is in this format.  So I use both of those typically because

4    together I get a nice, rounded view of the data that is coming

5    from a phone.

6    Q.   Are both of those programs considered, you know, reliable

7    and are they widely used in your field?

8    A.   Yes.  These are probably the two most widely used forensic

9    tools in the world.

10   Q.   Can you explain to us how mobile devices like the iPhone

11   XS Max and the Samsung Note communicate with one another?

12   A.   Sure.  In most cases, whatever communication is sent from

13   any of those devices to another device, it's through the

14   internet.  That would be either through the cellular internet

15   that is provided through the service provider, or through wifi,

16   if they are connected to a wifi network at their home or

17   business or some such.

18       Then that data will go through either the cellular

19   internet or through the wifi that's at their residence or

20   workplace.

21   Q.   We've already discussed Snapchat quite a lot in this

22   trial, we heard how a user thinks of it.  You know, as an

23   expert in mobile devices and someone who's trained in those

24   apps, can you tell us, what is Snapchat?  What is its purpose?

25   A.   Snapchat is an ephemeral messaging app, that just means

MICHAEL LITTRELL - DIRECT

1   that the messages are designed to disappear after a certain

2   period of time.  And those can either be set by the user or

3   they can be set by the receiver or the sender in some cases.

4   And the messages, when you send a picture or a text message,

5   they are designed that, after you read or view them, they are

6   deleted from the device and deleted from the servers in which

7   they were stored prior to them being viewed.

8   Q.   On what types of mobile devices is Snapchat available?

9   A.   Snapchat is available on Android operating systems as well

10  as the Apple IOS operating system.

11  Q.   Why would I, as a user or someone who wants to communicate

12  with someone else, why would I choose Snapchat over text

13  messaging or email?

14  A.   I think that a lot of people choose that because of its

15  ephemeral nature.  The messages disappear and there is not a

16  log kept of conversations or pictures sent back and forth.

17  Q.   Once something is deleted within the Snapchat app, you

18  told us it kind of disappears after a certain period of time,

19  right?

20       Is the data associated with that text message or that

21  picture or video still on the device?

22  A.   Sometimes it is and sometimes it is not.  It depends on

23  the settings of the user.  So in some cases, users can choose

24  to save their messages for 24 hours or for a period of time or

25  indefinitely.  In some cases, users choose to allow them to

MICHAEL LITTRELL - DIRECT

1    expire, thus they are deleted.

2         Depending upon which of those settings is in place

3    determines whether that data will be recoverable or not.

4         In some cases, we will sometimes find Snapchat photos and

5    videos that have remained on the device and sometimes not.

6    Again, depending.  There's a lot of factors that go into if

7    they are still available on a device or not.

8    Q.   Earlier in your testimony you talked about data being

9    stored on the device versus in the Cloud.  Does Snapchat have

10   any type of Cloud storage?  Or an even more simple question,

11   does Snapchat keep your data?

12   A.   Snapchat stores communication logs on their servers as

13   well as the communication itself.  So they will store the

14   pictures and videos and messages on their server until such

15   time that the user views them.  Once the user views the data,

16   then the data is deleted from their server as well.  They do

17   maintain some logs of that data, but by and large, most of that

18   data is discarded.

19   Q.   So in this case there were a lot of Snapchat messages

20   between Mr. Fields and the victim, and that information was not

21   preserved by Snapchat.  Based on your education and your

22   experience, is that unusual?

23   A.   No, that's perfectly normal.  In most cases -- we do

24   Snapchat warrants out of an abundance of thoroughness; but in

25   most cases, we get nothing in return from them as a result of

MICHAEL LITTRELL - DIRECT

1    issuing search warrants to them.

2    Q.   Because once it's viewed by the user, Snapchat gets rid of

3    it as well, right?

4    A.   Sure.   Right.

5    Q.   If two people in Kentucky communicate through Snapchat,

6    can you explain how that data gets from one user to another?

7    A.   Sure.   So, for example, I wanted to send you a Snap

8    message.   I would send that message, then it would go to the

9    servers of Snapchat which are stored all over the country,

10   primarily in California is where they are headquartered.   The

11   message is stored there until you open it.   Once you open it,

12   then again that message is then deleted.

13        So it travels the internet from my device to the server,

14   and then from their server to your device, where you receive a

15   notification.   And then you open it.   And then your device

16   communicates back with their server to view it.   And then it

17   disappears.   Or if you choose to reply, then the reverse

18   happens.

19   Q.   Where did you say their servers are typically located?

20   A.   California, they are located in California.

21   Q.   Talking about the iPhone XS Max in this case, can you

22   tell us how that device or its data came to your office?

23   A.   Yes.   So the Cynthiana Police Department, Detective Jett,

24   had contacted me asking for -- if we could conduct a couple of

25   exams on a couple of devices.   So he brought this phone to our

MICHAEL LITTRELL - DIRECT

1    office to be examined.

2    Q.   What was your understanding of why your services were

3    needed?

4    A.   They had done a prior Cellebrite extraction on an iTunes

5    backup extraction on this device, and they expected to locate

6    more data but were unable to -- but the data wasn't there.  So

7    they wanted to see if we had the capability of extracting

8    additional data, more data than they were able to get from the

9    iTunes backup.

10   Q.   Can you remind us where, in terms of those three different

11   types of extraction, the iTunes backup ranks in terms of

12   completeness?

13   A.   Sure.  It is the lowest level of completeness in terms of

14   the level of data that you get.

15   Q.   Okay.  So it's not common that the iTunes backup is not

16   going to show everything on the phone?

17   A.   That's correct.  Because, again, it's only the folders and

18   file system information that is allowed by the developers to be

19   recovered or to be backed up during that process.

20   Q.   Tell us about the extraction that you performed.

21   A.   So I did a full file system extraction on this device,

22   which means that I was able get all of the files and folders as

23   it relates to all of the user data and all of the additional

24   files and folders on the device, including the health database,

25   the email database, significant locations database, which are

MICHAEL LITTRELL - DIRECT

1    typically unavailable for any type of backup.  So the

2    extraction was what we call a full file system extraction that

3    allows us to get, again, all the data on the device.

4    Q.   All right.  Can you tell the jury what they are looking at

5    here?

6    A.   This is a screen shot of Magnet Axiom.  This is just an

7    overview of what I see when I open up the software.  So on the

8    left side, it indicates the types of evidence, the types of

9    artifacts that have been recovered.  By "artifacts," I just

10   mean bits of data that are related to a specific thing on the

11   phone.

12        And so you see, you know, Google searches, and web pages,

13   and web chats.  You see chat messages.  Media, which will be

14   pictures and videos.  Email.  Documents.  And then operating

15   system functions, like how the user interacts with the phone,

16   that sort of thing.

17        The little window shows me sort of a list view of those

18   items.  And then the right side is the details view pane.  It

19   kind of gives me the details, which will give me dates, times,

20   file sizes, things of that nature that may or may not be

21   important to a particular file.

22   Q.   So when you were telling us earlier that these software

23   programs will extract and then decode the data to make it

24   readable to you, is this a representation of what you were

25   talking about?

MICHAEL LITTRELL - DIRECT

1   A.   Yes.   There is what -- how this software package presents

2   that data to the user so that we can go through and find what

3   we're looking for.

4   Q.   What did the extraction of the iPhone reveal?

5   A.   So the extraction of the iPhone found more than 600,000

6   different types of artifacts.   Those are broken down into more

7   than 12,000 chat messages, 243,000 media, 128,000 web-related

8   artifacts, internet history, things of that nature.

9        So there was quite a bit of data recovered and decoded by

10  the software in this particular case.

11  Q.   What did you do after you had performed your extraction

12  and the data was decoded?

13  A.   So as is typical for these types of cases where I am not

14  the investigator in the case, I will put the information into a

15  package.   And that package is just a software package that I

16  can give back to the investigator, who can then go through and

17  find and look for information that's related to his

18  investigation or her investigation.

19       Because I don't know who victims are a lot of times or

20  who -- what messages are important or what words are important

21  to investigations, because I don't know what those things are,

22  I will give these back in a way that allows the investigator to

23  go through and find messages of importance or photographs of

24  importance to their investigation.

25       Once they do that, they will come back to me and say, hey,

1  Mike, I found these things, can you explain why they are here,

2  where they came from.

3  Q.   All right.  So aside from providing the investigating

4  officer a package in this case, what else, if anything, did you

5  do with the data from this iPhone?

6  A.   So in this case there was some photos that were identified

7  located in a specific folder that were important to the

8  investigation.  And so I went back in and looked at those

9  particular photographs and videos to determine the nature of

10  those photographs, where they came from, that sort of thing.

11  Q.   You mentioned a folder that was of significance.  Can

12  you -- is that the media/DCIM that we see there?

13  A.   It is.  DCIM is a digital camera image folder.  That is a

14  typical location where you would find photographs or videos

15  that are taken or modified or saved by the user of the device.

16      Then we can look at the pictures or videos more

17  specifically to determine if they were taken by that phone or

18  by another phone or just stored in those folders.  Maybe they

19  were received by text messages or some such.  We can look at

20  them more specifically, but this folder is typically where a

21  user stores those particular photos and videos.

22  Q.   So typically if something is in this folder, it was either

23  created by that phone or it was modified by that phone?

24  A.   That's correct.  There are dozens of these folders,

25  subfolders in these things that are in various locations on the

MICHAEL LITTRELL - DIRECT

1    device for a way in which photographs got there.  So if they

2    were, say, from Snapchat, say from somewhere else, they are

3    stored in various locations.

4    Q.   We got an image here on the slide that shows some

5    different folders.  And you mentioned some folders in the file

6    system earlier.  Is that what you meant by that?

7    A.   Yeah.  So if you look here, talking about the file system,

8    we see you start with user, which is the folder there.  And

9    under that, we have applications and documents.  It looks just

10   like a computer would if you were looking through your computer

11   folder.  You'll have my documents and my pictures and that sort

12   of thing.  So it's very similar in that, that we see on a

13   phone.

14   Q.   Dr. Littrell, I'm going to ask the CSO to hand you what's

15   been admitted as Government Exhibit 2.

16   A.   Thank you, sir.

17   Q.   Dr. Littrell, do you recognize this item?

18   A.   Yeah, there is a CD or DVD made of photographs from the

19   case.

20   Q.   And I think I actually neglected on the last slide to ask

21   you what we mean over here when we say five videos and two

22   photos on March 24.  Can you explain those items to us?

23   A.   So there were five videos and two photos that were located

24   in the DCIM folder, that digital camera folder, that were

25   associated with the date of March 24, 2019.

MICHAEL LITTRELL - DIRECT

1   Q.   Is that what is contained on that disk, Government

2   Exhibit 2?

3   A.   Yes, it is.

4   Q.   How do you know that's what is on that disk?

5   A.   This disk was created from the extractions, and then was

6   verified to make sure that it is the exact same thing that is

7   in evidence.

8   Q.   And how did you verify that?

9   A.   By viewing those.

10  Q.   Did you initial it?

11  A.   I did.

12  Q.   So that we don't have to take disks in and out of the

13  laptop and take 15 minutes between disks while it loads, we've

14  copied the contents of that disk onto our desktop.

15       Have you also verified that the folder on that desktop

16  that we're using for this trial matches exactly what's in

17  Government Exhibit 2?

18  A.   Yes.

19       MS. MELTON:   If we can pull up the Exhibit 2 folder?

20  Q.   Dr. Littrell, do you see the folder there?

21  A.   No, white screen.

22  Q.   So, Dr. Littrell, at this time we're going to publish the

23  visual depictions that are there on Government's Exhibit 2.

24       Starting at the top of this folder, could you read the

25  first file name into the record, please?

MICHAEL LITTRELL - DIRECT

1   A.   Yes, it's IMG_4004.

2   Q.   We're going to open it, Doctor.  When we open it, can you

3   tell the duration of the video and describe for the written

4   record that particular video while it's playing?

5   A.   Yes.  It's 41 seconds.  And it is a picture of a female

6   who is bent over and a male who is penetrating the anus of that

7   female with his fingers.

8        Now it's showing the girl's face or the side of her face,

9   she's bent over a desk or some such.

10  Q.   What color shirt is she wearing there?

11  A.   Wearing a pink shirt.

12       Now the person is performing oral sex on the anus of the

13  individual, the female, in the photograph -- or, I'm sorry, in

14  the video.

15       MS. MELTON:  I do apologize.  The sound was not on for

16  that one, we are not going to replay it.  But, Your Honor, we

17  will be turning the sound on for the remaining videos.

18  Q.   Dr. Littrell, moving on to the next video in the folder,

19  could you read that file name into the record?

20  A.   It's IMG_4005.

21  Q.   Again, when we open it, could you please tell us the

22  duration of that video?  And please describe for the written

23  record what is occurring in the video as it's playing.

24  A.   This one is 38 seconds, it is a male who is wearing a

25  condom on his penis, and he is penetrating the vagina of a

100

MICHAEL LITTRELL - DIRECT

1    female.  It shows the same pink shirt the female was wearing

2    and it shows her face.  Again, she's on a desk or a table.

3    Q.   Moving on to the next video here, Dr. Littrell.  Can you

4    read that file name into the record for us?

5    A.   Yes.  IMG_4006, which is also a video.

6    Q.   Again, could you describe how long the video is and what

7    the video is as it's playing?

8    A.   It's 48 seconds in length.  It is a male performing oral

9    sex on the vagina of a female.

10   Q.   Dr. Littrell, are we able to see any part of the male's

11   face in that video?

12   A.   Yes.

13   Q.   Before we talk about those two picture files there, I

14   would like to get the videos out of the way first.  So could

15   you tell us the next video file on that folder?

16   A.   Next video file is IMG_4010.

17   Q.   Again, could you tell us how long the video is?  And

18   please describe what is occurring.

19   A.   Sure.  It's -- I didn't see the time on there.  I believe

20   it said it was 50 -- maybe it was not -- it looks like it's 30

21   seconds long, it is a male penetrating the vagina and the anus

22   of a female.

23   Q.   Were you able to see any other identifiers in this video

24   as you were watching it?

25   A.   You can see a pink shirt, which was the pink shirt that

MICHAEL LITTRELL - DIRECT

1   was worn in the other.  You can also see the table, desktop

2   there as well.

3   Q.   And then moving on to the next video file and the folder,

4   can you please read the name of that file into the record?

5   A.   Yes, IMG_4011.

6   Q.   Again, if we open it, can you give us the duration of that

7   video and please describe what is occurring?

8   A.   It's 15 seconds long and it is a finger penetrating the

9   anus of a female.

10  Q.   Looking at the first JPEG item in that folder, can you

11  please read that file name into record?

12  A.   Yes, it's IMG_4007.

13  Q.   Just to clarify for the record, what type of file is this?

14  A.   That's an image file, a photo.

15  Q.   Can you please state for the written record what is

16  depicted there in that video -- or, excuse me, that picture?

17  A.   The picture is of similar nature of the video where a male

18  finger is being inserted into the vagina of a female.

19  Q.   And looking at the next image file there in Government

20  Exhibit 2, can you read that file name into the record, please?

21  A.   Yes, IMG_4008.

22  Q.   Can you please describe what is depicted in that picture?

23  A.   Yeah, it's a similar picture of the other, with an adult

24  male finger in the vag -- stuck in the vagina of a female.

25  Q.   Thanks.

MICHAEL LITTRELL - DIRECT

1          MS. MELTON:   You can go back to the PowerPoint.

2     Q.   Dr. Littrell, while we're pulling that up, all of the

3     images that we just viewed occurred or were created on the same

4     day, according to your examination, correct?

5     A.   Yes.

6     Q.   What else, if anything, did your examination reveal?

7     A.   I believe that some of the videos contained not only dates

8     and times, but also additional information related to the GPS

9     location of the photograph or the video.

10          And when you take a picture with a device, with a mobile

11    device, if you have location services turned on, it also

12    captures as part of that data the location of where the picture

13    was taken.  So that way you can see it on a nice map or

14    whatever, but it keeps that data stored in that picture as

15    well, or video, as the case may be.

16    Q.   Dr. Littrell, I'm going to hand you what's been premarked

17    as Government Exhibit 10.

18          Do you recognize that document?

19    A.   Yes.  This is screen shots of the Magnet Axiom program

20    that depicts the image files that we just looked at.

21    Q.   Is the information in that document the EXIF data that you

22    just told us about?

23    A.   Yes, there is EXIF data on the picture.  It has the file

24    name, the size, the date, and time that the photo was created.

25    The make and model, software version of the phone that took the

MICHAEL LITTRELL - DIRECT

1   picture, as well as the latitude and longitude of the GPS

2   locations.  And also contains some digital hash information of

3   the photo, as well as the location on the device.

4   Q.   And for what images is the EXIF data listed there?

5   A.   There is IMG_4007 and IMG_4008.  Those are both

6   photographs that we just viewed a moment ago.

7        MS. MELTON:  Your Honor, at this time we would move to

8   admit what's been premarked as Government Exhibit 10 and

9   publish that to the jury through the slide show.

10       MR. SPEDDING:  No objection.

11       THE COURT:  Exhibit 10 will be admitted.  It may be shown

12   to the jury.

13            (Government Exhibit 10 was admitted.)

14   BY MS. MELTON:

15   Q.   Dr. Littrell, you've added some sort of highlights there

16   on Government Exhibit 10 for us.

17       Can you tell us what we're seeing in the red boxes there?

18   A.   The red boxes are the date and time of the photograph.

19   Q.   What is the date and time for IMG_4007?

20   A.   I'm looking on the paper here, it's more clear.  March 23,

21   2019, at 2243 hours.

22   Q.   How about the date and time data for IMG_4008?

23   A.   Same date of March 23rd, 2019, at 2243 hours.  There's a

24   one-second difference between photograph 4007 and photograph

25   4008, one second apart.

1   Q.   And then moving on to the green boxes.

2        What can you tell us about those?

3   A.   Those are the GPS coordinates that are associated at the

4   time that the picture was taken.  So it would be the location,

5   the physical location on the planet where the person was when

6   the picture was taken.

7   Q.   Back when we first started talking about this iPhone in

8   more detail, you told us that before the phone came to you,

9   that there had been an iTunes backup extraction with

10  Cellebrite; is that right?

11  A.   That was my understanding, yes.

12  Q.   I believe you said that that extraction just revealed one

13  image and the investigator expected more; is that right?

14  A.   Yes.

15  Q.   Okay.  Was that one image, that had previously been found

16  in your extraction or in the data from your extraction?

17  A.   I do not believe that the picture was located in my

18  extraction.

19  Q.   Is that uncommon based off your education and experience?

20  A.   It's not uncommon, particularly if the picture had been

21  deleted or was a deleted photo.  Because with that process of

22  wear leveling where data is moved around, data from one

23  extraction could have been overwritten by the time the next

24  extraction was done, and therefore would overwrite any

25  potentially deleted data that existed on the device at the

MICHAEL LITTRELL - DIRECT

1   time.

2   Q.   Thank you.  Moving on to talk about the Samsung Note 8,

3   can you tell us how that device or its data came to your

4   office?

5   A.   That device, similar in nature to the iPhone, was

6   brought to me by Detective Jett, who was looking to get

7   information from the phone.  Because the phone was passcode

8   protected and they did not know the passcode, they understand

9   that we have some capabilities that some forensic labs do not

10  have to bypass the passcode.  So he brought those phones to see

11  if I could help with that phone as well.

12  Q.   What ultimately did you do with that phone?

13  A.   So that phone was eventually sent off to the Secret

14  Service laboratory in Cleveland.  They have a Cellebrite

15  premium service, which is an additional paid service that

16  allows access to and a physical extraction of locked Samsung

17  devices.  And that lab was able to perform -- get the passcode

18  and unlock the phone and perform that physical extraction.

19  Q.   And once you received the data back from the Secret

20  Service, were you able to ascertain the type of extraction that

21  was performed?

22  A.   Yes.  So when the extraction is performed, there is a

23  series of folders created and some logs that are created.  In

24  looking at those logs, the type of extraction that was done in

25  this case was what we call a physical advanced bootloader,

1   which is just a type of -- a subtype of the physical

2   extraction.

3        And that extraction allows, again, a full physical file

4   extraction of that device, which allows us to get all of the

5   data, deleted data, unpartitioned space of the phone.

6   Q.   We viewed a picture of this phone earlier.  Is this the

7   cellphone that you received that physical bootloader for?

8   A.   Yes.

9   Q.   And how is the physical bootloader extraction performed?

10  A.   So there is a -- on the phone, just like on a computer,

11  when you turn on your phone, it boots up and it shows you,

12  like, the logo of the company.  So it will show an apple, if

13  it's an iPhone.  Show the Android or Samsung logo.  It may even

14  show like T-Mobile or AT&T.

15       That process is known as the boot process.  That is just

16  like a computer, is booting up the phone, preparing it for use.

17  So it's loading files into memory and it is preparing a bunch

18  of things, unlocking the phone, decrypting the phone if it's

19  encrypted.  Performing those types of functions in your ease of

20  use in the phone.

21       So what the physical bootloader does is it loads a copy, a

22  new copy of a bootloader to that phone without affecting the

23  user section of the phone.  The phone is partitioned off into

24  various sections.

25       And so the boot partition, what we do is we overwrite the

MICHAEL LITTRELL - DIRECT

1    partition that is on that particular device, which allows us to

2    bypass the passcode and perform the extraction of the device

3    and recover the passcode.

4        Once that's done, the original bootloader is restored to

5    the phone so it's in its original condition.  But that bypass

6    process allows us to then access all of the data that was

7    locked in the phone behind the passcode.

8    Q.   And then what did you do use to decode the data?

9    A.   For this particular phone, for Android phones, I like to

10   use Cellebrite.  So I put that into the Cellebrite software to

11   decode it so that Detective could take a look at it and see

12   what information he was looking for.

13   Q.   And did you similarly provide Detective Jett with a

14   package like you told us about earlier?

15   A.   So in this case I provided him with a Cellebrite reader

16   package, it's a very similar package of the Axiom software.  It

17   breaks down, as you see here on the screen, a view of how -- of

18   what we can see and how it decodes the different data.  It's

19   very similar in nature to the Axiom software, but I think it

20   does a better job with the Android phones.

21   Q.   Can you tell us what you and Detective Jett found on the

22   Samsung Note 8?

23   A.   Right.  Again, so I provided that information or provided

24   the extraction to Detective Jett, who looked through it and

25   found some photographs on the phone that were -- I believe

MICHAEL LITTRELL - DIRECT

1    there were 19 photographs on the phone.  And those photographs

2    were thumbnail images, cache images on that particular device.

3    And they were located in a location on the phone that was

4    related to a calculator app.

5         And a calculator -- in this case, the calculator app is an

6    app that gives the user the ability to hide or conceal those

7    photographs from a casual user of the phone.

8    Q.   We'll dissect that more in a second.  We see here in those

9    two red boxes smart.calculator.gallerylock.

10        Is that related to the app you were just telling us about?

11   A.   That's correct.  So the way the file system stores these

12   different apps is the way you see it there, the

13   smart.calculator.gallerylock.  And then it was stored in the

14   cache folder, which means it was a temporary storage location

15   for this particular piece of software.

16   Q.   Tell us about the smart calculator app that you were just

17   describing.

18   A.   So the Smart Calculator app, according to their app page,

19   calls itself the best calculator photo vault to hide your

20   photos.  You can hide private photos.  You can put them behind

21   a pin code and have a secret photo vault which is encrypted in

22   which all of the photos or videos can be stored.  And it can be

23   used as a calculator.

24   Q.   So how does it work for a user?  So it looks like a

25   calculator to a user, right?

MICHAEL LITTRELL - DIRECT

1    A.    That's correct.

2    Q.    And then you open it and you put a pin into the

3    calculator, I guess?

4    A.    You put a pin into the calculator and then press the

5    deactivation key, sometimes it's the equals key or the percent

6    key or something, and it will unlock that app, giving you then

7    access to a series of hidden folders that are inside of that

8    particular app.

9    Q.    What data, if any, did you find that was associated with

10   the Smart Calculator app on this particular phone?

11   A.    So on Android devices, settings or preferences are stored

12   in what we call an XML format.  And this is just sort of a way

13   that the software stores information for use for processing.

14        And in this case, we could see the email address

15   associated with the registration on this account, which was the

16   VW_man72@hotmail.com.  We also see that that was the user name

17   as well.  And then we see a password of 5977, which would have

18   been the pin code used to unlock this particular app to access

19   the hidden folders beneath.

20   Q.    This screen shot shows that email address,

21   VW_man72@hotmail.

22        Was that email associated with anything else on the device

23   that you saw?

24   A.    That email was found in various locations on the device,

25   including the email -- the email application, as well as

MICHAEL LITTRELL - DIRECT

1    various user names for various accounts that were located on

2    the device.

3    Q.    What can you tell us about that pin code, 5977?

4    A.    The pin code 5977 was also the same pin code that was used

5    to secure the phone itself.  So the passcode that was recovered

6    during that bootloader extraction process was 5977 as well, so

7    those number match.  The same number used to unlock the phone

8    was the same number you use to unlock this application.

9    Q.    So the user or owner of this Samsung Note 8 when they pick

10   their phone up and they go to unlock it, they put in 5977, and

11   then they also use 5977 for the Smart Calculator, right?

12   A.    Yes.  That's possible, yes.

13   Q.    So we've talked about the Smart Calculator.  You also

14   mentioned something about a cache.  What is a "cache"?

15   A.    So a cache is a temporary storage location for photographs

16   and videos.  In some cases, it allows for quick access.  In

17   some cases, it allows for thumbnail views, which is just a

18   small picture.

19       So when I look at my hidden folder app and I want to look

20   at the photographs or videos that are inside there, they are

21   going to show me a small thumbnail so I know what the content

22   of that picture is.  Just when you look at your phone or

23   looking through your photo album, it doesn't show you a

24   full-size picture, it shows you a small picture.

25       Well, not only is the full-size picture stored on your

MICHAEL LITTRELL - DIRECT

1    phone, but also the small thumbnail picture is also stored on

2    your phone because those are two different sized photographs

3    and those are stored in different locations.

4        So the cache location stores recently used or recently

5    accessed photographs or videos, and it stores just a thumbnail

6    image of those so the user can see those when they go into

7    their application.

8    Q.   Explain to us how this cache location or this notion of

9    cache came into play in this case.

10   A.   So the cache location came into play because when we look

11   at the photographs that Detective Jett and I found on the

12   device, they were located inside of that cache.  So some

13   investigation into what application that cache folder was

14   related to led me back to examining the calculator application.

15       In doing so, I was able to locate some images and video

16   folders that had once existed underneath that particular

17   application.

18       And so in this case, as we see here, inside we saw a

19   Facebook folder, which was deleted but not overwritten, so it

20   means that the folder was deleted, but yet we still have some

21   information about that folder because it had not yet been

22   overwritten by new data, so we could still recover it.

23       We could see the pictures folder, which was deleted and

24   overwritten.  We could see the screen shot photo which was

25   deleted and overwritten.  And we can see the Snapchat folder,

MICHAEL LITTRELL - DIRECT

1   which was deleted but not overwritten as well.

2        So those were folders that at one point existed inside of

3   that calculator application, they can be in the default folders

4   or folders created by the user.

5   Q.   So fair to say that the folders where the photos were

6   originally stored, those were deleted but you were still able

7   to see those images in the cache folder?

8   A.   That's correct.

9   Q.   Okay.

10  A.   Yes.

11  Q.   You mentioned here in this slide in your testimony that

12  some of those items were deleted.

13       Were you able to tell when they were deleted?

14  A.   In some cases, if they had not been overwritten, I was

15  still able to recover from the database when those folders were

16  deleted.

17       So, for example, in this photo that you're looking at, or

18  screen shot rather, the Facebook application or Facebook folder

19  was deleted -- we can see the created date first, which was

20  9/29 of 2018.  We can see that it was deleted on 4/16 of 2019.

21  And then the Snapchat folder we can see was deleted on 4/22 of

22  2019.

23  Q.   But since the other two were overwritten, the pictures and

24  the screen shot, you were not able to tell when those were

25  deleted, right?

MICHAEL LITTRELL - DIRECT

1    A.    That's correct.   I was unable to recover from the database

2    because that information had been overwritten.

3    Q.    I think you said 19 photos that you found in the

4    calculator app, how many of those were related to the charges

5    that we're here to discuss today?

6    A.    There were -- I'm trying to remember.   I don't remember

7    the number that was in there, there was -- I don't recall the

8    number exactly that was in there.

9    Q.    Well, I will ask you again, because we're going to talk

10   about the -- some of EXIF data associated with those images

11   before we introduce those to the jury.

12        What were you able to tell from the EXIF data of the

13   images that you found in the app that were related to this

14   case?

15   A.    So the pictures that were located there appear to be

16   either screen shots or thumbnail images of the originals.   And

17   those have a created date of when they were either originally

18   created or where they were created inside of that folder, so

19   when they were saved inside of that particular folder.

20        Even though the folder is gone, we can still see the

21   thumbnail was created at the same time that the original

22   picture would have been created, so those two dates would

23   match.

24   Q.    We're going to show these in a moment.   But it looks like

25   the exhibits have been kind of divided up by date.   Can you

MICHAEL LITTRELL - DIRECT

1   tell us the date for Government Exhibit 3a there?

2   A.    That would be 3/17 of 2019 at 4:40 a.m.

3   Q.    And then looking at the EXIF data associated with the

4   exhibits in Government Exhibit 4, can you read into the record,

5   starting with Government Exhibit 4a, the created date?

6   A.    So the March 24th, 2019, at 8:01:28 a.m.

7   Q.    What about 4b?

8   A.    March 24th, 2019, at 8:01:30 a.m.

9   Q.    And 4c?

10  A.    Would be March 24th, 2019, at 8:01:30 a.m.

11  Q.    4d?

12  A.    March 24th, 2019, at 8:01:30 a.m.

13  Q.    And then 4e?

14  A.    March 24, 2019, at 9:36 a.m.

15  Q.    So when we were looking at the EXIF data from the iPhone

16  earlier, I believe it was Government Exhibit 10, it had a date

17  of March 23rd, but here we see created dates of March 24th.

18       Can you explain that?

19  A.    Sure.  So as I said, those pictures of the thumbnails were

20  created at that time, so there was either one of two

21  explanations.  One would be that that was the date that the

22  picture was copied to that particular folder, or it was the

23  date that the user opened that picture or accessed that

24  picture, so whereby a thumbnail would be created in that cache

25  folder.

MICHAEL LITTRELL - DIRECT

1     So that creation date has to do with the access of the

2   picture within that application, not the original created date

3   of the original media.  Because this isn't the original media,

4   this is just a thumbnail or copy of that image stored in the

5   cache temporarily.  So those dates and times would differ from

6   the original date and time of the original media.

7   Q.   And then similarly, if you and I were sending pictures to

8   one another and you sent me a photograph, and rather than

9   saving it, I just took a screen shot of it, would the EXIF data

10  on my screen shot be different than the data associated with

11  the photo that you sent me?

12  A.   Yes.

13  Q.   Dr. Littrell, I'm going to ask the CSO to hand you what's

14  been marked -- excuse me, premarked as Government Exhibit 3.

15       THE COURT:  Ms. Melton, before you continue, I don't know

16  if any of our jurors need to take a break.  We've been at it

17  about an hour and a half now.  I'm planning to go about another

18  30 minutes at least this afternoon.

19       Does anyone need to take a break right now?

20       We'll take about a 10-minute recess before we go to the

21  next exhibit.  Well, let's take 15 minutes.

22       Please keep in mind the admonitions that you were given

23  previously not to discuss the case among yourselves while we

24  are in recess.  The jury will be excused for 15 minutes.

25       We will be in recess for 15 minutes.

MICHAEL LITTRELL - DIRECT

1          (Jury left courtroom at 4:10 p.m.)

2          THE COURT:  Thank you.  Any matters to take up outside the

3  presence of the jury?

4          MS. MELTON:  No, Your Honor.

5          THE COURT:  We will be in recess.

6          (A recess was taken from 4:11 p.m. to 4:26 p.m.)

7          THE COURT:  Thank you.

8          The record will again reflect that all members of the jury

9  are present, the defendant and all counsel are present as well.

10         We were on direct examination of the witness, I'll remind

11  him that he is still under oath, of course.

12         And, Ms. Melton, you may continue.

13         MS. MELTON:  Thank you.

14  BY MS. MELTON:

15  Q.   We did hand you Exhibit 3, right?  Okay, great.  Do you

16  recognize that item?

17  A.   Yes, this is a disk created with photographs mentioned in

18  this slide on them.

19  Q.   Now, what does the disk contain?

20  A.   Photographs from the evidence that's on the slide here.

21  Q.   From 3/17; is that correct?

22  A.   Yes, that's correct.

23  Q.   How do you know what's on that disk?

24  A.   It was viewed and initialed.

25  Q.   That disk contains, just to be clear, a picture from 3/17

MICHAEL LITTRELL - DIRECT

1  in the defendant's phone; is that correct?

2  A.   That's correct, yes.

3  Q.   Okay.

4       MS. MELTON:   Your Honor, at this time we would move to

5  admit Government Exhibit 3, and we will also be publishing it

6  to the jury shortly.

7       THE COURT:   All right.   Any objection?

8       MR. SPEDDING:   No objection.

9       THE COURT:   Exhibit 3 is admitted.

10          (Government Exhibit 3 was admitted.)

11 BY MS. MELTON:

12 Q.   At the risk of being redundant, Dr. Littrell, again so we

13 don't have to take the disks in and out, we have copied what is

14 on Government Exhibit 3 onto the desktop of our trial laptop.

15      Did you verify the contents of that folder as well to

16 confirm that it matches Exhibit 3?

17 A.   Yes, that's correct.

18 Q.   So looking at the file that's there, can you just, it

19 should be pretty simple, read that for us?

20 A.   Yes, GX3a.

21 Q.   And when we open that image, I'm going to ask you to

22 describe what is pictured there.

23 A.   This is a picture of a penis wearing a condom inserted

24 into the vagina of a female.

25 Q.   Going back to the folder there, just so we've got a clear

MICHAEL LITTRELL - DIRECT

1  record, Dr. Littrell, how many files are in Government

2  Exhibit 3?

3  A.   Just one.

4  Q.   Just one.   Okay.

5      I believe you told us earlier that this image was created

6  on 3/17, correct?

7  A.   Yes, that's correct.

8  Q.   Now I'm going to ask the CSO to hand you what's been

9  premarked Government Exhibit 4.

10  A.   Thank you.

11  Q.   Do you recognize that item?

12  A.   Yes, this is the contents of Exhibit 4, which is

13  photographs as well.

14  Q.   Okay.   And how many photographs and what date?

15  A.   I believe there are five photographs on this one.   And

16  they are the photographs, I forget the date that was on the

17  previous slide for those particular photos.   I think it was the

18  24th.

19  Q.   Correct, 3/24.

20      How do you know what is on that disk?

21  A.   I, again, viewed the disk and initialed it and compared it

22  to the trial laptop version as well.

23  Q.   Just so we're clear, the five photos that you described,

24  those came in the extraction of the defendant's phone, correct?

25  A.   Correct, yes.

MICHAEL LITTRELL - DIRECT

1      MS. MELTON:  Your Honor, at this time we would move to

2  admit Government Exhibit 4.

3      THE COURT:  Any objection?

4      MR. SPEDDING:  No objection.

5      THE COURT:  Exhibit 4 will be admitted.

6          (Government Exhibit 4 was admitted.)

7  BY MS. MELTON:

8  Q.   Similar to the other exhibits that we talked about,

9  Doctor, did you review the folder that is on the trial laptop

10  to confirm that it matches the contents of Government

11  Exhibit 4?

12  A.   Yes.

13      MS. MELTON:  Your Honor, at this time we would like to

14  publish those items to the jury.

15      THE COURT:  Yes, ma'am, you may.

16  BY MS. MELTON:

17  Q.   So we're going to go one by one, starting at the very top.

18  If you could read that file name for us?

19  A.   Sure, GX4a.

20  Q.   Before we open it up, Dr. Littrell, these are PDF files

21  and not JPEG files.

22      Can you explain what that means?

23  A.   So PDF is just a type of file that can encompass different

24  things, it could be a Word document or image or whatever.  And

25  typically when you export from the forensic software, it likes

1  to create -- users like to create PDF files because they can be

2  opened on other computers without having to have a specific

3  reader, or use them for -- you know, sometimes pictures won't

4  open on a particular laptop or something.  So it makes it easy

5  for users to be able to move those around.

6  Q.   So people will like print to PDF so they can open it in

7  various places?

8  A.   That's correct.

9  Q.   So you said the top one there is GX4a.  We're going to

10 open that, and I'll ask you to describe what's depicted there.

11 A.   GX4a, this is a finger in the anus of a female.

12 Q.   Okay.  Moving on to the next item in the folder.

13 A.   GX4b.

14 Q.   And when we open it, I will ask you again to describe

15 what's there.  Just takes a minute to get it.  There we go.

16 A.   Sure.  Very similar to 4a again, which is a finger inside

17 of a female.

18 Q.   Okay.  Looking at the next item there, can you tell us

19 what that file name is?

20 A.   GX4c.

21 Q.   Can you tell us what's depicted here?

22 A.   Yes.  The finger inside of a female as well.

23 Q.   Are you able to tell which orifice in this photograph?

24 A.   It looks like the anus.

25 Q.   Looking at the next item, can you read that file name for

MICHAEL LITTRELL - CROSS

1   us?

2   A.    GX4d.

3   Q.    What is depicted in GX4d?

4   A.    This is the penis with a condom inserted into the vagina

5   of the female.

6   Q.    Looking at what I believe is the last item there, can you

7   read that for the record?

8   A.    GX4e.  This is a picture of a finger in the vagina of the

9   female.

10  Q.    What other identifiers, if any, do you see in this

11  photograph?

12  A.    Sure.  You can see the pink shirt, so from the videos that

13  we watched earlier.  You can also see that this has got, in the

14  top right-hand corner, the three dots in it, which would be

15  indicative of screen capture of a Snapchat.

16        MS. MELTON:  Dr. Littrell, that is all I have for you.

17  I'm sure Mr. Spedding is going to have some questions and I

18  will pass it over to him.

19        THE COURT:  Thank you, Ms. Melton.

20        Mr. Spedding.

21        MR. SPEDDING:  Thank you, Your Honor.

22                        CROSS-EXAMINATION

23  BY MR. SPEDDING:

24  Q.    Dr. Littrell, my name is Chris Spedding and I represent

25  Mr. Fields, I don't believe you and I have ever met, but I have

1    some questions here for you.

2         Going back to the beginning of your testimony, on these --

3    on videos, I know that you've testified -- let me back up.

4         You testified on direct that any time an image is taken

5    with a camera, there is a date and time associated with that

6    particular image, correct?

7    A.   Yes.  In most cases, that's correct, yes.

8    Q.   Okay.  What I didn't hear and what I'm a little bit

9    confused about is how that works with a video.  Is it the same

10   exact way with a video?

11   A.   Yes, it is.

12   Q.   Are you aware of any third-party apps, applications, that

13   people can download where they can manipulate those types of

14   things on images or videos on a phone, whether it be the

15   iPhone or Android?

16   A.   Yes, there is a couple of applications where you can

17   adjust the EXIF data of pictures and videos.

18   Q.   Okay.  And I'm sure, when you did your examination, you

19   checked for those; is that correct?

20   A.   I did not check for those apps, no.

21   Q.   So we don't know whether or not those third-party apps

22   were on either one of those phones; is that a fair statement?

23   A.   That is correct.

24   Q.   Also, do you know whether or not any of these phones ever

25   had a factory reset conducted on them?  Could you tell during

MICHAEL LITTRELL - CROSS

1  your examination?

2  A.   It is possible to tell that in some cases, but that's not

3  something I typically look for, in terms of if they've been

4  factory restored or not.

5  Q.   If a phone -- if one of these devices did -- or had a

6  factory reset, does that reset all of the data?  Meaning -- I'm

7  going to use the term overwrite because I don't know what else

8  to say.  Basically would it permanently erase everything on

9  that phone?

10 A.   When a phone is factory wiped, and in most cases the data

11 that is currently on the phone, that resides on the phone, is

12 wiped, meaning that it is overwritten, then a new operating

13 system is restored to that without the original user data.

14 Q.   When Ms. Melton first went over -- I can't remember

15 exactly which exhibit it was, but it indicated on the iPhone

16 that there were various files, and I think you said there were

17 approximately 243,000 media, I'm going to say files, it might

18 be folders.  But then I noticed there were 128,000 web-related

19 folders on that particular exhibit.  Then I also noticed there

20 were, it said, 72 pornography folders on that phone; is that

21 accurate?

22 A.   I believe that there were some, I don't remember the exact

23 number.  But there were a number of decoded pornography URLs,

24 so those would be websites that had been viewed on that device.

25 Q.   That was on the iPhone, correct?

MICHAEL LITTRELL - CROSS

1   A.   Yes.

2   Q.   Okay.  And that was, to the best of your knowledge, that

3   was Grace's phone, correct?

4   A.   Yes.

5   Q.   That was not Mr. Fields' phone?

6   A.   Correct.

7   Q.   Now, the five videos that we observed as well as the two

8   images, those were all dated March 17; is that correct?

9   A.   I don't think they were all dated March 17th, I don't --

10  which ones are you talking about?  There was several videos and

11  pictures that we looked at.

12  Q.   It was the first exhibit that we went through with the

13  United States, where you went through and it was -- let me see

14  here -- IMG_4004, that was 41 seconds.

15       Do you have that exhibit up there?

16  A.   I don't have the exhibit with the dates on it in front of

17  me, no.

18  Q.   You don't have the dates on the videos, you mean?

19  A.   I don't have those in front of me, no, I do not.

20  Q.   So you don't know what dates those were taken?

21  A.   I don't remember when they were taken.  We talked about

22  them earlier.  I don't recall.

23  Q.   There's nothing on those videos that would tell you as a

24  forensic examiner who took them, correct?

25  A.   Correct.  It does indicate a phone in some cases that took

MICHAEL LITTRELL - CROSS

1  them or a device that took them, but not a person.

2  Q.   Right.  And we can conclude based on your testimony that

3  those were taken on that iPhone, correct?

4  A.   Yes, I believe that was correct.

5  Q.   Now, on the Samsung Note 8, would it -- would you agree

6  with me that of all the videos and all the images that we're

7  talking about, none of them were taken with that phone?

8  A.   Yes, that's what I would -- I would agree with that.

9  Q.   You would agree with that?  So to follow up on that, it's

10 safe to say that all of those images came from somewhere else?

11 A.   All of the images on the Note 8?

12 Q.   Yes.

13 A.   Yes, it's reasonable to assume that those photographs

14 were -- somehow came from the iPhone and ended up on the

15 Note 8, yes.

16 Q.   That was going to be my next question.  Okay.

17      And then one thing I wanted to talk to you about, on

18 that -- I think it's Exhibit 3, it had one image that was dated

19 3/17, and I believe 4:04 a.m. -- 4:40 a.m., and then there were

20 several images, I believe you used the term "created," on

21 March 24th at 8:01 a.m., correct?

22 A.   Right.

23 Q.   Just so I understand exactly what you were saying, those

24 would be or could be created simply by opening them, right?

25 A.   So the -- in that cache folder, the photo that we saw

MICHAEL LITTRELL - CROSS

1    could be created in a couple of ways.  One, when the image or

2    video is copied into the original folder that no longer

3    existed; or when the person opened that, it would create a

4    thumbnail image inside of that folder when that person opened

5    them.  Those are the two ways that those would be created.

6    Q.   Okay.  But when you did your examination, you can't tell

7    based on the information that you have or we have when those --

8    when those files were sent to that phone, correct?

9    A.   When they were sent to the phone?  No.

10   Q.   Okay.  Did you look to see if -- well, let me back up.

11        If you had looked for that, would you have been able to

12   determine that?

13   A.   If the data still existed related to their distribution to

14   someone else, yes.

15   Q.   Okay.  But that just wasn't part of your examination,

16   correct?

17   A.   To my knowledge, that information wasn't available.  There

18   wasn't a text message that indicated that they were sent that

19   way.  And so it is unknown how they got on that phone.  It

20   could have been Snapchat, it could have been text messages, but

21   it is unknown how they got there.

22   Q.   All right.  Are you familiar with -- I'm assuming you're

23   pretty familiar with Snapchat obviously, you knew a lot about

24   it.  But are you familiar with that function that if somebody

25   screen shots an image that another person sends them, that the

MICHAEL LITTRELL - CROSS

1   sender gets notification that the image has been screen shot?

2   A.   Yes.

3   Q.   Was there any indication in your examination of these

4   devices that any notification like that was sent?

5   A.   No, there was no indication of that.  And again, if the

6   messages were gone, I would have no way to know where that

7   information -- if that information is there.

8        Once the messages are deleted, I can't see them.  So if

9   they did exist at some point, then I would have no way to know

10  if they were there or not.

11  Q.   Okay.

12  A.   There's also a way to bypass that so you don't receive

13  that notification as well.

14  Q.   Is that through Snapchat or another third-party app?

15  A.   There is a third-party app on the Android device, and

16  there is also a way to do that through manipulating the phone

17  that allows it not to send that notification to the user that a

18  screen shot was taken.

19  Q.   I think I already know what the answer to this is, you

20  can't tell from viewing these videos who took them, can you?

21  A.   No, I don't think so.  I mean, in the one video you can

22  clearly see there is a person's face, and it seems reasonable

23  from the position that the person whose face was there took the

24  video, but....

25  Q.   Well --

MICHAEL LITTRELL - CROSS

1  A.   Possibly.

2  Q.   -- right.  But there's nothing that -- there's nothing

3  that you can see on that video that would definitively tell us

4  that, correct?

5  A.   I believe that in the one video, the girl's arms were up

6  over her face.  So the only other person that could have taken

7  that would be the person in the room.

8  Q.   Right.  Or another device that was in the room?

9  A.   Well, not if the EXIF data indicated that it was with the

10  phone that was there.  So if the iPhone that was used to take

11  that video, and the girl's hands are visible in the video, the

12  only other person that could have taken that would have been

13  the person using the phone, i.e. the defendant, or another

14  person that was in the room.

15  Q.   Correct.  But what I'm getting at is, there are other

16  accessories that can be used on a phone that could take an

17  image like that or take a photograph like that, such as a

18  selfie stick, tripod, anything along those lines, timers,

19  things like that, that could have done that, correct?

20  A.   I guess it's possible, yeah.

21  Q.   And selfie sticks are pretty common; you would agree with

22  that, wouldn't you?

23  A.   I don't know if "common" is the word, but I know they

24  exist.

25       MR. SPEDDING:  Your Honor, can I have just a second,

MICHAEL LITTRELL - REDIRECT

1    please?

2          THE COURT:  Yes, sir, certainly.

3          MR. SPEDDING:  Your Honor, that's all I have.  Thank you.

4          THE COURT:  Ms. Melton, any redirect of the witness?

5          MS. MELTON:  Yes, Your Honor.

6          THE COURT:  Yes, ma'am.

7                        REDIRECT EXAMINATION

8    BY MS. MELTON:

9    Q.   Dr. Littrell, early in your cross-examination,

10   Mr. Spedding asked you if a factory reset was performed on the

11   phone, what you would be able to recover?  I believe you told

12   us if that happened, the data would be overwritten, correct?

13   A.   Yes, that's correct.

14   Q.   And so if it's overwritten, that means that you in your

15   extraction would not be able to see that data, right?

16   A.   That's correct.  If a phone is factory reset and I do an

17   extraction of that factory reset phone, the only data I will

18   get is the data that is unique to that operating system without

19   any user data on it.  So there would be no pictures, no text

20   messages, no web history.  Basically is a blank phone.

21   Q.   So a factory reset really wouldn't have any relevance to

22   artifacts that you actually found on the phone, right?  Because

23   you were able to recover them.

24   A.   That's correct.  So provided someone wiped the phone and

25   then restored it from a backup or an iCloud backup or Android

MICHAEL LITTRELL - REDIRECT

1   backup, then the phone would look identical before and after

2   that wipe and restore.

3   Q.   We talked a little bit about -- or Mr. Spedding was asking

4   you if some of the items that were there in that cache folder,

5   if that cache file could just be created by sort of passively

6   opening it.  I believe you said that was one of the ways that

7   that could happen, right?

8   A.   Sure.

9   Q.   Let's talk about screen shots a little bit.  Is a screen

10  shot an affirmative act or is it a passive thing that the user

11  does?

12  A.   Sure.  A screen shot would be an affirmative act where

13  they have to hit multiple key combinations in order to do that.

14  So it would require them to hit the home button and the power

15  button, or some combination of buttons in order to capture that

16  screen.

17  Q.   So if we see indicia of a screen shot like those three

18  little dots that make it look like it was a screen shot in

19  Snapchat, that would indicate that the picture got there not by

20  simply passively opening it, correct?

21  A.   That's correct.

22  Q.   You were also asked some questions about dates for the

23  five videos and two images in Government Exhibit 2.  I believe

24  you have Government Exhibit 10 up there with you that has the

25  EXIF data for those two images.

MICHAEL LITTRELL - REDIRECT

1    A.    Yes.

2    Q.    And so can you tell us again what the created date was for

3    those two images?

4    A.    Yes.  March 23, 2019.

5    Q.    Okay.  You were also asked some questions about if there

6    is any way to tell from the EXIF data who, as a person, created

7    the video or made the video, right?

8    A.    Correct.

9    Q.    You said you can tell the device, but there's nothing

10   about that EXIF data that can tell you specifically who the

11   person was, right?

12   A.    Correct.  The most specific data you can get is which

13   camera was used on the front or the back of the phone to take a

14   picture.

15   Q.    So when you were saying that there's not any way to tell

16   from the EXIF data, you weren't saying that there's not any way

17   to tell at all, right?

18   A.    That's correct.  As I've stated, the one video, it seems

19   fairly obvious that the female wasn't taking the video because

20   her hands were visible in it.

21   Q.    And similarly talking about her hands being visible, you

22   were asked if it was possible that maybe someone used a tripod,

23   you know, maybe she had a tripod laying around her house and

24   set it up herself there at the EMT training facility where

25   Mr. Fields works.

MICHAEL LITTRELL - REDIRECT

1          If somebody uses a tripod, is it usually stationary or

2     does the video move?

3     A.    It would be stationary.

4     Q.    Okay.  And we may not all know what a selfie stick is, so

5     can you tell us what that is?

6     A.    Sure.  It's an adapter that you put on your cell phone

7     that extends the reach of that device.  So they are typically

8     two or three feet long.  And they have a trigger, for lack of a

9     better word, that activates the camera so you can take

10    photographs and stuff.  So you get a large group of people or

11    some such in the photograph.

12    Q.    So it gives you a greater distance but you still have to

13    hold the selfie stick, right?

14    A.    That's correct.

15          MS. MELTON:  That's all I have.  Thank you.

16          THE COURT:  Thank you.

17          Let's see if we have any recross on matters brought out on

18    redirect.

19          MR. SPEDDING:  No, Your Honor.

20          THE COURT:  All right.

21          Thank you.  You may step down.  You can leave those

22    exhibits there.

23          If counsel could approach just for one moment before I

24    excuse the jury for the evening.

25          (Bench conference on the record.)

1        THE COURT:  So I don't misstate anything, it looks like

2   we'll be able to finish the government's proof tomorrow by

3   maybe 10 or 11:00; is that fair?

4        MS. ROTH:  Possibly even earlier than that.  We have one

5   witness left.  I'm a little hesitant to give you a time, but I

6   don't think it will be extremely long.  I would think it would

7   be one hour or less.

8        THE COURT:  That's what I was expecting.  And I don't know

9   how long cross would be, but assuming we finish the

10  government's case by the first break in the morning, would you

11  be ready to go at that point?

12       MR. SPEDDING:  Yes, sir.

13       THE COURT:  All right.  You don't have to tell me who your

14  witnesses might be, but do you expect to finish the proof in

15  the morning?

16       MR. SPEDDING:  Yes, sir.

17       THE COURT:  All right.  Then I'll have just a couple of

18  issues to take up with you before we leave on jury

19  instructions.  I want to make sure we touch all the bases

20  before tomorrow.

21       I'll go ahead and excuse the jury and advise them that

22  they are likely to get the case at least by midday tomorrow,

23  depending on how long it takes to complete.

24       MS. MELTON:  Your Honor, I did want to apologize about

25  leading through that witness versus what we filed in the

1    witness list.  We were thinking that the videos would be

2    published through another witness and I never filed an amended

3    one.

4        THE COURT:  That's fine.

5        MS. MELTON:  I apologize.  But like Ms. Roth said, our

6    witness tomorrow should be shorter.

7        THE COURT:  I don't hold you to that, that's an estimate.

8        MS. MELTON:  Thank you.

9        MR. SPEDDING:  Thank you, Judge.

10       (Bench conference concluded.)

11       THE COURT:  All right.  Members of the jury, I'm going to

12   go ahead and excuse you for the evening.

13       Before I do that, I do want to tell you that I anticipate

14   that the parties will complete their proof tomorrow, maybe by

15   midday.  Once all the proof is in in the case, I have an

16   instructions conference and sometimes that takes a little while

17   to complete that, but I do anticipate that the case will be

18   presented to you probably by early afternoon tomorrow.

19       So the attorneys have really moved the case along very

20   well and I do expect, rather than completing the proof on

21   Wednesday, I believe we'll be able to complete the proof

22   tomorrow and get the case to you tomorrow.

23       Now, of course you haven't heard everything yet.  You

24   heard some of the testimony of the witnesses.  The testimony

25   and the evidence has not been completed so you're not to begin

1    deliberating or even thinking about your verdict in the case.

2            And so when you go home tonight, just put this case out of

3    your mind.  We'll start back tomorrow morning at 9:00.  And

4    when you get here tomorrow, the security officers will be able

5    to bring you up to your respective rooms.  And we'll call you

6    in at approximately 9:00 to continue with the presentation of

7    the case.

8            So again, I do want to remind you when you go home

9    tonight, please don't talk with anyone about the case and don't

10   allow anyone to approach you to discuss the matter.  Outside

11   the courtroom, you're just not to talk with anyone about the

12   case.

13           Of course, if anyone should approach you in an attempt to

14   discuss the case, you should report that to the Court promptly

15   and allow the Court to deal with that.

16           Don't speak with the parties, any of the attorneys or any

17   witnesses in the case.  Don't read, watch or listen to any

18   accounts of the case, if there should be any.  And please don't

19   do any type of research or investigation on your own while we

20   are in recess.

21           Please don't communicate through any forms of social media

22   your position as a juror or anything about this matter.  And of

23   course, don't make up your mind about the case until it is

24   finally submitted to you.

25           If you would, please, you can leave your badges here.  You

1    can actually leave those in the room upstairs or in this room.

2    And you can leave your notebooks there as well, you'll be able

3    to pick those up tomorrow.   That's why I wanted you to make

4    sure you write your juror numbers on the front of those

5    notebooks if you haven't done so already, so you'll be able to

6    identify your notebook and your pen.

7         Is everyone okay in terms of paper and pens, pencils?

8         All right.   With that admonition, the jury will be excused

9    until 9:00 a.m. tomorrow morning.

10        (Jury left courtroom at 4:59 p.m.)

11        THE COURT:   Thank you.   Please be seated for just a moment

12   before we recess.

13        There's one issue I wanted to take up with the parties,

14   and I wanted to identify this one issue and then I may have the

15   parties do further research or be prepared to address the issue

16   in our instructions conference.

17        That is the Instruction Number 14, which is in the draft

18   set of instructions that you were given earlier.   That's the

19   substantive instruction in the case.   There are a number of

20   terms that are defined following the elements that are listed,

21   and these come from Sixth Circuit Pattern Jury Instructions.

22        And specifically in the next-to-the-last paragraph, the

23   draft includes a definition of "uses."   It state that a

24   defendant uses a minor if he photographs or takes video of the

25   minor engaging in sexually explicit conduct.

1          I believe that definition is taken from a 2014 case in the

2     Sixth Circuit, *United States versus Wright*.  My recollection is

3     that that case does not limit the word "use."  It explains that

4     a person uses if he engages in this way, if he himself takes

5     photographs or video of a minor engaging in sexually explicit

6     conduct.  It's not limited to just the defendant.  The section,

7     I believe, may be met, use or uses may be met, with a third

8     party including the minor.

9          But I do want to give you an opportunity to review and

10    look at that, and it may be necessary to further define that

11    term based upon how the proof is presented, but I did want to

12    at least alert you to that fact.

13         We can take that up during the instructions conference.

14    If the parties have additional legal authority they would like

15    to present, of course I'll look at that at that time.

16         There is some other definitions that we may not need in

17    this case, such as the definition of a computer, that I've

18    highlighted for you.  I'm not sure this case really involves a

19    computer or it's necessary to include that definition, but of

20    course if the parties feel that it would be helpful in

21    explaining the charge in the case, then certainly leave that

22    in.

23         Those are just a couple of points I wanted to bring up

24    with the parties.

25         Also, are there any other issues we need to take up at

```
 1   this time?  As I instructed the jury, I believe that we'll be

 2   able to complete the proof in the morning tomorrow and then, if

 3   necessary, of course, we'll have our instructions conference

 4   immediately thereafter.

 5        Ms. Roth or Ms. Melton, on behalf of the government, are

 6   there any issues we need to take up that would save the jury a

 7   little time tomorrow?

 8        MS. ROTH:  Not at this time, Your Honor.

 9        THE COURT:  Ms. Melton, are you aware of anything?

10        MS. MELTON:  No, Your Honor.

11        THE COURT:  Thank you.

12        Mr. Spedding?

13        MR. SPEDDING:  Not at this time, Your Honor.

14        THE COURT:  All right.  If you do have issues that we need

15   to take up outside the presence of the jury and before we start

16   tomorrow, you can alert me.  And of course I'm here early, but

17   if we need to take those issues up and any other issues, we can

18   do that at 8:30 before the jury is brought in.

19        All right.  If there's nothing else to take up in the

20   case, at this time we will be in recess.  Unless I hear from

21   the parties, we will be in recess until 9:00 a.m. tomorrow

22   morning.

23        (Proceedings adjourned at 5:02 p.m.)

24

25
```

```
 1                       C E R T I F I C A T E
                I, Linda S. Mullen, RDR, CRR, do hereby certify that
 2      the foregoing is a correct transcript from the record of
        proceedings in this above-entitled matter.
 3
        /s/Linda S. Mullen            January 15, 2021
 4      Linda S. Mullen, RDR, CRR     Date of Certification
        Official Court Reporter
 5                          I N D E X
```

```
 6      WITNESS                                    PAGE
        E.Y.
 7      Direct Examination By Ms. Melton              2
        Cross-Examination By Mr. Spedding            37
 8      Redirect Examination By Ms. Melton           45
        Recross-Examination By Mr. Spedding          48
 9
        NATHAN LINVILLE
10      Direct Examination By Ms. Roth               51
        Cross-Examination By Mr. Spedding            58
11      Redirect Examination By Ms. Roth             60
        Recross-Examination By Mr. Spedding          61
12
        RONALD ALAN JUDY
13      Direct Examination By Ms. Roth               62
        Cross-Examination By Mr. Spedding            69
14
        MICHAEL LITTELL
15      Direct Examination By Ms. Melton             73
        Cross-Examination By Mr. Spedding           121
16      Redirect Examination By Ms. Melton          129

17      EXHIBITS                               ADMITTED

18       Government Exhibit 1                        25
         Government Exhibit 2                        31
19       Government Exhibit 3                       117
         Government Exhibit 4                       119
20       Government Exhibit 5a                        6
         Government Exhibit 5b                        6
21       Government Exhibit 6                         7
         Government Exhibit 7a                       79
22       Government Exhibit 7b                       79
         Government Exhibit 7c                       79
23       Government Exhibit 10                      103
         Government Exhibit 12                       17
24       Government Exhibit 13                       18

25
```