<pre>
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   CENTRAL DIVISION AT LEXINGTON

 3                            - - -
    UNITED STATES OF AMERICA,      .   Case No. 5:19-CR-00178
 4
                 Plaintiff,        .   Lexington, Kentucky
 5                                 .
                 - v -             .   Tuesday, June 2, 2020
 6                                 .   8:52 a.m.
    WILLIAM MICHAEL FIELDS JUNIOR, .
 7                                 .   JURY TRIAL DAY 2 OF 2
                 Defendant.        .   WITNESS TESTIMONY ONLY
 8                            - - -

 9         EXCERPT OF TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              BEFORE THE HONORABLE DANNY C. REEVES
10             UNITED STATES DISTRICT COURT JUDGE

11                            - - -

12

13  For the United States:      ERIN ROTH, ESQ.
                                MARY LAUREN MELTON,ESQ.
14                              Assistant U.S. Attorneys
                                United States Attorney's Office
15                              260 West Vine Street, Suite 300
                                Lexington, Kentucky  40507
16
    For the Defendant:          CHRISTOPHER A. SPEDDING, ESQ.
17                              Spedding Law Office
                                271 West Short Street, Suite 402
18                              Lexington, Kentucky  40507

19  Court Reporter:             LINDA S. MULLEN, RDR, CRR
                                Official Court Reporter
20                              101 Barr Street
                                Lexington, Kentucky  40507
21

22  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
23

24

25
</pre>

1          (Proceedings in open court, May 29, 2020, 2:00 p.m.)

2

3

4           (Proceedings in open court, June 2, 2020, 8:52 a.m.)

5          THE COURT:  Thank you.  And good morning, everyone.

6          I understand we have an issue to take up before jury comes

7    in.

8          MR. SPEDDING:  Judge, it may be somewhat of a housekeeping

9    issue.  I was contacted by Judge Caldwell's chambers yesterday

10   about a 1:00 teleconference we're supposed to have today.  And

11   I told Jamie that I would ask the Court this morning whether or

12   not the Court would allow me to participate in that.  I think

13   it's more of a scheduling conference than anything, so I don't

14   think it will take a very long time.  And I just wanted to

15   bring that up and see if the Court would allow me do that

16   at 1:00.

17         THE COURT:  Yes, sir.  Certainly.

18         I don't think we have all of our jurors here yet.  While

19   you're here, I wanted to mention that I revised the draft

20   instructions and have given you a second set of draft

21   instructions.  I'll just call your attention to the changes so

22   you won't have to try to figure out where those come in.

23         On page 7, Instruction Number 4, there are a couple

24   references to judicial notice and we haven't gotten to that

25   point yet, so I've left that highlighted section in.

1          I did modify paragraph 4.  If you'll notice, if you'll

2    recall, the original pattern jury instruction talks about not

3    only preventing the jurors from hearing answers to some

4    questions and striking matters in the record and not allowing

5    exhibits to be reviewed, so I have attempted to limit it to

6    just the issues in the case to this point.  Of course that

7    might change, but I have modified the instruction in that

8    regard.

9          Over on Instruction 14, which is an issue I raised with

10   the parties yesterday, I have included a phrase in the

11   next-to-the-last paragraph.  "A defendant uses a minor if he or

12   someone at his direction photographs or takes video of the

13   minor engaging in sexually explicit conduct."  That would then

14   be consistent with the language that's contained on page 20,

15   which is the next-to-the-last paragraph.  "It's not necessary

16   that the government prove the defendant took the visual

17   depictions or that the defendant knew of the interstate nature

18   of the materials used to produce the visual depictions."

19         I have included an Instruction Number 15.  The

20   instruction, the cautionary instruction that was given to the

21   jury during the victim's testimony, mistake of age and consent

22   not being defenses.

23         And then on page 24, Instruction Number 18, witnesses

24   testifying to both facts and opinions, I have attempted to

25   include what I believe the parties will request with respect to

1 │ two of the witnesses that have testified and one who is

2 │ expected to testify today.

3 │     And then, of course, the judicial notice instruction is

4 │ Instruction Number 19, which remains in the set of

5 │ instructions.

6 │     I believe those are the major changes that were made to

7 │ the earlier draft.  And again, that's -- I'm going through

8 │ those provisions just to give you a heads up at this time.  We

9 │ haven't had our instructions conference yet, but we'll

10 │ certainly address those at the appropriate time.

11 │     All right.  As I indicated, I think we're still waiting

12 │ for about three jurors to appear.  And as soon as they are here

13 │ and have had a chance to settle in, we'll go ahead and bring

14 │ the jury down and put the jury in the jury box and we'll be

15 │ ready to go.  And we will be in recess until that time.

16 │     (A recess was taken from 8:57 a.m. to 9:07 a.m.)

17 │     THE COURT:  The record will again reflect that all members

18 │ of the jury are present, the defendant and counsel are present

19 │ in the courtroom.

20 │     I think we are ready for the next witness to be called by

21 │ the United States.

22 │     MS. ROTH:  Your Honor, the United States calls Detective

23 │ Justin Jett.

24 │     THE COURT:  Thank you.

25 │     **JUSTIN JETT, GOVERNMENT WITNESS, SWORN**

5

JUSTIN JETT - DIRECT

1    THE COURT:  Thank you, Ms. Roth.  You may.

2    MS. ROTH:  Thank you, Your Honor.

3                        JUSTIN JETT

4                     DIRECT EXAMINATION

5  BY MS. ROTH:

6  Q.    Can you please tell the jury your name?

7  A.    Justin Jett.

8  Q.    How are you employed?

9  A.    I'm a police officer with the Cynthiana Police Department.

10 Q.    Okay.  What are some of your duties as a police officer

11 with the Cynthiana Police Department?

12 A.    Mainly I act as a general detective, I'll investigate

13 anything from rape to a murder.  Robbery, and just kind of

14 general stuff like that.

15 Q.    Anything in between?

16 A.    Anything in between.

17 Q.    Okay.  Did you become involved in an investigation

18 involving Michael Fields in this case?

19 A.    I did.

20 Q.    Can you please describe to the jury how you came to become

21 involved in that investigation?

22 A.    April 15th, 2019, I was called into the chief's office, he

23 had received a memo from an Officer Boswell, and Officer

24 Boswell had claimed in the memo that there was some allegation

25 of underage drinking after a Police Explorers event and the

6

JUSTIN JETT - DIRECT

1  chief wanted me to look into it.

2  Q.   Did you do that?

3  A.   I did.

4  Q.   During the course of investigating that allegation, did

5  you come to learn about new allegations?

6  A.   I did.  I started doing some interviews with some of the

7  participants on the 15th.  And on April 16th, I went to -- are

8  we calling her E.Y.?

9  Q.   Call her Grace.

10 A.   -- Grace's residence with her mom in Cynthiana on the 16th

11 and interviewed her.

12 Q.   Okay.  What were you there to interview her about?

13 A.   There was some allegations there was some sexual, like a

14 sexual relationship that had been going on.

15 Q.   Between who?

16 A.   Grace and Mr. Fields.

17 Q.   Now I want to back up just a minute.  You said on the 15th

18 you learned about the allegations involving -- about providing

19 alcohol to minors after the Police Explorers event.

20     Do you know the date on which that eventually happened?

21 A.   I believe that was the 13th of April.

22 Q.   So April 13th we have the bonfire; is that right?  And

23 then you start investigating on the 15th?

24 A.   Yes, ma'am.

25 Q.   Okay.  And you said you went to talk to Grace and her

7

JUSTIN JETT - DIRECT

1    mother on the 16th?

2    A.   Yes.

3    Q.   And what if anything did you do after talking with them?

4    A.   I had -- I had gone through Grace's phone and ended up

5    taking it for evidence.

6    Q.   Okay.  And what did you do with the phone?

7    A.   Obtained a search warrant and I believe it was maybe

8    the -- April 24th, Detective Judy had run a Cellebrite

9    extraction.

10   Q.   At the time, was Detective Judy the only person with the

11   Cynthiana Police Department trained and certified to do that

12   process?

13   A.   He was, he was the only one with the actual -- I guess the

14   Cellebrite hardware.

15   Q.   Okay.  So you gave it to him to look at, extract the data

16   from?

17   A.   I did.

18   Q.   And you have been sitting in the courtroom through the

19   trial, correct?

20   A.   Yes.

21   Q.   You heard testimony he did do that?

22   A.   Yes, he did.

23   Q.   Okay.  And did you also review the evidence that he

24   extracted from that cell phone?

25   A.   I did, I reviewed it.  I found a picture from, I believe,

8

JUSTIN JETT - DIRECT

1   March 17th.  And it depicted a penis with a condom going into a

2   vagina.

3   Q.   Okay.

4        MS. ROTH:   At this time I would like to hand the witness,

5   please, what's been already introduced as Government Exhibit 1.

6        THE COURT:   Yes, ma'am.

7   Q.   Do you recognize that CD?

8   A.   I do.

9   Q.   And what is it?

10  A.   It is the Government Exhibit 1, says one pic and it's

11  initialed E.Y.

12  Q.   And have you reviewed that picture?

13  A.   I have.

14  Q.   Is that the same picture that you just described finding

15  on Grace's phone --

16  A.   It is.

17  Q.   -- after the examination?

18  A.   Sorry.  Yes, it is.

19  Q.   Okay.

20       MS. ROTH:   At this time I would move to publish that image

21  to the jury.  Again, it's already been introduced.

22       THE COURT:   All right.  It was not shown earlier to the

23  jury?

24       MS. ROTH:   Correct.

25       THE COURT:   It may be displayed at this time.

9

JUSTIN JETT - DIRECT

1          MS. ROTH:   Thank you.

2     BY MS. ROTH:

3     Q.   Do you see the image on your screen, Detective Jett?

4     A.   I do.

5     Q.   Can you please describe what you're seeing on the screen?

6     A.   Again, you see legs and you see a penis, it looks like

7     with a condom on, going into a vagina.

8     Q.   Is there anything about that image that helps you to

9     identify the people photographed in it?

10    A.   Later on, after seeing the videos that came from the full

11    file extraction of Grace's phone, you're able to see a mole

12    that appears on her pubic area.

13    Q.   Is that mole apparent in the videos?

14    A.   It is.

15    Q.   And do those videos show Grace's face?

16    A.   They do.

17    Q.   So you believe, based on that, that this is in fact Grace?

18    A.   I do.

19    Q.   Did you hear her testimony that is in fact her?

20    A.   I did.

21    Q.   Okay.

22         MS. ROTH:   So we can take the image off.   Thank you.

23    Q.   Now, you heard Grace's testimony about the location of

24    where that was taken.   Was there any evidence found from the

25    cell phone extraction that would also give a sense of where the

JUSTIN JETT - DIRECT

1  picture that they just saw was taken from the 17th?

2  A.   That picture had a GPS, I guess, tag located on it.

3  Unlike the one that came in the full file extraction, the GPS,

4  it looked like it came back to a cell phone tower in Paris.  I

5  drove to the location, it was in the middle of a field.  And

6  based on other cell phone extractions that I have done and

7  analyzed, sometimes a phone will ping to the nearest tower,

8  whichever it hits on, and that's where it comes back to.

9  Q.   Okay.  So there was evidence it was taken in Paris?

10  A.   That's correct.

11  Q.   But the location when you went to look was the cell phone

12  tower?

13  A.   That's correct.

14  Q.   And that evidence came from the less complete extraction

15  performed by Detective Judy?

16  A.   I believe it came from the advanced iTunes backup.

17  Q.   Did you do any additional investigation about the location

18  where that image was taken?

19  A.   I did.  I met with the Paris fire chief, and we went to

20  the EMT training facility as well as the storage that the

21  office was located in, and I photographed the inside and

22  outside of both facilities.

23  Q.   Okay.

24       MS. ROTH:  At this time I would ask to show the witness --

25  it has not been introduced -- just to the witness at this time,

JUSTIN JETT - DIRECT

1   Exhibit 9a and b, please.

2   Q.   Can you see those on your screen?

3   A.   Yes.

4   Q.   Do you recognize those images?

5   A.   I do.

6   Q.   And are those images you just described taking?

7   A.   Yes, this one right here is a side of the building outside

8   of the -- I guess the storage facility at the -- next to the

9   soccer fields in Paris.

10  Q.   Do those images fairly and accurately depict the

11  conditions on the day that you photographed them?

12  A.   They do.

13       MS. ROTH:   Your Honor, at this time I would move to

14  introduce and publish Government Exhibits 9a and b.

15       THE COURT:   All right.   With regard to 9a, it will be

16  admitted.

17       9b, are you able to describe that second image that was

18  just shown to you?   Or are you able to identify it?

19       THE WITNESS:   Yes, sir.   It was inside the -- it was

20  inside the facility.   The day that I photographed it, from my

21  recollection, I think the chief said that the ambulance had

22  gone down.   So they had to pull the ambulance inside the

23  facility and put it on the road for an ambulance to be on the

24  road, so there were just two older fire trucks in there and no

25  ambulance at the time.

JUSTIN JETT - DIRECT

1    THE COURT:  Any objection to the admission of Exhibits 9a

2  and b?

3    MR. SPEDDING:  No, Your Honor.

4    THE COURT:  Those exhibits will be admitted at this time,

5  and they may be displayed to the jury.

6    MS. ROTH:  Thank you, Your Honor.

7    (Government Exhibits 9a and 9b were admitted.)

8  BY MS. ROTH:

9  Q.   Again, let's start with 9a.  Can you again describe to the

10  jury what it is they are seeing?

11  A.   In Paris, if you go around the bypass, which is Martin

12  Luther King Boulevard, there is a soccer field complex that

13  sits right next to the wastewater treatment plant.  And right

14  up by that, on top of the hill, there's a storage -- metal

15  storage building that you're looking at right here.  And it

16  appears like the fire department -- and the fire department and

17  ambulance service utilize that building for storage, or I guess

18  an extra building, extra vehicles.

19    And right in front of the building, there is a little

20  safety city for younger kids to go and I guess learn about

21  traffic safety.

22  Q.   Let's move to 9b.  Again, can you describe what this image

23  is of?

24  A.   This is just a random, a random photo inside the building.

25  Q.   It's showing the inside of the building?

13

JUSTIN JETT - DIRECT

1   A.   Showing the inside of the building.

2   Q.   Is that where the ambulance was kept?

3   A.   This would be -- this would be right around the area that

4   the ambulance was kept.  It's an open area.

5        If you go in the building, there's two ambulances that

6   were parked, two firetrucks that were parked in the back of the

7   building, and this was an open bay area where nothing was at.

8   Q.   But you learned during the course of your investigation

9   that normally that is where the ambulances are kept?

10   A.   Yes.

11   Q.   And you mentioned that that was in Paris.  Is that in

12   Bourbon County?

13   A.   It is.

14   Q.   And is that in the Eastern District of Kentucky?

15   A.   It is.

16   Q.   All right.  Now, what did you do after finding Exhibit 1,

17   the picture that the jury just saw, on Grace's phone?

18   A.   I went back and interviewed -- I went back and interviewed

19   Grace.  And based on that interview, I obtain a search warrant

20   for Mr. Fields' cell phone.

21   Q.   Okay.  Now, before we talk about Mr. Fields' cell phone, I

22   want to continue talking about what was found on Grace's phone.

23   Did you take at some point Grace's phone for further

24   examination?

25   A.   Yes, I did.

14

JUSTIN JETT - DIRECT

1    Q.   Where did you take it, first of all?

2    A.   I took it to the Attorney General's Office in Frankfort.

3    Q.   Can you explain to the jury why you did that?

4    A.   I had contacted Dr. Littrell -- Detective Littrell, and he

5    advised me that he had the ability to do a more extensive

6    download of the iPhone than Cellebrite was allowed to do, so I

7    took it to him for that examination.

8    Q.   Okay.  Did that, in fact, occur?

9    A.   It did.

10   Q.   What, if anything, was found during Detective Littrell's

11   more complete examination?

12   A.   We found five -- five small videos and two pictures, like

13   two still shots of another sexual occurrence that had happened

14   in Bourbon County.

15   Q.   Have those been previously introduced and shown to the

16   jury as Government Exhibits 2a through g?

17   A.   They have been.

18   Q.   Now, was there any, again, location information associated

19   with any of those images that were found?

20   A.   The two images that were found, they had a GPS tracking

21   embedded in the actual picture, along with the time stamp.  And

22   I plugged those GPS coordinates into Google Maps and it dropped

23   like a pin right in Paris, and it's right there.  It dropped

24   the pin right at the EMT training facility.  And then I drug

25   the little street view guy over on the map and the image of the

15

JUSTIN JETT - DIRECT

1    EMT training facility popped up on that street view.

2    Q.    I would like to walk through that a little bit more

3    slowly.

4         MS. ROTH:  Can we show Government's Exhibit 10, which has

5    already been introduced, please.

6         THE COURT:  Yes, ma'am.

7    BY MS. ROTH:

8    Q.    Do you recognize that, Detective Jett?

9    A.    Yes.

10   Q.    What is that?

11   A.    That's the metadata from the image, IMG_4007, IMG_4008.

12   Q.    Those have been previously introduced as Government

13   Exhibits 2f and 2g?

14   A.    Yes.

15   Q.    Is that the location information you were just describing

16   that was found to be associated with those pictures?

17   A.    It is.  If you go about five or six lines down, you see

18   the date and the time.  And then go a little bit further down,

19   you see what it was taken with.  It was taken with an Apple

20   iPhone XS Max.  And then it tells the software, it gives you

21   GPS longitude and latitude there.

22   Q.    Okay.  That GPS longitude and latitude information is what

23   you used for your next step?

24   A.    Yes, when I plugged it into Google Maps.

25        MS. ROTH:  Now if we could show the witness Government's

JUSTIN JETT - DIRECT

1   Exhibit 11, please.

2   Q.   Detective Jett, do you recognize what's on your screen?

3   A.   Yes, it's the -- it's like a snip of the screen in Google

4   where it shows where the pin dropped on -- right at this EMT

5   training facility.  And then the bottom is the street view,

6   where you drag the little guy over and it pops the image up.

7   Q.   Did you prepare that exhibit?

8   A.   I did.

9   Q.   Does that accurately and fairly reflect what you saw when

10  you performed those actions?

11  A.   Yes, it does.

12       MS. ROTH:  Your Honor, at this time we would move to

13  introduce and publish Government Exhibit 11.

14       THE COURT:  All right.

15       MR. SPEDDING:  No objection, Your Honor.

16       THE COURT:  Exhibit 11 will be admitted at this time and

17  may be shown to the jury.

18            (Government Exhibit 11 was admitted.)

19  BY MS. ROTH:

20  Q.   Again, can you please describe what this building is that

21  they are looking at?

22  A.   The top image is, if you see it's kind of blurry, but

23  there is a little red pin drop toward the middle of the screen,

24  I believe that's High Street.  And then like I said, I drug the

25  little street view over and the image at the bottom is the one

JUSTIN JETT - DIRECT

1   that popped up on the screen as soon as you drug it over there.

2   That's the EMT training facility.

3   Q.   Did you recognize that from your own personal view of that

4   building?

5   A.   I did.

6   Q.   And did you also take images at that building?

7   A.   I did.  The image that I took was a little more close up.

8   This one was taken, I guess, in the middle of the road.

9         MS. ROTH:  I would like to at this time show the witness

10  and the witness only at this point Government Exhibits 8a

11  through d.  And if we could kind of cycle through those

12  pictures, I think we can discuss them as a group.

13        THE COURT:  This is 8a through d?

14        MS. ROTH:  Yes.

15        THE COURT:  Thank you.

16  BY MS. ROTH:

17  Q.   Have you had a chance to look at those images?

18  A.   Yes.  These are the ones I took inside of the EMT.  This

19  one right here I took inside the training facility.

20  Q.   Just to be clear, have you had a chance -- I'm sorry, I

21  don't have a screen in front of me -- to see a through d?

22  A.   I have.

23  Q.   Do you recognize all of those images?

24  A.   I took all of them.

25  Q.   Okay.  And as a group, what do they depict?

18

JUSTIN JETT - DIRECT

1   A.    It depicts different rooms inside the empty training

2   facility.

3   Q.    And you took those at the EMT facility?  Do they

4   adequately and fairly depict what it looked like at the time

5   you took those pictures?

6   A.    They do.

7        MS. ROTH:  Your Honor, at this time I would move to

8   introduce and publish Government Exhibit 8a through d to the

9   jury.

10       THE COURT:  Any objection?

11       MR. SPEDDING:  No objection.

12       THE COURT:  United States Exhibits 8a through d will be

13   admitted and may be shown to the jury.

14          (Government Exhibits 8a - 8d were admitted.)

15   BY MS. ROTH:

16   Q.    Thank you.  Let's start with 8a, please.

17   A.    This looks like a -- it's the instructional area inside

18   the facility.  There's desks, and you see some of the little

19   mannequins used for CPR in the back.  In my memory, this is

20   when you walk in, the downstairs, you are looking at the

21   building earlier, you walk in the downstairs door, this is the

22   room you kind of walk into.

23   Q.    All right.  Let's move to 8b.

24   A.    This was a -- this was like a break room in the back.

25   Q.    8c.

JUSTIN JETT - DIRECT

1    A.   This was the -- this was the office.  It appeared to be in

2    the videos that were displayed yesterday.

3    Q.   Okay.  And what is the significance, whose office is this,

4    where is it?

5    A.   This is -- the way it was described to me was the office

6    that Mr. Fields had used to do paperwork and different stuff

7    for the EMT classes.

8    Q.   And you have reviewed the videos in this case?

9    A.   I have.  There was some stuff that popped out, like the

10   desk, you can see the copier in one of the videos and as well

11   as some -- like the linoleum on the floor and the wood

12   paneling.

13   Q.   All of those are shown here in 8c?

14   A.   Yes, ma'am.

15   Q.   All right.  Let's move to 8d.  What is this?

16   A.   This is a different view of the desk I was just

17   describing.

18   Q.   And again, you have heard the testimony in this case, is

19   this the location where Grace testified that Government's

20   Exhibit 2 were filmed or taken?

21   A.   It is.  She said it was the desk that the -- that she was

22   laying on.

23   Q.   All right.  Now, you had mentioned previously that you

24   also got a search warrant for the defendant's phone?

25   A.   I did.

JUSTIN JETT - DIRECT

1    Q.    I would like to move to that at this time.

2    A.    Okay.

3    Q.    Can you tell the jury what you did once you got that

4    search warrant for the defendant's phone?

5    A.    I seized the phone with the search warrant, and we were

6    unsuccessful doing a Cellebrite at Detective Judy's office of

7    the task force because there was a passcode on it.  And we were

8    unable to bypass that.  The Kentucky State Police crime lab in

9    Richmond was unable to bypass it.

10        Apparently when you plugged it in, it looked like the

11   version was available to bypass the lock, we just didn't -- we

12   didn't have that version, it's a lot more expensive.

13        And I contacted Detective Littrell again, and he advised

14   me that they had a -- I guess had a contract through Secret

15   Service that allowed them to take certain phones to them, and

16   they were able to operate as a Cellebrite hub and they had the

17   capability to bypass that.

18   Q.    Did that, in fact, happen?

19   A.    Yes.

20   Q.    And so the Secret Service was able to use their software

21   to get into the phone, and then was it sent back.

22   A.    It was sent back, yes, ma'am.

23   Q.    Where was it sent?

24   A.    Back to the Attorney General's Office in Frankfort.

25   Q.    And what happened next?

JUSTIN JETT - DIRECT

1    A.    We reviewed the data, and we found some images that

2    appeared to be either the ones that came off of -- off of

3    Grace's phone, or similar screen shots of videos that came off

4    Grace's phone.

5    Q.    Let's talk a little bit more about that.  Can you describe

6    to the jury -- you know, we've talked about the incident in the

7    ambulance and the incident at the EMT facility.  Let's talk

8    about them separately.

9         The ambulance picture, Government's Exhibit 1 that the

10   jury saw here today, was there evidence on the defendant's

11   phone of him possessing the same or a similar image?

12   A.    It appears to be almost the identical image that was --

13   that we looked at earlier with the penis going into the vagina

14   with the legs.  The same image appears to be on Mr. Fields'

15   phone as well.

16   Q.    And that's Government Exhibit 3?

17   A.    Yes, ma'am.

18   Q.    Okay.  So 1 came from Grace's phone, Government's

19   Exhibit 1 came from Grace's phone, Government Exhibit 3, very

20   similar picture, but from the defendant's phone?

21   A.    Yes, ma'am.

22   Q.    Okay.  Now, what about the videos and/or images that were

23   found on Grace's phone from the EMT training facility,

24   Government Exhibit 2?  Was there any evidence on the

25   defendant's phone of similar images?

JUSTIN JETT - DIRECT

1   A.   There were.  It looked like there were almost like still

2   shots or screen shots of certain segments of the videos that

3   were taken that were on Mr. Fields' phone as well.

4   Q.   Are there certain things apparent in those pictures on

5   Fields' phone that make you think that they came from the same

6   incident?

7   A.   After reviewing the videos, you recognize certain aspects

8   of the video.  They look similar.  One in particular is a --

9   shows -- appears to show Grace laying back on the desk and

10  shows the pink shirt she had on.

11  Q.   You can see the same clothing items --

12  A.   Yes.

13  Q.   -- on Grace in the pictures on the defendant's phone as

14  are depicted in Government Exhibit 2?

15  A.   That's correct.

16  Q.   Okay.  And are those images that were found on the

17  defendant's phone Government Exhibits 4a through e?

18  A.   Yes.

19  Q.   Now, once you had the videos and the pictures that you

20  just described from both Grace's phone and the defendant's

21  phone, what did you do next?

22  A.   After I had all that together, I got the case ready and

23  presented it for prosecution.

24  Q.   Is that how we ended up here today?

25  A.   It is.

JUSTIN JETT - CROSS

1           MS. ROTH:  May I have just a second?

2           THE COURT:  Yes, ma'am.

3           MS. ROTH:  We have no further questions of this witness,

4     Your Honor.

5           THE COURT:  All right.  Thank you.

6           Mr. Spedding.

7                        CROSS-EXAMINATION

8     BY MR. SPEDDING:

9     Q.   Detective Jett, you and I have met on several occasions

10    regarding this case and talked about the evidence and things

11    like that.  I just want to go over some of the things that you

12    were asked on -- on direct.

13         You were the lead detective on the investigation in both

14    Harrison and Bourbon Counties, correct?

15    A.   That's correct.

16    Q.   And during the course of that investigation, you applied

17    for and received certain search warrants, correct?

18    A.   I did.

19    Q.   And you applied for and received actually a warrant for

20    arrest regarding some charges that were levied in Harrison

21    County; is that correct?

22    A.   That's correct.

23         MR. SPEDDING:  Your Honor, if I could hand this document

24    up to the witness?

25         THE COURT:  Yes, sir.

JUSTIN JETT - CROSS

1        MR. SPEDDING:  I'm just going to give this to you in case

2   you need to refresh your recollection.

3        THE COURT:  Show it to counsel first.

4        Ms. Roth, have you seen the document?

5        MS. ROTH:  I have, Your Honor.

6        THE COURT:  Thank you.  You can give it to him.

7   BY MR. SPEDDING:

8   Q.   Take just a second and take a look at it.  Let me know

9   when you're ready.

10  A.   Okay.

11  Q.   Okay.  And what I want to do is go through the process of

12  this for the jury so they understand, and you correct me if I'm

13  wrong.

14       Once you feel there's probable cause to charge somebody

15  with a crime, you fill out or complete a complaint warrant.

16  And in that warrant, you file an affidavit, correct?

17  A.   That's correct.  Either you can go through a complaint

18  warrant or you can do, I guess, a citation, probable cause to

19  arrest them.

20  Q.   When you file these, when you ask for these warrants, you

21  actually are considered what's called an affiant; is that

22  correct?

23  A.   That's correct.

24  Q.   Can you explain to us what an "affiant" means?  What an

25  affiant is?

25

JUSTIN JETT - CROSS

1   A.   You're pretty much the one that's bringing the charges

2   forward, kind of signing saying this happened.

3   Q.   Okay.  And when you fill out an affidavit or when you're

4   the affiant, you're swearing that what you're saying in that

5   document is true, correct?

6   A.   That's correct.

7   Q.   In this particular warrant of arrest that I've handed you,

8   there are some charges that you asked to be placed against

9   Mr. Fields, correct?

10  A.   That's correct.

11  Q.   Down under the portion where it says complaint, there's a

12  narrative there that talks about the basis for these charges,

13  correct?

14  A.   That is correct.

15  Q.   Isn't it true in this particular complaint you indicate

16  that Mr. Fields had sexual intercourse, deviant sexual

17  intercourse, with a 17-year-old female when he was 36 years

18  old?

19  A.   Yes.

20  Q.   And then you also say that the act was videotaped by the

21  minor with his knowledge, correct?

22  A.   Yes.

23  Q.   So you acknowledge in this particular affidavit that Grace

24  is the one that videotaped the act, correct?

25  A.   Yes.

JUSTIN JETT - CROSS

1  Q.   Okay.  Now what I'm going to do is move to your -- I was

2  provided a copy by the United States of your KYIBRS narrative.

3  A.   All right.

4  Q.   Do you have that up there in front of you?

5  A.   I may.  There were four -- I think four separate reports

6  that came out of this.  Of course there are four separate cases

7  that came out of this one, I don't know which one you have.

8  Q.   Well, this one was actually the one out of Bourbon County

9  for the unlawful transaction with a minor.

10  A.   I think there were two out of Bourbon County.  Do you know

11  the case number on the top of the incident number, what dash it

12  is?

13  Q.   Dash 4.

14  A.   That's the one I've got in front of me.

15  Q.   Now, likewise, on these reports, this is an investigative

16  document, correct?

17  A.   Yes.

18  Q.   When you're conducting these investigations, you would

19  agree with me that it's important for you to note and to record

20  all the pertinent information surrounding your findings or what

21  you're doing, correct?

22  A.   That's correct.

23  Q.   Okay.  In this particular case, you testified earlier on

24  direct that you seized Ms. XXXXX's cell phone, correct?

25  A.   Yes.

JUSTIN JETT - CROSS

1  Q.   On that cell phone, there was certainly information you

2  testified to, correct?

3  A.   That's correct.

4  Q.   And do you recall conversations that she had with other

5  individuals on that phone?

6  A.   I do.

7       MS. ROTH:  Your Honor, may we approach?

8       THE COURT:  Yes, you may.

9       (Bench conference on the record.)

10      THE COURT:  Yes, ma'am.

11      MS. ROTH:  Your Honor, it sounds to me like he's getting

12  ready to ask the detective about additional conversations had

13  by the victim on her cell phone, that would be hearsay and

14  inadmissible.

15      MR. SPEDDING:  It's not hearsay, Judge.  I'm not

16  introducing it to prove the truth of the matter asserted.  What

17  I'm introducing it for is to show this conversation that she

18  had with another individual.

19      I can show you what I'm --

20      THE COURT:  I'll sustain the objection.  It still would be

21  hearsay, conversation she had with another individual.

22      MS. ROTH:  What is the -- I mean --

23      MR. SPEDDING:  It's not hearsay, but I understand your

24  ruling, Judge.

25      THE COURT:  Well, let me see it.

JUSTIN JETT - CROSS

1          By the way, I thought we had an agreement that you were

2     not to mention this young lady by name, but you just did.

3          MR. SPEDDING:  I called her Grace.

4          MS. ROTH:  You said "Ms. XXXXX."

5          MR. SPEDDING:  I didn't even know I did that.

6          THE COURT:  Do you want to see the transcript?

7          MR. SPEDDING:  No.  I believe you, Judge.  I just didn't

8     know that I did it.

9          THE COURT:  What do you want to ask?

10          MR. SPEDDING:  I want to ask him about this conversation

11     up at the top.

12          THE COURT:  If the victim had a conversation with another

13     individual?

14          MS. ROTH:  What's the relevance of that?

15          MR. SPEDDING:  Because it goes to what she testified about

16     yesterday.  She didn't remember anything.  I'm going to ask him

17     about conversations that they had where she claimed she didn't

18     remember anything.

19          MS. ROTH:  I think her testimony yesterday was if she said

20     that, it wasn't true, that she was embarrassed.

21          THE COURT:  I'm going to allow him to ask if, during the

22     course of the investigation, the victim acknowledged that she

23     had another conversation about the encounter.  You can't get

24     into the details of it.  That would be hearsay.

25          MS. ROTH:  Thank you.

JUSTIN JETT - CROSS

1           (Bench conference concluded.)

2           THE COURT:  Thank you, you may proceed.

3    BY MR. SPEDDING:

4    Q.   Detective, how many times did you meet with Ms. XXXXX?

5    A.   I don't know the exact number.  It was quite a few.

6    Q.   Approximate.

7           THE COURT:  Counsel, I'm going to admonish you at this

8    point, using the victim's name as I've told you previously --

9           MR. SPEDDING:  Yes, sir.

10          THE COURT:  -- the last two minutes in front of the bench

11   here.

12          MR. SPEDDING:  Yes, sir.

13          THE COURT:  If you do it again, I'll hold you in contempt.

14   Do you understand?

15          MR. SPEDDING:  Yes, sir.

16   BY MR. SPEDDING:

17   Q.   Detective, how many times have you met with Grace?

18   A.   I'm not for sure.  It was quite a few times.

19   Q.   Did you hear her testimony yesterday in which she

20   testified it was ten to 12 times?

21   A.   I did.

22   Q.   Would you agree with that?

23   A.   That could be -- that could be an accurate number.  It was

24   quite a few.  If you count every time I talked to her, every

25   time we went to like a CAC interview as an interview, then it

30

JUSTIN JETT - CROSS

1    was well over ten, yes.

2    Q.    Okay.  You testified on direct about these images that

3    were, I believe, exhibits -- Government Exhibit 3 on Grace's

4    phone, correct?

5    A.    Yes.

6    Q.    I'm sorry.  They are Exhibit 3 on Mr. Fields' phone.

7    A.    Yeah.  The Exhibit 1 was on Grace's.  Exhibit 3 was on

8    Mr. Fields'.

9    Q.    The images that you found on Mr. Fields' phone, you can't

10   determine whether or not those were taken on that phone or

11   taken on Grace's phone, correct?

12   A.    Which one is that?

13   Q.    On Exhibit 3.

14   A.    On Exhibit 3?

15   Q.    Government Exhibit 3.

16   A.    I don't know if any kind of data came back on that to show

17   like the other ones.  It just showed the GPS.  And if you allow

18   me to look at the report real fast?

19   Q.    Sure.

20   A.    Exhibit 1 just had the date and time and the GPS location.

21   It didn't -- I didn't see -- I don't recall a -- the phone that

22   was used to take the image.

23   Q.    Okay.

24        MR. SPEDDING:  One moment, please, Your Honor.

25        THE COURT:  Yes, sir.

31

JUSTIN JETT - REDIRECT

1        MR. SPEDDING:  Your Honor, that's all I have.  Thanks.

2        THE COURT:  Ms. Roth, any redirect?

3        MS. ROTH:  Yes.

4        THE COURT:  All right.  You may proceed.

5        MS. ROTH:  Thank you.

6                    REDIRECT EXAMINATION

7  BY MS. ROTH:

8  Q.   Detective Jett, you were asked by Mr. Spedding about some

9  charges that you brought in Harrison County, correct?

10 A.   That's correct.

11 Q.   And I just want to clarify for the jury because I think

12 that that might be a little bit confusing.

13      The two incidents that are charged in this indictment

14 occurred where?

15 A.   In Bourbon County.

16 Q.   In Bourbon County?

17 A.   Yes.

18 Q.   So both the ambulance facility and the EMT training

19 facility are in Bourbon County?

20 A.   That is correct.

21 Q.   Okay.  What is this complaint in reference to?

22 A.   Interviews with Grace, along with a video that was -- that

23 was recovered from the inside of Mr. Fields' bedroom.

24 Q.   Okay.  And can you tell me what that video showed?

25 A.   It showed -- it showed Grace laying down across the bed

JUSTIN JETT - REDIRECT

1  and Mr. Fields down at the end of the bed with his head between

2  her legs.

3  Q.   Who was taking the pictures or the photographs or the

4  video?

5  A.   It appeared that Grace was taking that video.

6  Q.   Okay.  And where did that happen?

7  A.   In Harrison County.

8  Q.   In Harrison County.  And that was in Mr. Fields' home?

9  A.   Yes, ma'am.

10  Q.   And how do you know that?

11  A.   I went in on a separate search warrant and observed the

12  inside of his residence and took photos.

13  Q.   And did you recognize that room in that video?

14       MR. SPEDDING:  Your Honor, I object to this line of

15  questioning.

16       THE COURT:  It's responsive to the questions that were

17  brought out on cross-examination, so I will allow a few

18  additional questions along this line.

19       MS. ROTH:  We're about to wrap up.

20  A.   It was inside of the bedroom.  I had a detective with KSP

21  that had a device that was able to find bodily fluids.

22  Q.   We don't need to go into more.  I just wanted confirmation

23  that the video you're just describing happened in Mr. Fields'

24  bedroom?

25  A.   Yes.

33

JUSTIN JETT - REDIRECT

1    Q.   And that was located in Harrison County?

2    A.   That's correct.

3    Q.   But just to clarify for the jury, that video isn't charged

4    in this indictment?

5    A.   No, it is not.

6    Q.   Okay.  What we're talking about are two additional videos?

7    A.   From Bourbon County.  Yes, ma'am.

8    Q.   From Bourbon County, okay.  So did you bring charges at

9    the state level in Bourbon County as well?

10   A.   Bourbon County and in Harrison.

11   Q.   And Mr. Fields lived in Harrison County?

12   A.   That's correct.

13   Q.   Okay.  And then I just want to note what you charged him

14   with here in Harrison County, for the bedroom video that you

15   just described, includes use of a minor in a sexual

16   performance; is that correct?

17   A.   That's charge 3, yes, ma'am.

18   Q.   And is that because you can still use a minor even if you

19   aren't the one holding the phone?

20   A.   Yes.

21        MS. ROTH:  No further questions, Your Honor.

22        THE COURT:  All right.  Let's see if there's any recross

23   on matters brought out on redirect?

24        MR. SPEDDING:  No recross, Your Honor.

25        THE COURT:  All right.  Thank you.  You may step down.

1        Mrs. Roth, Ms. Melton, the United States may call its next

2   witness.

3        MS. ROTH:  Your Honor, the United States has no additional

4   witnesses.

5        THE COURT:  The United States rests at this time?  All

6   right.

7        Ladies and gentlemen, we'll take a brief recess, about a

8   15-minute recess before we call you back.  Please keep in mind

9   the admonitions that you've been given previously.  Please

10  don't discuss the case among yourselves while we are in recess.

11  We'll call the jury back approximately five minutes after ten

12  this morning.

13       (Jury left courtroom at 9:49 a.m. and returned at 10:50

14  a.m.; the charge was read by the Court; closing arguments were

15  given; a verdict was returned at 1:40 p.m.; transcripts not

16  requested.)

17            (Proceedings concluded at 1:40 p.m.)

18

19                  C E R T I F I C A T E

20       I, Linda S. Mullen, RDR, CRR, do hereby certify that

21  the foregoing is a correct transcript from the record of

22  proceedings in this above-entitled matter.

23  /s/Linda S. Mullen              January 14, 2021
    Linda S. Mullen, RDR, CRR       Date of Certification
24  Official Court Reporter

25

```
 1                            I N D E X

 2     WITNESS                                        PAGE

 3     JUSTIN JETT
       Direct Examination By Ms. Roth                   5
 4     Cross-Examination By Mr. Spedding               23
       Redirect Examination By Ms. Roth               31
 5

 6     EXHIBIT                                       ADMITTED

 7       Government Exhibit 8a                         18
         Government Exhibit 8b                         18
 8       Government Exhibit 8c                         18
         Government Exhibit 8d                         18
 9
         Government Exhibit 9a                         12
10       Government Exhibit 9b                         12

11       Government Exhibit 11                         16

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25