```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                    CENTRAL DIVISION AT LEXINGTON

 3                              - - -
       UNITED STATES OF AMERICA,     .  Case No. 5:19-CR-00178
 4                                   .
                 Plaintiff,          .
 5                                   .  Lexington, Kentucky
               - v -                 .
 6                                   .  Wednesday, October 28, 2020
       WILLIAM MICHAEL FIELDS JUNIOR, .  9:01 a.m.
 7                                   .
                 Defendant.          .
 8                              - - -

 9              TRANSCRIPT OF SENTENCING PROCEEDINGS
                BEFORE THE HONORABLE DANNY C. REEVES
10               UNITED STATES DISTRICT COURT JUDGE

11                              - - -

12

13     For the United States:     MARY LAUREN MELTON, ESQ.
                                  Assistant U.S. Attorney
14                                United States Attorney's Office
                                  260 West Vine Street, Suite 300
15                                Lexington, Kentucky  40507

16     For the Defendant:         CHRISTOPHER A. SPEDDING, ESQ.
                                  Spedding Law Office
17                                271 West Short Street, Suite 402
                                  Lexington, Kentucky  40507
18
       Court Reporter:            LINDA S. MULLEN, RDR, CRR
19                                Official Court Reporter
                                  101 Barr Street
20                                Lexington, Kentucky  40507

21

22     Proceedings recorded by mechanical stenography, transcript
       produced by computer.
23

24

25
```

1    (Proceedings in open court, October 28, 2020, 9:01 a.m.)

2         THE COURT:  Thank you.

3         Madam Clerk, would you call the matter scheduled for 9:00,

4    please.

5         THE CLERK:  Yes, Your Honor.  Lexington Criminal Action

6    Number 19-178, United States of America versus William Michael

7    Fields Junior, called for sentencing.

8         THE COURT:  Thank you.

9         Would counsel state their appearances, please.

10   Ms. Melton.

11        MS. MELTON:  Mary Melton on behalf of the United States,

12   Your Honor.

13        THE COURT:  Mr. Spedding.

14        MR. SPEDDING:  Good morning, Your Honor.  Christopher

15   Spedding for William Michael Fields Junior.  He is seated to my

16   right.

17        THE COURT:  All right.  Thank you.  This matter is

18   scheduled for a sentencing hearing this morning.

19        Before we proceed with the hearing, let me first confirm

20   that Mr. Fields has had the opportunity to review his

21   presentence report and also to discuss the report with his

22   attorney to his satisfaction; is that correct?

23        THE DEFENDANT:  I have, Your Honor.

24        THE COURT:  Mr. Fields, your presentence report will be

25   filed in the record under seal pursuant to Rule 32 of the

1    Federal Rules of Criminal Procedure.  It's available if the

2    parties should need the report for any reason, it's not

3    available for the general public to review pursuant to that

4    rule.

5         There are several objections that have been filed to the

6    presentence report that will require ruling by the Court.

7    We'll address those in just a moment.

8         Before we get to the objections, I will note for the

9    record that I have received the sentencing memorandum filed by

10   the defendant that appears at Docket Entry Number 70, as well

11   as the sentencing memorandum filed by the government at Docket

12   Entry 71, a supplement to the sentencing memorandum containing

13   letters, that's Docket Entry 73.  And then a second supplement

14   containing additional letters in support of the defendant,

15   Docket Entry 75.  All of that information, of course, will be

16   considered in determining an appropriate sentence in the case.

17        Now, turning to the objections that do appear through the

18   addendum, the objections have been filed and attached to the

19   presentence report.  The addendum addresses those objections on

20   behalf of the probation office.

21        We'll proceed with these in the order in which they are

22   presented.

23        In the first objection, the defendant objects to the

24   two-level increase that's reflected in paragraph 20.  That's a

25   two-level increase under 2G2.1(b)(3).  The defendant contends

1    that he did not knowingly distribute the images in issue here.

2         Under 2G2.1(b)(3), there is a two-level increase that the

3    defendant knowingly engaged in the distribution.  Inasmuch as

4    this is an increase, the burden falls upon the United States to

5    address the matter first.

6         Ms. Melton.

7         MS. MELTON:  Thank you, Your Honor.

8         At the outset, it should be noted that the definition of

9    distribution under the sentencing guidelines is much broader

10   than the definition of distribution under the child

11   exploitation statute such as 2252.

12        Under the guidelines, distribution is broadly defined as

13   "any act related to the transfer of child exploitation

14   material."  In *U.S. v Grzybowicz*, I'm not sure if I'm

15   pronouncing that correctly, from the Eleventh Circuit, the

16   Court explicitly noted the distinction between the guidelines

17   definition and the statutory definition.

18        Similarly, in *United States v. Fernandez* from the Ninth

19   Circuit, the Court held that "any inference of any act is a

20   term of great breadth."  And the Court also noted that "related

21   to" evoked similar breadth.

22        In *United States v. Holt* from the Eleventh Circuit, the

23   Court noted that the commentary language defines distribution

24   somewhere along the spectrum between posting material on a

25   website, which is distribution, and merely soliciting that

1   material, which is not distribution.  So it covers a wide range

2   of conduct.

3        Finally, in *United States v Mudd*, which is a published

4   decision from the Sixth Circuit, the Court stated that "the

5   definition of 'distribution' is capacious, including any act

6   related to the transfer of material involving the sexual

7   exploitation of a minor."

8        In *United States v Mudd,* there were similar factual

9   circumstances as here, in that the defendant sent the material

10  to himself.  And, actually, Your Honor, he did, in *United*

11  *States v Mudd,* show the material on his phone to another party.

12  But I think I was thinking of *United States v Holt* in terms of

13  the case that was very similar.

14       But nevertheless, both of those cases stand for the

15  proposition that you can send an image to yourself and then

16  show that image to a third party on your device and that is

17  enough for distribution under the guidelines.

18       Here, the evidence at trial showed that Mr. Fields had sex

19  with a minor victim, produced the two videos of her on her

20  phone, and then sent those materials to himself.  So the

21  transmission was from the minor victim's Snapchat to the

22  defendant's Snapchat, which the United States contends is an

23  act related to the transfer of child exploitation material,

24  that sending from one Snapchat account to the other was

25  certainly a transfer.

1        I think the concern comes in as to whether something is

2    distribution if you merely send it to yourself.  However, the

3    United States is prepared to put on testimony today that did

4    not come out at trial, which was not particularly relevant,

5    that the defendant, after sending these images to himself, did

6    show the images to at least three other individuals on his

7    phone.

8        THE COURT:  All right.  If that factual issue is

9    contested, then we will proceed with proof on that point.

10       Mr. Spedding?

11       MR. SPEDDING:  Your Honor, primarily we will stand on the

12   objections as written in the letter to Officer Cardin and as

13   contained in our sentencing memorandum.

14       The only additional comment I would make is that I think,

15   in this particular instance, considering that issue from an

16   intent of the actual guideline standpoint would be appropriate.

17   And the distribution that Ms. Melton has indicated, as well as

18   the cases that I've looked at that were contained in the United

19   States' sentencing memorandum, all seem to indicate and seem to

20   involve file sharing, things of that nature.  So in that sense,

21   there was no evidence of that.

22       I agree that there was -- and there could -- the United

23   States could put on evidence that at least on one occasion

24   Mr. Fields, I believe he offered to show a photograph that, as

25   far as I know, would be without going to the extreme of having

1    someone identify the body part, I believe that there was

2    evidence or information in discovery that he offered to do that

3    to one person.

4         So from the standpoint of that, and if the Court believes

5    that satisfies that particular guideline, then I think that it

6    satisfies it.

7         But again, from the standpoint of what the intent of the

8    guidelines is all about, I don't think that there was a

9    distribution here.  It was basically a personal

10   gratification-type situation, so I would ask the Court to

11   overrule that increase.

12        THE COURT:  All right.  Thank you.

13        We'll proceed with proof on that point.

14        Ms. Melton.

15        MS. MELTON:  Yes, Your Honor.  Your Honor, would you like

16   copies of the reports that Mr. Jett will be talking about

17   during his testimony?

18        THE COURT:  Yes, ma'am.  Do you intend to offer that as

19   evidence in the case?

20        MS. MELTON:  Yes, Your Honor.

21        THE COURT:  All right.  You can premark that and I'll look

22   at the version that you would provide for the clerk's copy.

23        MS. MELTON:  Your Honor, there are three different

24   statements, can I mark it as a collective exhibit?

25        THE COURT:  Yes, ma'am.

8

JUSTIN JETT - DIRECT

1      I'll note before you call your witness, of course while

2  the rules of evidence do not technically apply in sentencing

3  hearings, the Court does consider evidence that has sufficient

4  indicia of reliability.  Of course, I'll have to wait until I

5  hear that testimony before I make that determination in this

6  matter, but you may proceed with your witness.

7      MS. MELTON:  Yes, Your Honor.  United States calls

8  Detective Jett.

9      **JUSTIN JETT, GOVERNMENT WITNESS, SWORN**

10     THE COURT:  Ms. Melton, you may proceed.

11                          JUSTIN JETT

12                       DIRECT EXAMINATION

13  BY MS. MELTON:

14  Q.   Detective Jett,  can you please state and spell your name

15  for the record?

16  A.   Justin Jett, J-u-s-t-i-n, J-e-t-t.

17  Q.   How are you employed, sir?

18  A.   I'm a sergeant detective with the Cynthiana Police

19  Department.

20  Q.   Did you have an occasion to investigate the defendant

21  involved in this sentencing hearing, William Michael Fields?

22  A.   I did.

23  Q.   Just to remind everyone for the record, what was the

24  nature of that investigation and what was Mr. Fields ultimately

25  convicted of?

JUSTIN JETT - DIRECT

1    A.    It was a production of child pornography case -- charge.

2    Q.    During the course of your investigation of the production

3    of child pornography, what, if any, evidence did you learn

4    about Mr. Fields' showing the subject images or any images of

5    the minor victim to third parties?

6    A.    In April of 2019, I had gone to Fire Station 1 and

7    interviewed some of the other firefighters there in Paris,

8    Kentucky.

9         And three different -- three different individuals there

10   had made a remark that Mr. Fields had shown them images of

11   either a vagina, breast or anus on his cell phone.  One -- one

12   individual, it was Ben Gnau, I think I'm saying his last name

13   right, it's G-n-a-u is his last name, he had made the remark

14   that Fields had alluded that that was the female from Cynthiana

15   that he was seeing.

16   Q.    And what did Mr. Gnau say he saw on Mr. Fields' phone?

17   A.    Mr. Gnau said that he had shown him a picture of a

18   female's breast, and that was the only thing visible in the

19   photo.

20   Q.    That Mr. Fields showed Mr. Gnau --

21   A.    Yes.

22   Q.    -- a photo of a female's breast?  Thank you.

23        You mentioned two other individuals.  Can you tell us what

24   those individuals saw and the circumstances surrounding them

25   viewing the images?

10

JUSTIN JETT - DIRECT

1    A.   Yes.  The other firefighter was Kendall Williams, and he

2    had shown him explicit photos, he had said, of just breasts,

3    vaginas and anuses, but that was the only thing visible in the

4    photos.

5    Q.   And, again, Mr. Fields showed Mr. Land that on Mr. Fields'

6    phone, correct?

7    A.   Showed Mr. Williams that.

8    Q.   Excuse me, showed Mr. Williams that?

9    A.   Yes.

10   Q.   And what was the name of the other individual who made a

11   similar report to you?

12   A.   Chad Land.

13   Q.   Can you tell us what Mr. Land said with respect to

14   Mr. Fields showing him images?

15   A.   He said that Mike had briefly, one day they were hanging

16   out, pulled his phone out and said, look at this, and showed

17   him a picture of a vagina on his phone.

18   Q.   I understand you said that the witnesses stated that there

19   was not a face shown in these images.  What leads you to

20   believe that these were, in fact, the images of the minor

21   victim?

22   A.   When we were talking, it was around the same time frame as

23   when the victim was going to the fire department up there in

24   Paris.  Along with, I guess, Mr. Williams saying that Mike had

25   told him that was the female from Cynthiana.

JUSTIN JETT - DIRECT

1   Q.   Detective Jett, I am going to show you what has been

2   premarked as Government Exhibit 1.

3        Do you recognize those documents?

4   A.   I do.

5   Q.   What are they?

6   A.   They are the witness interview sheets that Kendall

7   Williams, Ben Gnau, and Chad Land filled out for me on

8   April 25th, 2019, at the Paris Fire Department.

9   Q.   And each of those statements has handwriting on it,

10  correct?

11  A.   That is correct.

12  Q.   Whose handwriting is on each of those statements?

13  A.   Kendall Williams -- my handwriting is on there for the

14  interviewing officer.  But all the rest of the handwriting is

15  Kendall Williams is on his.  Ben Gnau on his, and Chad Land on

16  the sheet with his name.  I allowed them to fill them out

17  themselves.

18  Q.   Did each of those witnesses sign their statements?

19  A.   They did.  When I do witness interview statements, I have

20  the witness initial before they start their statement, and

21  initial any error they have in it, and then initial at the very

22  end.  And then we make like an X at the end of the statement,

23  they initial every quadrant of that X, and they sign and date

24  at the bottom.

25  Q.   When did you obtain these statements again, Mr. Jett?

                                   JUSTIN JETT - CROSS                    12

1    A.   April 25th, 2019.

2         MS. MELTON:   Your Honor, at this time the government would

3    move to introduce what's been premarked as Government Exhibit 1

4    for the record.

5         THE COURT:   All right.

6         Any objection to its admission?

7         MR. SPEDDING:   No objection, Your Honor.

8         THE COURT:   It will be admitted for this hearing.

9              (Government Exhibit 1 was admitted.)

10   BY MS. MELTON:

11   Q.   Detective Jett, when you obtained these statements, did

12   you make any threats or any promises to any of these witnesses

13   about the outcome of them potentially providing a statement?

14   A.   No, I did not.

15        MS. MELTON:   Thank you.   That's all I have, Your Honor.

16        THE COURT:   All right.   Thank you.

17        Mr. Spedding.

18                         CROSS-EXAMINATION

19   BY MR. SPEDDING:

20   Q.   Detective Jett, none of these three witnesses ever

21   identified who the photos were of, correct?

22   A.   That's correct.

23   Q.   I believe I may have misheard, but I believe you said

24   Mr. Williams said that Mr. Fields told him that was the female

25   from Cynthiana -- is that -- did you say that?   I didn't see

JUSTIN JETT - CROSS

1  that.

2  A.   Yeah, I believe, unless I've got my statements mixed up.

3  I'm sorry, you're correct, it was Ben Gnau that had said that.

4  I'm sorry.  It was Ben Gnau that said that it was the female he

5  had been hanging out with from Cynthiana.

6  Q.   An 18-year-old female, is that what he said?

7  A.   Mike Fields advised that the picture was of an 18-year-old

8  female he had been hanging out with from Cynthiana, that's what

9  it says.

10  Q.   But then up above that, he says -- or he writes he didn't

11  know the identity of either of the females, correct?

12  A.   That is correct.

13  Q.   So we don't know who they are of?

14  A.   We don't know.  And all witnesses had stated they were --

15  that there were no -- the only thing they saw was the private

16  areas there.

17  Q.   Okay.

18       MR. SPEDDING:  That's all I have, Judge.  Thanks.

19       THE COURT:  All right.  Thank you.

20       Anything else for the witness, Ms. Melton?

21       MS. MELTON:  No, Your Honor.

22       THE COURT:  All right.  Thank you, you may step down.

23       Any other proof or argument on this particular

24  enhancement?

25       MS. MELTON:  No, Your Honor.  I do have copies of some of

1   the case law that I mentioned earlier, if you would like me to

2   tender that to the Court.  I also have a copy for defense

3   counsel.

4        THE COURT:  I have reviewed most if not all of the

5   authorities that you had cited earlier, but if you would like

6   to supplement the record, you can certainly do so.  But I'm

7   familiar with that case law.

8        MS. MELTON:  If you've already reviewed it, I don't think

9   I need to.

10        THE COURT:  All right.

11        MS. MELTON:  Thank you.

12        THE COURT:  Thank you.

13        Let me address these as we go through them.

14        The first objection relates to an enhancement under

15   2G2.1(b)(3), the defendant knowingly engages in distribution,

16   increase by two levels.

17        And as counsel for the United States indicates, the

18   definition of distribution is broad under this particular

19   application note -- excuse me, under the guidelines section.

20   Distribution is defined in the application notes under the

21   definition section.

22        In this particular case, I do find that the defendant

23   engaged in distribution.  The proof in the case establishes

24   that the defendant did, in fact, take photographs and videos of

25   the victim during sexual activity in which he engaged.  He then

1    used Snapchat to send the material to himself.

2         The question raised here is whether these images that may

3    have been shown to third persons, whether that is necessary to

4    constitute distribution.  In other words, can a person

5    distribute just by sending images from one phone another, to

6    himself.

7         In this particular case, I do find that there is

8    sufficient evidence to establish by a preponderance of the

9    evidence that the photographs at issue were of the victim.  And

10   so I do find the defendant not only sent these images to

11   himself, but then also showed the images to at least one, and

12   perhaps three individuals.

13        There's no evidence in the record that would indicate that

14   the defendant had any other type of pornography, either child

15   pornography or adult pornography, on his phone.  And that at

16   the time the interviews were conducted, the defendant had been

17   involved in this relationship with the victim since at least

18   March of that year.

19        So the photographs or the images on the phone would be

20   close in time to the activity charged and for which the

21   defendant stands convicted.

22        While there is reference to more than one individual in

23   some of these witness statements, that may certainly be due to

24   the fact that you could not tell whether it was one or more

25   individuals based upon the body parts that were being shown in

1    the photographs.  And so I do find that based upon the

2    defendant's actions in sending images to himself, taking that

3    action to obtain those images, and then close in time showing

4    images to others, and no indication that there were other types

5    of pornography on his phone, that in fact he did engage in

6    distributing or showing those to other individuals, and that

7    conduct would fall within the definition of distribution under

8    the guidelines section.

9        I will overrule the objection to the two-level increase

10   under paragraph 20, which reflects a two-level increase under

11   2G2.1(b)(3).

12       The next enhancement is under that same general section,

13   it's 2G2.1(b)(6), which provides that "if, for the purpose of

14   producing sexually explicit material or for the purpose of

15   transmitting such material live, the offense involved (A) the

16   knowing misrepresentation of a participant's identity to

17   persuade, induce, entice, coerce, or facilitate the travel of,

18   a minor to engage in sexually explicit conduct; or (B) the use

19   of a computer or interactive computer service to (i) persuade,

20   induce, entice, coerce, or facilitate the travel of, a minor to

21   engage in sexually explicit conduct, or to otherwise solicit

22   participation by a minor in such conduct, or (ii) solicit

23   participation with a minor in sexually explicit conduct,

24   increase by two levels."

25       The definition of "computer" is referenced in the

1   application notes under Title 18, Section 1030(e)(1), and

2   there's also a section in application note 6 -- excuse me, and

3   also the definition of "interactive computer service" that is

4   defined in Title 47 of the United States Code, Section

5   230(f)(2).

6       There's also a section on the use of a computer or

7   interactive computer service under application note 6.

8       Again, this is an increase that the probation office has

9   applied to the base offense level, therefore the United States

10  would have the burden of proof and the burden of going forward.

11      MS. MELTON:  Yes, Your Honor.  The focus of this

12  enhancement is subsection (B) under 2G2.1(b)(6).  In other

13  words, that the defendant used a computer or interactive

14  service to persuade, induce, entice a minor to engage in

15  sexually explicit conduct, or to otherwise solicit

16  participation by a minor to engage in such conduct.

17      The facts relating to this enhancement are that the

18  defendant messaged the minor victim on Snapchat the very first

19  day that they met.  In fact, just that night he sent a picture

20  of his penis to her over the Snapchat application.

21      Thereafter, they communicated exclusively through Snapchat

22  when they were not face to face.

23      And finally, and perhaps most saliently, on March 23rd,

24  the defendant enticed the victim to come to the Paris Fire

25  Department using Snapchat where he later produced sexually

1   explicit images of her.

2         THE COURT:  Thank you.

3         Mr. Spedding.

4         MR. SPEDDING:  Your Honor, we'll just -- again, we'll rest

5   on what we submitted in the objections in our sentencing

6   memorandum for the Court.

7         THE COURT:  All right.  Thank you.

8         Ms. Melton, it's the government's position, as I

9   understand, that the use of Snapchat would fit within the

10  definition of interactive computer device under Title 47,

11  Section 230?

12        MS. MELTON:  Yes, Your Honor, that's correct.

13        THE COURT:  All right.  I've looked at that particular

14  section and it would appear to apply here.  The phrase as used

15  in that particular section, "the term 'interactive computer

16  service' means any information service, system, or access

17  software provider that provides or enables computer access by

18  multiple users to a computer server, including specifically a

19  service or system that provides access to the internet and such

20  systems operated or services offered by libraries or

21  educational institutions."

22        The use of Snapchat as it has been defined and as it was

23  testified to during the testimony in this particular matter

24  would fit within that definition, and I do find that under the

25  circumstances presented that the defendant enticed and induced

1  the victim in the case through the use of Snapchat.

2      He was essentially grooming her initially by the use of

3  Snapchat, sending these images and attempting to solicit images

4  from her.

5      And then used the same type of device, interactive

6  service, to entice the individual at least on one occasion, on

7  March 23rd, to engage in sexual conduct.  The victim herself

8  testified to that, and I do find that the testimony was

9  credible and is sufficient to support by a preponderance of the

10  evidence that this particular section should be applied.

11      Therefore, I will overrule the objection to paragraph 21

12  and apply the two-level increase under 2G2.1(b)(6).

13      The next objection is under 3B1.3.  There is a two-level

14  increase that has been applied for the defendant abusing a

15  position of public or private trust in a manner that

16  significantly facilitated the commission or the concealment of

17  the offense.  That's a two-level increase that is reflected in

18  paragraph 23 of the presentence report.

19      Again, the government does have the burden of proof on

20  this issue.  I have reviewed the parties' arguments and their

21  written materials.  I do believe that this is a much closer

22  question as to whether this enhancement should be applied.  And

23  I am skeptical as to whether this two-level increase should be

24  applied under the circumstances that are presented.

25      I do understand the government's position to be that the

1    defendant used his position as a constable and as a volunteer

2    firefighter.  Now, while there is some skill involved in both

3    positions, I do not know that the positions significantly

4    facilitated the commission or the concealment.  So that's my

5    focus on this particular objection.

6         Ms. Melton, if you would like to further state your

7    position.

8         MS. MELTON:  Yes, Your Honor.  Speaking particularly to

9    the Court's concern there and not the issue more broadly as

10   discussed in the sentencing memo, but how the defendant's

11   positions contributed to either the commission of the crime or

12   the concealment of the crime, I think the most salient facts

13   relating to that are that the defendant used the Paris Fire

14   Department facility as a secret place to rendezvous with the

15   minor victim.

16        THE COURT:  Let's assume for a moment that the defendant

17   was a maintenance person or a janitor that had access to that

18   facility by virtue of having the keys to the facility and he

19   could come and go when he or she pleased.  How would that be

20   any different here?

21        MS. MELTON:  Two different things, Your Honor, and I guess

22   this is where we look at everything sort of collectively.

23        So, first, I don't think that that janitor or that

24   maintenance person would take an oath to uphold and enforce the

25   law in the same way that the defendant in this case has.

1     Similarly, the janitor or the maintenance man presumably

2   would not be using his position and his access to certain

3   resources as knowledge to groom the minor victim to even bring

4   her there at the outset.

5     THE COURT:  All right.  Now, the case that's cited

6   involves -- or one of the cases cited involves law enforcement

7   and using a police cruiser, basically under the auspices of law

8   enforcement activity, stopping a person and then using the full

9   force and weight of that law enforcement officer's abilities

10   and his position then to abuse an individual.

11     This is really not that same situation, is it?  Factually,

12   this is distinct from the evidence in that case.

13     MS. MELTON:  It is distinct, Your Honor.  But it is not

14   worlds away from that case.  At the beginning of this

15   relationship between the defendant and the minor victim, based

16   off what the minor victim has said and what was in her victim

17   impact statement, it appears to the United States that at first

18   it was much more about this is someone with knowledge and

19   access that can teach me things and help me achieve my plans.

20     But then as the minor victim's feelings started to change

21   and realized -- she realized what the defendant was after,

22   there was an element of fear.  And part of that fear was this

23   is someone who has status in the community, who has power

24   within the community.  And me, as a 17-year-old, I don't have

25   that.  So that disparate bargaining power between the defendant

1   and the minor victim is similar to the circumstances with the

2   cruiser, although it just happened over a much longer period of

3   time and it evolved.

4        THE COURT:  A constable is an elected position?

5        MS. MELTON:  Yes, Your Honor.

6        THE COURT:  So it doesn't require any specific skill to be

7   elected to be a constable?

8        MS. MELTON:  No, Your Honor.

9        THE COURT:  Barney Fife could be elected to be a

10  constable?

11       MS. MELTON:  I believe so, Your Honor.

12       THE COURT:  And a volunteer fireman, of course that person

13  has certain specialized skills and training, but does that

14  individual -- is that person required to have a background

15  check, such as a person that works in the school system?  A

16  person that works, let's say, with a sports team that has to

17  have a background check to make sure that there's nothing

18  untoward in that person's background.  There's no evidence of

19  that in this particular case that I've been given.

20       MS. MELTON:  No, Your Honor.  I do not -- I have not heard

21  any evidence that he underwent any type of background check for

22  being a firefighter or for being a constable.

23       Interestingly, with respect to the Police Explorers, we

24  heard some testimony during trial that he was supposed to do

25  some additional training and fill out some paperwork in order

1   to participate in that program, but he never did.

2        And, of course, he used his position as a constable and

3   his knowledge of law enforcement to sort of qualify himself for

4   that role to gain greater access to the minor victim.

5        THE COURT:  All right.  Thank you.

6        MS. MELTON:  Your Honor, may I add two additional

7   things --

8        THE COURT:  Yes, ma'am.

9        MS. MELTON:  -- that I believe show the close nexus

10  between this defendant's position and access to resources and

11  the specific crimes at issue here?

12       On March 17, 2019, the defendant used the opportunity to

13  view fire department equipment to lure the minor victim to that

14  storage facility.  And I believe the testimony at trial was

15  that on that date, he actually took the minor victim there in

16  his constable vehicle.

17       And then furthermore, on March 23rd, 2019, just hours

18  before the production in that case, the minor victim had been

19  hanging out at the EMT training facility with the defendant and

20  he gave her a police radio just hours before that incident.

21       And that's all I have, Your Honor.

22       THE COURT:  All right.  Now, he did not then use the

23  police radio to contact her to get her to come back.  He used

24  Snapchat to get her to come back to the fire station?

25       MS. MELTON:  Correct, Your Honor.

1      THE COURT:  Thank you.

2      Mr. Spedding.

3      MR. SPEDDING:  Your Honor, a couple of things.  As pointed

4  out in my sentencing memorandum, I believe that one of the

5  things that the Court should look at is whether or not there

6  was some type of supervisory role exercised by the defendant

7  for purposes of the position of trust.  And there wasn't in

8  this matter.

9      Clearly, when I look at the proof as a whole, much of what

10  was -- what was done, including the police radio, the

11  ride-along, things like that, were one of an effort to impress

12  as opposed to instill fear.  I think, as delicate of a subject

13  as this is, I don't and I never did glean from the discovery

14  that there was any fear.

15      THE COURT:  Well, the victim testified that there was.

16  That she was -- that he had a gun.  She was generally fearful

17  of anyone that she didn't know very well, and she was taught

18  that you should be fearful of someone carrying a firearm.

19      MR. SPEDDING:  I don't remember exactly -- I remember the

20  testimony, Judge.  I'm not denying that happened.  I just --

21  I'm trying to impress upon the Court what my impression was

22  after looking through the discovery and sitting through the

23  trial.

24      The other thing about this, where they were and the fact

25  that he could only be there -- basically that he was trying to

1   conceal the act and things like that.  The fact of the matter

2   is, is when they were in the ambulance, he actually called, if

3   I'm not mistaken, members of the police department and told

4   them they were there and not to come out there.  So it wasn't a

5   matter of him trying to conceal the fact that they were in the

6   location they were in.

7        The constable, from my understanding, is not a law

8   enforcement officer.  I believe that in some instances they

9   have peace officer -- they may be considered a peace officer.

10  And they might have, in some jurisdictions, some law

11  enforcement power.  But in many jurisdictions -- and I know the

12  state law provides that the local legislative bodies can

13  restrict the law enforcement functions that they can even

14  perform.  And I know that's the case in Lexington.

15       They are not allowed to pull people over.  They are not

16  allowed to perform general law enforcement duties.  So I think

17  to characterize Mr. Fields as a law enforcement officer for

18  purposes of this enhancement is misguided.

19       And I don't think that, looking at this case in its

20  totality, there was any situation where he was in this position

21  of trust over the victim so that the two-point enhancement

22  applies.  We would ask you to overrule that.

23       THE COURT:  All right.  Thank you.

24       Of course, again, turning to the guidelines section 3B1.3,

25  abuse of position of trust or use of a special skill, I don't

1  find that this defendant used a special skill of the type that

2  is defined in the application notes, which is defined as "a

3  skill not possessed by members of the general public and

4  usually requiring substantial education, training or licensing.

5  Examples would include, pilots, lawyers, doctors, accountants,

6  chemists, and demolition experts."

7      The definition of public or private trust is also outlined

8  in application note number 1, and I do find in this particular

9  case, that based upon the defendant's position, he could be in

10  a position of public trust over the victim, but I think that

11  the two-level increase falls short because I have not been

12  persuaded by a preponderance of the evidence that he used that

13  position of trust in a manner that significantly facilitated

14  the commission or the concealment of the offense.

15      I do find that he used the position in order to, number

16  one, groom the victim as I've indicated; and then used some of

17  the facilities that were available to him in order to engage in

18  sexual activity with the victim.  I do not find his position

19  significantly facilitated the commission or the concealment of

20  the offense.

21      As I indicated, I do think that it is a close question,

22  but under the facts that are presented, I will sustain the

23  objection and remove the two-level increase for abuse of a

24  position of public or private trust that is reflected in

25  paragraph 23, and also would be reflected in paragraph 31 of

1    the presentence report.

2         The next objection relates to the five-level increase that

3    is set forth in paragraph 35.

4         Now, after we go through the adjustments for the various

5    counts, and the defendant has made the same objections for

6    Count 2 as he has for Count 1, and the Court's rulings on those

7    objections, specifically paragraphs 27 and 28, would be the

8    same.

9         Now, of course, there's a little different evidence with

10   regard to the depictions on March 17th versus the 23rd, but the

11   Court's ruling and the basis for overruling the objections to

12   those paragraphs would essentially be the same as the

13   objections for those earlier paragraphs 20 and 21.  But I would

14   make sure we covered these all.

15        So we get down to paragraph 35, and that raises an issue

16   under section 4B1.5 of the guidelines.  We have to go to

17   section (a) before we go to section (b).  And section (a) of

18   that guideline section, "In any case in which the defendant's

19   instant offense of conviction is a covered sex crime," which

20   this would be, "Section 4B1.1," that's the career offender

21   section, "does not apply," and it does not apply here.

22        "And the defendant committed the instant offense of

23   conviction" after "sustaining at least one sex offense

24   conviction."  He has not had such a conviction.  So that

25   section would not apply.

1          So we would go to section (b).  It provides, "In any case

2     in which the defendant's instant offense of conviction is a

3     covered sex crime," and again, Chapter 110, Title 18, would be

4     a covered section crime as reflected in application note 2, and

5     "neither 4B1.1 nor subsection (a) of the guideline" would

6     apply, "and the defendant engaged in a pattern of activity

7     involving prohibited sexual conduct: The offense level shall be

8     5 plus the offense level determined under Chapters Two and

9     Three."

10         The definition of pattern of sexual activity is contained

11    in application note 4(B)(i).  It provides that, "In general -

12    for purposes of subsection (b), the defendant engaged in a

13    pattern of activity involving prohibited sexual conduct if on

14    at least two separate occasions, the defendant engaged in

15    prohibited sexual conduct with a minor."

16         I understand the United States' position to be that the

17    photos and videos depicted on the two dates in question, the

18    17th and 23rd, would constitute two separate occasions, and

19    would depict the defendant engaging in prohibited sexual

20    contact with a minor and therefore asserts this five-level

21    increase should be applied; is that correct, Ms. Melton?

22         MS. MELTON:  That's correct, Your Honor.

23         THE COURT:  And, Mr. Spedding, if you would like to

24    briefly respond?  I think the evidence I outlined would be

25    sufficient to indicate by a preponderance of the evidence that

1   the section should be applied, so then the burden would then

2   shift.

3       MR. SPEDDING:  Yes, sir.  And again, I won't contest the

4   language of application note 4(B)(i), and I will just rest on

5   what we have submitted so far for the Court's consideration in

6   that matter.

7       THE COURT:  All right.  For the reasons I just outlined in

8   summarizing the United States' position, evidence was submitted

9   in the case that would support the increase under this section,

10  4B1.5.  The activity of the defendant does meet the definition

11  of a pattern of activity involving prohibited sexual conduct,

12  and therefore that five-level increase will be applied.

13      The defendant has also raised objections to the probation

14  officer's failure to include a number of downward departures

15  under Chapter 5 of the guidelines and so we'll go through these

16  as well.

17      The first would be section 5H1.5, and the defendant would

18  have the burden under these sections of establishing they

19  should be applied in the case as departures.

20      5H1.5 refers to employment record and states that,

21  "Employment record is not ordinarily relevant in determining

22  whether a departure is warranted.  Employment record may be

23  relevant in determining the conditions of probation or

24  supervised release, such as the appropriate hours of home

25  detention."

1    Mr. Spedding.

2    MR. SPEDDING:  Your Honor, I withdrew the 5H and 5K

3  chapters when preparing the sentencing memorandum and the

4  objections.   And quite frankly, again, I understand that

5  specifically none of the downward departure provisions would

6  normally apply.

7    And again, I am submitting the sentencing memorandum as

8  written for the Court's consideration and have nothing further

9  to add as far as that goes.

10    THE COURT:  All right.  With regard to each of these

11  sections or just 5H1.5?

12    MR. SPEDDING:  Each of the sections.

13    THE COURT:  All right.  Thank you.

14    Ms. Melton, would you like to briefly address these

15  sections of the guidelines?  That would be 5H1.5, 5H1.6,

16  5H1.11, 5K2.10 and 5K2.20.

17    Of course, I do understand that in some of these sections,

18  the indication of the section is that these departures should

19  not be applied for these type of covered crimes under Title

20  110.  But if you would like to briefly respond, please.

21    MS. MELTON:  Yes, Your Honor.  And as you may have noticed

22  in the United States' sentencing memorandum, I was not entirely

23  sure what to say about each of these departures because the

24  defendant did not really articulate why they should be applied,

25  so it's a bit like arguing with yourself.

1        However, 5H1.5, the guidelines state that it is not

2   ordinarily relevant in determining whether a departure is

3   warranted.  So the default rule is that it's not ordinarily

4   relevant.

5        I don't think we've heard anything here to suggest that

6   this is the exception to the default rule.  And if anything,

7   with respect to the close call on the abuse of public trust, in

8   my eyes, if anything, the employment record could even be

9   aggravating because he did use his employment history and his

10  knowledge and his access to somewhat help facilitate these

11  crimes.

12       With 5H1.6, similarly they are not ordinarily relevant.

13  We have had a lot of character statements from the defendant's

14  family and friends showing the connection that he has to this

15  local area, and the fact that he is a good father and so forth.

16       However, with respect to the nature of this particular

17  type of crime, I don't believe those family ties should be

18  relevant to overcome what the guidelines tell us, which is this

19  is a very serious offense that should have a lengthy term of

20  imprisonment.

21       THE COURT:  Well, specifically, the second paragraph of

22  that section states that for "an offense involving a minor

23  victim," under Chapter 110, "family ties and responsibilities

24  and community ties are not relevant in determining whether a

25  sentence should be below the applicable guideline range."

1         MS. MELTON:  Yes, Your Honor.

2         THE COURT:  So this is not ordinarily relevant, but this

3    is the sentencing commission saying it's not relevant under the

4    circumstances of an offense of this nature.

5         MS. MELTON:  Yes, Your Honor.  That's as much of a

6    bright-line rule as I can think of.  I think the language --

7         THE COURT:  That's not to say this information can't be

8    considered under 3553, but of course I have to go through

9    potential departures before we get to the 3553 section.

10        MS. MELTON:  Yes, Your Honor.  I believe next was 5H1.11.

11        THE COURT:  Yes, ma'am.

12        MS. MELTON:  Again, the rule states that, "Civic,

13   charitable, or public service; employment-related

14   contributions; and similar prior good works are not ordinarily

15   relevant in determining whether a departure is warranted."  So

16   we don't have the bright-line rule as we have 5H1.6, but we've

17   got a statement that it's not ordinarily relevant.

18        And similar to the United States' position on 5H1.5, we

19   feel, if anything, this could be more aggravating than

20   mitigating because Mr. Fields did use his position as a public

21   servant to help facilitate these crimes.

22        THE COURT:  Now, the next section is 5K2.10, Victim's

23   Conduct.  And that section provides that, "If the victim's

24   wrongful conduct contributed significantly to provoking the

25   offensive or the offense behavior, the court may reduce the

1   sentence below the guideline range to reflect the nature and

2   circumstances of the offense."  And then there are a number of

3   factors that are listed that the Court should consider in

4   making this determination, including "The size and strength of

5   the victim, or other relevant physical characteristics, in

6   comparison with those of the defendant."

7        "The persistence of the victim's conduct and any efforts

8   by the defendant to prevent confrontation."

9        (3), "The danger reasonably perceived by the defendant,

10  including the victim's reputation for violence."

11       (4),  "The danger actually presented to the defendant by

12  the victim."

13       (5), "Any other relevant conduct by the victim that

14  substantially contributed to the danger presented.

15       And (6), "The proportionality and reasonableness of the

16  defendant's response to the victim's provocation."

17       And the section provides, "Victim misconduct ordinarily

18  would not be sufficient to warrant application of this

19  provision in the context under Chapter Two, Part A, Subpart 3,"

20  that is a different section, criminal sexual abuse section.

21       It would appear that by raising the issue, the defendant

22  is essentially attempting to shift the blame to the victim in

23  this case, and that may be more of an aggravating factor than a

24  mitigating factor.

25       MS. MELTON:  Yes, Your Honor.  I did plan to address that

1    more in my allocution, but I'll go ahead and note here that the

2    rule actually states victim misconduct ordinarily won't be

3    sufficient to warrant application of this provision with child

4    sex cases.  And the facts of this case do not show that this

5    victim was reaching out to the defendant and trying to induce

6    the defendant in any type of relationship.

7        And this minor victim was not some sort of adult Jezebel

8    that was trying to tempt the defendant into a sin of the flesh.

9    She was a child and she was at an impressionable age,

10    interested in certain things that the defendant also was

11    interested in, and he took advantage of that.

12        And the fact that the first day that he met her, he

13    messaged shortly after that, and that night sent him -- sent

14    her a picture of his penis, I think shows the predatory nature

15    of this.  And the fact that it was not this minor victim that

16    was trying to seduce him.  And even if she was, he is the

17    adult.

18        THE COURT:  As I recall the testimony in the case, at the

19    time that all this was occurring, the victim had a part-time

20    job working at McDonald's?

21        MS. MELTON:  Yes, Your Honor.

22        THE COURT:  All right.

23        MS. MELTON:  And I apologize.  My memory is what did we

24    talk about during the trial prep versus what did we talk about

25    at trial.  And without the transcript, I may be misstating

1    things.

2        But my recollection is that the defendant had gone to

3    McDonald's to watch her and see her, and that's where he

4    initially thought that she was pretty and might be somebody

5    that he wanted to talk to.

6        THE COURT:  All right.

7        The last section raised as an objection is the failure to

8    include a departure for aberrant behavior under 5K2.20.  This

9    section states in subparagraph (a), "Except where a defendant

10   is convicted of an offense involving a minor victim" under

11   various chapters, including 110, "and the conduct meets the

12   requirements of subsections (b); and (2) a departure is not

13   prohibited."

14       The requirements under (b) would be that, "The court may

15   depart only if the defendant committed a single criminal

16   occurrence or single criminal transaction that was committed

17   without significant planning, was of limited duration, and

18   represented a marked deviation by the defendant from an

19   otherwise law-abiding life."

20       MS. MELTON:  Yes, Your Honor.  I think that the finding

21   that this was a pattern of behavior sort of conflicts with any

22   suggestion that this was aberrant conduct on behalf of the

23   defendant.  This went on for several months, and we've got at

24   least two production convictions here, suggesting that this was

25   not a single act on behalf of the defendant.

1           THE COURT:  All right.  Thank you.

2       I don't find that any of the sections of 5H or 5K that

3   have been raised as objections should be applied in this

4   particular case.  Many of the sections or -- of course the

5   policy statements and the indications are that they are not

6   ordinarily relevant, but in some cases the sentencing

7   commission says that they are not relevant.

8       5H1.5, employment, an employment record is not ordinarily

9   relevant; however, it may be relevant in determining conditions

10  of probation or supervised release.

11      In this particular case, the defendant, of course, is

12  looking at a significant mandatory minimum period of

13  incarceration.  His guideline range, I'll have to do the

14  calculations, but I believe his guideline range should be in

15  the range of life, which would be reduced down to the statutory

16  maximum for two convictions of 360 months each, or a total of

17  720 months under the guidelines.  And so considering employment

18  record would not be an issue with respect to probation.

19      And, of course, the defendant has been employed gainfully

20  in a number of occupations.  And that certainly is a factor

21  taken into account under 3553 as part of his history and

22  characteristics, but would not be grounds for a departure from

23  the guidelines under this particular section.

24      And likewise, a departure under 5H1.6 would not be

25  appropriate here.  Again, family ties and responsibilities

1    ordinarily would not be relevant.  And as the sentencing

2    commission indicates in the second paragraph, an offense

3    involving a minor victim under Chapter 110 would not be

4    relevant in determining whether the Court should sentence below

5    the applicable guideline range.

6         Now, the guideline also states that family

7    responsibilities that are complied with may be relevant to the

8    determination of the amount of restitution or fine, and I will

9    be addressing that in just a moment and asking the parties to

10   specifically address fine and restitution issues.

11        But for purposes of reducing the guideline range for

12   incarceration, family ties and responsibilities would not be a

13   basis for doing so under the facts that are presented in this

14   case.

15        Defendant has also argued for a departure under 5H1.11

16   based upon public service.  That particular section of the

17   guidelines provides in part that, "Civic, charitable, or public

18   service; employment-related contributions; and similar prior

19   good works are not ordinarily relevant in determining whether a

20   departure is warranted."

21        I don't find that the defendant's public service would

22   warrant a departure from the guideline range in this particular

23   case.

24        As the United States has argued, the defendant abused a

25   position of trust.  And while I do not find that that would be

1  sufficient to include that two-level increase for the reasons

2  previously stated, the defendant did in fact use his public

3  service to lure the victim into committing the acts of

4  conviction.  And under the circumstances, his public service

5  would not be a basis for a departure.  It's not ordinarily

6  relevant and certainly would not be relevant here.

7      The next section that has been raised, 5K2.10, the

8  victim's conduct.  I don't find that in this particular case

9  under any circumstance that the victim's conduct would be a

10  reason to depart from the guideline range in this particular

11  case.

12      I do not find that the victim's conduct contributed

13  significantly to provoking the offense.  And I do not find that

14  it contributed to provoking the offense, certainly not

15  significantly.

16      Considering the other factors that are listed for the

17  Court's consideration, while many of these factors would appear

18  to be relevant to other types of offenses, there's been no

19  evidence presented here that would support a reduction based

20  upon the defendant's conduct in this particular case.

21      Finally, I do not find that the defendant's behavior would

22  constitute aberrant behavior under the guideline 5K2.20.

23  Again, subsection (a) of that section would indicate that it's

24  not a factor to be taken into account if a person is convicted

25  under an offense under Chapter 110, which this would be.

1          And I also find that the requirements of subsection (b)

2     are not met because the defendant did not commit a single

3     criminal occurrence, as I've found previously.

4          I also find that there was substantial planning involved

5     and that the criminal activity of the defendant was not of

6     limited duration.

7          And therefore I will overrule the objections to the

8     probation officer's failure to include departures under those

9     sections of the guidelines.

10          Having addressed all of the objections that have been

11     raised to the presentence report, I will adopt the findings

12     that are contained in the presentence report, as well as those

13     additional findings I've made here based upon testimony and

14     evidence that has been presented.

15          I'll also adopt the guideline calculations with the

16     following modifications:

17          In turning to the offense level calculations, which begin

18     at paragraph 16, the 2018 edition of the guideline manual has

19     been used in this particular case.   Counts 1 and 2 do group,

20     but the offense level calculations are separate.

21          For Count 1, the base offense level is a level 32.   There

22     is the two-level increase under 2G2.1(b)(2)(A).   There is the

23     two-level increase under 2G2.1(b)(3), and that is knowingly

24     engaging in distribution.   There is the two-level increase

25     under 2G2.1(b)(6), which has also been addressed.   I will

1    remove the adjustment under paragraph 23, and that has the

2    effect of reducing the adjusted offense level for what would be

3    Count 1 to a level 38.

4        For Count 2, those same calculations would be applied.

5    The two-level increase as shown in the base offense level is

6    also 32.   The two-level increases shown in paragraphs 27, 28,

7    and 29 would be applied.   The two-level increase for the role

8    in the offense under paragraph 31 would be removed.   And that

9    would create an adjusted offense level of 38 for Count 2.

10       The enhancement, five-level enhancement under paragraph 35

11   is applied.   And that would create, then, an adjusted offense

12   level of 43, and a total offense level which would also be 43.

13   That's the maximum offense level under the guidelines and so

14   that would become the total offense level.   That would not

15   therefore affect the guideline calculations in the case that

16   follow.

17       The defendant does not have any criminal history points

18   assessed, and he is in criminal history category I.

19       There are a number of pending charges, and I have not been

20   advised of any resolution of any of those charges at this

21   point.

22       The range for incarceration, first I'll note that the

23   defendant has been convicted of two offenses that have a

24   mandatory minimum term of incarceration of 15 years and a

25   maximum period of 30 years.

1          Under the guideline calculations, the guidelines are

2     limited to the statutory maximums.  And so for each of Counts 1

3     and 2, the guideline range would be 360 months.  But then the

4     guidelines under 5G1.2(b) would combine those numbers to

5     produce a guideline range of 720 months based upon the fact

6     that the guidelines otherwise would be life, but would be

7     limited to the statutory maximum terms of 30 years for each

8     count of conviction.

9          Turning over to the fine section of the report,

10    paragraph 70.  Counts 1 and 2, there is first a special

11    assessment of $100 for each of those counts under Title 18,

12    Section 3013.

13         Under 3014, the Court shall also assess an amount of

14    $5,000 per count on any non-indigent person that has been

15    convicted of an offense under Chapter 110.  So the issue I do

16    expect the parties to address is indigency and whether the

17    $5,000 per count assessment should be applied in this

18    particular case under 3014.

19         The fine range in this case is a range of 50,000 to

20    $250,000.  And also calling the parties' attention back to

21    another provision, another special assessment Congress has

22    passed, and I'll refer to paragraph 13, it's the Amy, Vicky,

23    Andrew Child Pornography Victim Assistance Act of 2018, which

24    provides that a defendant convicted of child pornography must

25    pay up to a $50,000 assessment.  The statutory section is

1   Title 18, Section 2259A, subsection (a)(3).

2         Under that section, the factors to be considered in

3   determining the amount of the assessment would be those factors

4   set forth in 3553(a) and 3572.

5         The factors that are listed in 3572 include "the

6   defendant's income, earning capacity, and financial resources."

7         Number (2), "the burden that the fine" would place "upon

8   the defendant, any person who is financially dependent upon the

9   defendant, or any other person (including the government) that

10  would be responsible for the welfare of any person financially

11  dependent upon the defendant relative to the burden that the

12  alternative punishments would impose."

13        Number (3), "any pecuniary loss inflicted upon others as a

14  result of the offense."

15        Number (4), "whether restitution is ordered or made.  And

16  the amount of such restitution."

17        Number (5), "the need to deprive the defendant of

18  illegally obtained gains from the offense."

19        (6), "the expected cost to the government of any

20  imprisonment, supervised release, or probation component of the

21  sentence."

22        (7), "whether the defendant can pass on to consumers or

23  other persons the expense of the fine."

24        And, (8), "if the defendant is an organization, the size

25  of the organization and any measure taken by the organization

1   to discipline any officer, director, employee, or agent of the

2   organization responsible for the offense and to prevent a

3   recurrence of the offense."

4        So many of the issues the Court must address in

5   determining restitution will involve the question of indigency

6   of the defendant as well as restitution.  So it would appear

7   that the Court will need to address the issue of restitution

8   before making these determinations under the statutory

9   sections, so I'll note that for the parties' consideration.

10        Turning back to the guidelines again.  I've reviewed the

11   various statutory provisions, I believe, with the exception of

12   the statutory provision and the guideline range for supervised

13   release, which is a minimum of five years, maximum of life for

14   each count of conviction, as reflected in paragraph 65 of the

15   presentence report.

16        The defendant proceeded to trial, there are no counts to

17   be dismissed at this time.

18        Let me see if there are any other motions to be taken up

19   before we proceed with allocution in the case.

20        Ms. Melton, any motions by the government?

21        MS. MELTON:  No, Your Honor.  When would you like for me

22   to address restitution?

23        THE COURT:  Well, the reason I raised the issue in going

24   through the presentence report, many times restitution is

25   overlooked by the parties.  Of course victim restitution is

1    not, the statutory restitution is sometimes overlooked by the

2    parties.  And because we have a couple of different statutory

3    provisions at play, if I'm not able to address victim

4    restitution today, and in your sentencing memo you indicated

5    you would like to defer restitution for the victim for 90 days,

6    but that was 60 days ago, before there were a couple of

7    extensions or continuances that were granted in this case.

8         And I don't know what the position of the parties would be

9    on victim restitution and whether you're ready to proceed with

10   that issue today or not.

11        MS. MELTON:  Yes, Your Honor, we are.  I spoke with the

12   minor victim this week, as well as our victim-witness

13   coordinator.  And they had not had significant costs to date,

14   and they are not ready to provide a calculation for the cost of

15   future treatment.  So they are prepared for me to represent to

16   the Court that they are not making a claim for restitution.

17        That's not to say the minor victim won't require future

18   treatment, but she has not been evaluated to a sufficient

19   degree to where they know what future treatment looks like.

20   And we don't think that we're going to get that achieved in

21   30 days.

22        THE COURT:  Of course there is a statutory requirement

23   that it be addressed within a certain number of days following

24   the sentencing hearing.  I do want to make sure the victim is

25   aware of that, that you can request that the hearing on

1    restitution be continued.  My point is that there are several

2    different parts of the restitution that will have to be

3    addressed, some of which may be tied to victim restitution.

4         MS. MELTON:  Yes, Your Honor.

5         THE COURT:  Does the victim wish to make a statement

6    either in writing or orally today?

7         MS. MELTON:  I do have the victim's impact statement that

8    I can provide to the Court that's written.  And her mother

9    would also like to address the Court today.

10        THE COURT:  All right.  All right.  Very well.  So you

11   believe we can proceed then with the issue of restitution under

12   the statutory sections?

13        MS. MELTON:  Yes, Your Honor.

14        THE COURT:  All right.  Thank you.

15        Mr. Spedding, any motions or other issues that need to be

16   taken up before we proceed with allocution in the case?

17        MR. SPEDDING:  No, Your Honor.  I don't believe so.

18        THE COURT:  All right.  All right.  We will then proceed

19   with allocution.

20        Of course, I'll hear from Mr. Spedding and also from

21   Mr. Fields, if he would like to address the Court.

22        And after I've heard from the United States, Mr. Spedding,

23   if you would like to respond, I'll give you that opportunity as

24   well.

25        MR. SPEDDING:  Thank you, Your Honor.  Would you like --

1    do you want me to remain here?

2        THE COURT:  Whatever is more comfortable for you.

3        MR. SPEDDING:  Okay.  Judge, it's obviously a -- this is

4    obviously not a pretty case, and we all know that.  Mr. Fields

5    knows that.  He exercised his right to have this presented to a

6    jury of his peers, and we did that and they found him guilty of

7    the two counts.  And here we are.  We very respectfully

8    disagree with the outcome.  There are some things that we

9    disagree with that occurred during the trial, but be that as it

10   may, that's for another process and procedure and that will be

11   dealt with then.

12       The thing that I would like to address with the Court

13   today would be the 3553 factors.  And at the outset, the nature

14   and circumstances of Mr. Fields and the offense are laid out, I

15   think in significant detail in the presentence report and

16   sentencing memorandum.

17       I always hesitate to, at sentencing, get up and

18   regurgitate what I have said in that regard again.  So again,

19   I'll rest on what we've said about him in the sentencing

20   memorandum, the presentence report.  And I would also urge the

21   Court to consider what information he received through the

22   various letters that were submitted to you regarding the

23   defendant.

24       There are a couple of things I would like to point out to

25   the Court for your consideration.  One of them is, you know, we

1   have to deal with respect for the law, deterrence, things like

2   that under 3553.  And I think when we look at Mr. Fields, we're

3   looking at a man that made what the jury has found to be a

4   grievous mistake and has affected somebody's life negatively.

5   There's no question about that.

6       The things that I would like to point out to the Court are

7   some of the positive things about Mr. Fields.  And, you know,

8   leading up to this, Mr. Fields quite frankly led a pretty

9   exemplary life.  And I think that's reflected in his lack of

10  criminal history and his demographical information.  He was

11  married, he has three kids.  Very career oriented.  And now he

12  sits here in an orange jumpsuit before a Court looking at some

13  very substantial time.

14      But I don't want what he's done in the past to be lost on

15  the Court when deciding what sentence to pass.  I know that I

16  have been in front of Your Honor a few times and have been

17  posed a question about, "Is it the best indicator of what you

18  will do in the future, what you've done in the past?"  And I

19  think that's appropriate for the Court to consider in this

20  particular instance.

21      And I would ask the Court to look at Mr. Fields for what

22  he has done.  And obviously I'm talking besides what he's

23  standing in front of you to be sentenced for, the good things

24  that he's done.

25      He's been very productive.  He supported a family.  And

1    those are things that we don't always see and hear of

2    defendants when they are standing before Your Honor to receive

3    a sentence.

4         But I think most importantly, I would like to take a few

5    minutes, if I could, and address this issue of unwarranted

6    sentencing disparities.  Ms. Melton submitted a very artfully

7    drafted sentencing memorandum on behalf of the United States

8    where I believe Mr. Marye had done some research.  And I spent

9    some time last night going through each one of those cases and,

10   to the extent that I could, looking at those to see how they

11   compared to what we're dealing with here.

12        And I was quite frankly shocked at some of the facts of

13   those cases.  I mean, I've done enough of these cases where I

14   know that they're egregious.  But quite frankly, some of them

15   are more egregious than others.  When I looked at what was

16   listed in the sentencing memorandum, what I see are cases that

17   involve repeat offenders receiving 300 months.  I see people

18   that are victimizing 11-year-old daughters, granddaughters,

19   nieces, nephews repeatedly and sharing these things on KIT and

20   other file server platforms and engaging in these texts that I

21   looked at.

22        You know, when I could, I would read the criminal

23   complaint, some of them were brought by indictment and I didn't

24   have the benefit of that information.  But we're not dealing

25   with that in this particular case.  And I know that some may

1   disagree with me on that issue.

2       But you know, we're looking at *United States versus*

3   *Michael Rose*, 420 months.  He had a prior hands-on conviction.

4   He was engaging in sexual intercourse with a nine- and

5   11-year-old.  He was the victim's uncle.

6       Looking at *United States versus Corey Lane Snapp*.  He was

7   a stepfather, the victim was 10.  He would go into the bedroom

8   at night and take pictures of this victim.  He received 215

9   months.

10      *United States versus Jordan Combs*, 20 counts, 1,212

11  images, 217 known videos.  He received 360 months.

12      Five-month-old daughter, 360 months.  I believe that was

13  the case in front of this Court, *United States versus Ryan*

14  *Patrick Cooper.*

15      *United States versus Bobby Cassady,* that involved a

16  gentleman I think in Boyle County, that was catfishing is the

17  term I would use, I don't know if that's correct or not.  That

18  was in front of Judge Hood, catfishing some boys, posing as a

19  girl and having them send him nude pictures.  He received

20  180 months.

21      So when I look at this and I stand here in front of you,

22  Your Honor, and I try to formulate some type of argument on

23  behalf of Mr. Fields, you know, I look at these and I don't see

24  one on here that's similar to this.

25      When I look at these cases here, where they are getting

1    360 months and 420 months and 240 months, these cases are

2    more -- to the extent that you can say it, the facts are more

3    egregious in these cases than what we have in front of the

4    Court today.  Some may disagree with that, and Your Honor may

5    disagree with that.  And if that's the case, then so be it.

6        But when I look at this, I'm very concerned about what

7    we're looking at as far as a sentencing guideline goes, when

8    you're looking at 720 months?  That's 60 years for this case,

9    under the facts of this case, compared to what I'm looking at

10   that have occurred in the Eastern District since roughly the

11   year 2014.  I don't see it.

12       I can go through all the 3553 factors by paragraph with

13   you and talk to you about Mr. Fields.  But you know, he's in

14   front of you in the PSR.  He's been in front of you at trial.

15   Everybody in this room is well versed in the facts as they were

16   presented.

17       THE COURT:  Well, the people in this courtroom are not

18   well versed in the manner in which the guidelines operate, for

19   example, or the statute operates.

20       A person goes to trial and is convicted of two offenses

21   with the enhancements that are applied here and is looking at

22   720 months.  While you can argue that the offense may be less

23   severe than some of those other cases, in many of those other

24   cases, there was a guilty plea to one count and there was a

25   statutory maximum.

1        So let's use this case as a hypothetical.  Let's say the

2   defendant had entered a guilty plea to one count and not been

3   convicted at trial of two counts.  Well, we know that he

4   probably would have gotten acceptance of responsibility credit.

5        MR. SPEDDING:  Correct.

6        THE COURT:  We know his statutory maximum would have been

7   capped at 30 years.

8        MR. SPEDDING:  Correct.

9        THE COURT:  And he would not be looking at 720 months for

10  the same conduct.

11       MR. SPEDDING:  That's correct.

12       THE COURT:  The conduct would be the same, and you can

13  compare conduct with conduct in an indictment or conduct in a

14  criminal complaint, but there are certain caps and limitations

15  that would be applied.

16       MR. SPEDDING:  That's correct.

17       THE COURT:  So that's why it's so difficult, when you look

18  at and try to compare cases under 3553(a)(6), and that's why

19  the Sixth Circuit has indicated that that's a nationwide

20  sentencing disparity issue.

21       And I don't know why the government files these summaries

22  in these cases, of other sex offender cases within the

23  district, because to make that comparison, you really need to

24  compare judge for judge.  Right?  Because every judge is a

25  little different in terms of how they evaluate the facts of a

1    particular case.

2          MR. SPEDDING:  Yes, sir.

3          THE COURT:  Judge Hood may see things completely

4    differently than I do in terms of seriousness.

5          But you also have to have all the factual information.

6    Because when we look at 3553(a)(6), we're talking about

7    similarly situated defendants that have been convicted of

8    similar offenses.

9          MR. SPEDDING:  Yes, sir.

10         THE COURT:  And so by allowing a person to enter a guilty

11   plea to one offense, that may really eliminate a more serious

12   offense.  You can have a binding plea agreement that can also

13   affect a sentence in a case, I think some of the cases were

14   cited here --

15         MR. SPEDDING:  One was.

16         THE COURT:  -- was a binding plea agreement in one of

17   Judge Bunning's cases.  But we really have to have the

18   presentence report if we are going to evaluate similarly

19   situated individuals.

20         Because in many of these cases, I would say in most of

21   these cases, sex offender cases, there's not a lot of criminal

22   history.  You do have the occasional case where you have a

23   person that's a prior offender, but most of the cases there's

24   not a lot of criminal history.

25         You can argue that's because it's difficult to catch the

person.   Lots of different arguments.   Most offenders are male.
I know in the chart that was attached, we've got a couple of
female defendants that got some pretty significant sentences.

But, number one, it's difficult for me to compare apples
to apples because that's really not what we're doing.   We're
looking at stray information, I'll call it.   A guideline range
and a sentence based upon a clip of brief information about a
case, when you don't have a whole lot of information about the
defendant in a particular case.

Some of those cases that were cited, the sentences were
actually below the guideline range.

MR. SPEDDING:   Yes.

THE COURT:   The guidelines were higher and the sentences
were lower than the guideline range.

And the attorneys in those cases could have made the very
same argument that you're making about little criminal history,
great employment history, public service.   I just don't know
any of that.   And I certainly don't know it based upon the
limited information that's provided in the sentencing memo.
Number one.

Number two, Sixth Circuit has indicated very clearly that
while the Court can consider 3553(a)(6) factors within the
circuit or within the district, that that statutory provision
is based upon nationwide sentencing disparities.

And we do know, when we look at guideline information in

```
 1   this area, sex offender information, or sex offender
 2   convictions, judges depart more in those cases than probably
 3   any other type of case.
 4        So I understand your argument.  I understand your
 5   position.  I just don't know how helpful the information is
 6   that the government has provided on that.
 7        MR. SPEDDING:  Thank you, Judge.
 8        I think drawing from what you just told me, then I -- what
 9   I would say to the Court is the most important thing from where
10   I'm standing that this Court can do is look at the facts of
11   those cases.  Look at the sentence they received.  Those two
12   factors.  And where does this fall?
13        That would be the simplest analysis I think addressing
14   what the Court just -- the concerns that the Court just posited
15   to me, that would be the simplest way to analyze what should
16   happen here.  Because what should happen here, Judge, is not a
17   720-month sentence.
18        Now, that is not an appropriate sentence for the facts of
19   this case.  And my reading of all of this is an appropriate
20   sentence would be not one that -- I'm not -- I'm not saying
21   we're punishing him for going to trial, because I know that the
22   courts don't do that.  You know, he -- Mr. Fields elected to go
23   to trial.  That doesn't change what the facts are.
24        That doesn't change what would have been in the plea
25   agreement, paragraph 3.  The plea agreement would have read the
```

1    same whether -- it would have laid out the basic facts.  Yes,

2    as part of the agreement one of the counts probably would have

3    been dismissed.  So then we just would be dealing with, at

4    worst, a 15- to 30-year swing.  And I understand that.

5         And those types of situations make what we do on this side

6    extremely difficult because we know what can happen.  We know

7    what is coming, but at the same time, varying away from whether

8    we look at it at a nationwide -- on a nationwide basis, which I

9    have not done, versus a regional basis to see what type of

10   sentences are being handed out based on certain facts, to me,

11   regardless of the 3553 factors, that is a very good indicator

12   of what should happen in this case.

13        And, Your Honor, I would ask for you to do that.  And,

14   quite frankly, I would ask for a 240-month sentence.

15        THE COURT:  Would you like to address these issues of

16   restitution?

17        MR. SPEDDING:  I'm sorry, yes, sir.

18        THE COURT:  I tried to alert everybody to this.  They're

19   statutory.

20        MR. SPEDDING:  Yes, sir.  I think I can be very brief on

21   that.  After Mr. Fields was arrested, his wife filed for

22   divorce.  As part of the divorce settlement, basically all

23   assets Mr. Fields had were conveyed over to his wife.

24   Obviously, he's looking at a substantial period of

25   incarceration where he won't be able to earn any -- his earning

1   potential will be obviously very limited.

2        So as far as the 3553, and I believe it was 3572,

3   statutes, I don't know that he is capable of paying restitution

4   as it relates to those statutes.  And under paragraph 70, the

5   two counts each could carry a $5,000 fine.  I don't think that

6   he -- I think he is indigent.  I don't think there's any

7   question about that.

8        THE COURT:  The financial resources section of the

9   presentence report indicates that he has some property, I think

10  down in Whitley County, Corbin?

11       MR. SPEDDING:  I believe he does, yes, sir.

12       THE COURT:  I think he's got a net worth of I think

13  $41,000 listed in the presentence report.  Some minor debt and

14  a vehicle, which pretty much offset.  But he's got a net worth

15  of about $41,000, I assume that that made it through to him and

16  not through to his wife in the divorce proceedings.

17       MR. SPEDDING:  To be honest with you, Judge, I'm not sure

18  what the status of that property is at this particular moment.

19  I can't represent to you one way or the other whether it's his

20  or whether it's not.

21       But I agree with what it says in the presentence report.

22  But the reality is, going forward he's indigent, depending upon

23  the status of that property.

24       THE COURT:  All right.  Thank you.

25       MR. SPEDDING:  Thank you, Judge.

 1        THE COURT:  Mr. Fields, would you like to add anything to

 2   what Mr. Spedding has said on your behalf?

 3        THE DEFENDANT:  I do have something I would like to say,

 4   Your Honor.

 5        THE COURT:  Yes, sir.

 6        THE DEFENDANT:  If that's okay with you.

 7        THE COURT:  Yes, sir.

 8        THE DEFENDANT:  I've written it down on a piece of paper

 9   because I want to try to stay straight and as to the point as I

10   can, but I do have something that's not on the paper that I

11   would like to add.

12        So I've prepared this speech at least a hundred times in

13   my mind.  Every time that I've done it, even in writing it down

14   or attempting to put words on paper, it's been really long,

15   talking about what I've done with my life, how I've dedicated

16   my life.  However, I don't feel that I need to take the time to

17   again bring up all of that stuff today.

18        I've been blessed to live a good life.  I've got the best

19   friends and the best family that a person could ask for.  I've

20   lived my life trying to do as much good as I could.  While I

21   could spend a good deal of time telling you about several

22   different instances, several things that I've done with my

23   life, I don't think that me saying it stands near as good as

24   the letters that you have received on my behalf.

25        I believe that my friends and my family that have written

1   letters have said what needs to be said about me.  I'm not one

2   to brag about things that I've done.  I'm not one to talk

3   about -- like one letter that was written on my behalf talks

4   about an instance where I was at a restaurant and there were

5   two police troopers that were eating, and I paid for their

6   food.  You know, I don't need to talk about how many times I've

7   done that, because it's irrelevant.

8        But just to add a little perspective with that, that was a

9   month prior to being indicted on federal charges.  You know, it

10  was while I was out on bond.  I never -- I never stopped doing

11  the good deeds that I've done my whole life.

12       Moving on from that, I have had the opportunity to see and

13  experience a lot in both my family life and my career as well.

14  I have been fortunate enough to give my kids, up to this point,

15  a very, very good life.  I have taken them places that I only

16  dreamed of going myself when I was a kid, and unfortunately

17  didn't have the opportunity to do.

18       I do have three amazing kids, I've got two girls and a

19  boy.  And they are everything to me.  And still to today, I

20  talk to them almost every single day unless, of course, they

21  are traveling or there's some reason why I need to wait until

22  the next day.

23       And I still have a good relationship with them.  They

24  know.  I've explained to them that daddy's going to be gone for

25  a little while.  My youngest is seven years old.  Her name is

1   XXXXX.   And last night on the phone she said, "Daddy, what are
2   you doing tomorrow?"

3        And I said, "I'm going to court."

4        And she said, "So are you going to come home or are you
5   going to be gone?"

6        And of course I told her, "I'm going to be gone,
7   Sweetheart."

8        And there's a guy that was in my cell, and I'm on the
9   phone and he's like, no, no.  So I get off the phone and he
10  said, don't tell your kids you are going to be gone for a long
11  time.  And I just explained to him, I'm not going to lie to my
12  kids.  I don't want to give them false hope.  I know that no
13  matter what is said today, you're bound by law to give me at
14  least 15 years.  You can't do anything other than that, even if
15  you wanted to.

16      I'm not going to mislead them to believe that I'm coming
17  home any sooner than 15 years because it's not right.  I want
18  them to understand.

19      My 11-year-old, when I was talking them about it, I tried
20  to prepare each one of them.  And he said -- I said, "You know
21  I'm going to court this week."

22      He said, "Yeah, I know."

23      I said, "You understand that daddy is going to be gone for
24  a long time.  You know, I'm going to miss a lot.  I'm not going
25  to be there for your graduation.  I'm not going to be able to

1   teach you how to drive a car."

2       He said, "Yeah, and you're not going to be there for when

3   I get married and probably when I have kids."

4       I said, "Yeah.  You're going to be 26 if I get -- if I get

5   15 years, you're going to be 26.  And depending on what you

6   choose to do with your life, you may be married and you may

7   have kids.  So you're right.  You're right.  I'm probably going

8   to miss that."

9       That's part of the punishment that I -- that I have to own

10  up to.

11      Moving forward from today, you know, I know that the

12  federal system is very well-known for providing opportunities.

13  If you want to better yourself, you have every opportunity to

14  do so, and I look forward to the opportunity.  I look forward

15  to being able to possibly further my education, or at the very

16  least maybe learn a new trade while I'm there.  I don't know

17  what the future holds.  Whether it be 15 years, 25 years,

18  60 years, I don't know what the future holds.

19      But I want to be as prepared as I can be when and if the

20  day that I do get to walk back out.  You know, I know that I'll

21  never be able to go back to the career that I love.  I'll never

22  be able to do the things that I did in that career, to do good

23  for other people.  I'll never be able to do that again.  And my

24  mind is at ease with that.

25      But I do know that I've got to do what I've got to do in

1   order to be prepared to do what I can to continue supporting my

2   kids, continue supporting my family and grandkids at that point

3   in time.

4        Moving forward from that, upon my release, I do plan to

5   get back to work, support my family.  I know that I am going to

6   be missing a lot in my kids' lives, but I do have faith knowing

7   that when I get back to them, I'll be a better person.  I

8   tackle everything in my life with learning, moving forward,

9   being the best person I can be after whatever the situation is.

10       And I know that I'm going to be better.  To go into this

11  thinking that I'm going to come out worse would just be absurd.

12  I do know that going into a federal prison with a charge such

13  as I have, it's going to be difficult.  I've been at Fayette

14  County Detention Center for 342 days now, it's been rough.

15       I've been on protective custody twice, once when I first

16  went into the facility and I waived it.  And then -- and this

17  is something I'll address in just a second, and then just

18  recently, I was on protective custody again, and again I waived

19  it.  So I've been in general population.  Starting out in

20  maximum classification with people with murder charges.  Other

21  people that have state rape charges.  People that clearly did

22  what they did.

23       And it's disheartening to be there and be witness to some

24  of these guys come back after signing a plea deal and they will

25  be home before I will with a murder charge, or what they refer

1    to proudly as a body.  And that's tough.  That's a tough pill

2    to swallow.

3         The thing that I didn't have written down that I do want

4    to address is this last protective custody.  They got me out of

5    my cell on Friday for no reason, said to get my belongings

6    together and come with them, and they put me in protective

7    custody.  And I spent the weekend not understanding why I was

8    there until Mr. Spedding was able to get some clarification on

9    Monday.

10        And apparently somebody that I was incarcerated with had

11   reached out to the victim, and I still don't know the exact

12   details, but asked if she wanted me taken care of.  And I want

13   to thank her because clearly she did what was right and she

14   made notification to someone, and obviously they got me out of

15   that situation.

16        You know, fortunately, again -- I think it's because I've

17   got a much higher power looking over me, I've been blessed.

18   I've been there for, again, that amount of time, and I've never

19   been in any kind of altercations.  And I've been with some bad

20   people.  And obviously having the charge that I have, it's not

21   good, not good in a county jail, a state facility, and

22   definitely not in the federal penitentiary.

23        So in closing, I want to thank you for your time, the time

24   of this Court.  I know that by exercising my right to trial, it

25   did use resources.  It did take time for both parties to

```
 1    prepare, and I'm fortunate.  I'm blessed that both parties did
 2    what they did.  And I'm very thankful for that.
 3         And I also want to thank Mr. Spedding and Ms. Roth, and
 4    Ms. Melton is here today, for their professionalism that they
 5    have shown over the course of this whole investigation.  Not
 6    just your proceedings, but the whole investigation.
 7         And I would just like to ask for your leniency in
 8    sentencing.  I looked at all these same cases a month ago when
 9    I got this memorandum in the mail.  Again, just to say a little
10    bit about what he said.
11         You know, I tried to put myself in different positions.
12    And I just can't -- I can't imagine in my mind that the facts
13    of my case and the facts of those cases, you know, would
14    warrant me to spend 60 years in prison.  You know, I'm -- it
15    was hard for me to read those.  It was hard for me to look at
16    details of those cases, knowing that I have a seven-year-old
17    girl at home and a nine-year-old girl at home.  And I have not
18    seen them.  Visitation at the jail is nonexistent.  I see them
19    on a video screen.  And sometimes it works, sometimes it don't.
20         But as I'm told, you know, my nine-year-old is -- my
21    11-year-old definitely is hitting puberty now and has already
22    asked me a couple of difficult questions.  And my nine-year-old
23    is right behind him.  As a nine-year-old girl, I don't have any
24    answers for her, unfortunately.  But reading these cases, I
25    just can't -- I can't imagine.
```

1        And thank you for your time.  That's all I have.

2        THE COURT:  All right.  Thank you.

3        Ms. Melton.

4        MS. MELTON:  Your Honor, Mr. Spedding, may it please the

5   Court.  The defense sentencing memo states that the defendant's

6   guideline calculation in this case is "excessively harsh given

7   the circumstances of this case."  It goes on to say that, "this

8   case is not as egregious as many that come before the Court and

9   that the guidelines as written are meant to only target those

10  most egregious cases," not the "distasteful ones such as this

11  one."  And we have heard a lot of that same sentiment today.

12       Meanwhile, the defendant's character statements place him

13  on a moral pedestal.  And they say things like "he would not

14  cause harm to anyone," and "he got caught up in a situation and

15  made some very poor choices," making it sound like he got a

16  traffic ticket or had an affair or something along those lines.

17       But the truth is that this defendant did harm someone.

18  And the situation that he got caught up in was one of his own

19  design.

20       Your Honor, may I pause for a second?  Can we use the same

21  rules that we did in trial, in terms of the victim's middle

22  name?

23       THE COURT:  Yes.  Yes, ma'am.

24       MS. MELTON:  Thank you, wanted to double-check.

25       As I mentioned before, Grace is not an adult Jezebel that

1    tempted or seduced Mr. Fields and caused him this lapse of

2    judgment.   She was a child and Mr. Fields created the situation

3    where he preyed on a high school student, had sex with her and

4    created sexually explicit images.

5        Grace was actually -- so she was 17.   She was a high

6    school junior in a small town when all of this happened, when

7    Fields sought her out.   And he did act as a predator, contrary

8    to what some of the character statements suggest.

9        The very day that he met her, he messaged her on Snapchat

10   just hours later, and sent her a sexually explicit image that

11   night.

12       And then knowing that she was interested in law

13   enforcement, that she was interested in becoming a first

14   responder, Fields used his knowledge and his resources to

15   cultivate a relationship with her, to groom her.

16       Then on two different occasions, knowing that she was

17   intoxicated, Fields had sex with her and filmed it.   So he not

18   only exploited Grace, sort of in the flesh, there at the

19   training facility and in the back of the ambulance, he created

20   trophies that he could take with him and apparently showed to

21   his friends.

22       17 is still a tender and impressionable age in a person's

23   life.   On the cusp of adulthood, very much influenced by their

24   environment, very much dependent on the adults around them.

25   17-year-olds have dreams and plans that can either materialize

1   or evaporate into the ether.

2       Grace, her dream was to be a police officer, preferably in

3   or around her hometown.  And she also had plans to join the

4   military in a reserve capacity.  But now Grace's hometown

5   doesn't really feel like home anymore as a result of all of

6   this.  Everywhere she goes, it seems like people know intimate

7   details about her, things that somebody her age would never

8   want other people knowing.

9       And even now, many, many months later, rumors continue to

10  swirl around her hometown about her.  And now her dreams don't

11  really feel like dreams anymore, and some of her plans aren't

12  plans anymore.  Those dreams are less exciting and they seem

13  less attainable.  They have been tainted by Mr. Fields.

14      Specifically, despite always wanting to be in law

15  enforcement, when I first met Grace, the first meeting I had

16  with her, she told me and Ms. Roth that she didn't want to be a

17  cop anymore because she felt like she couldn't trust them.

18      And I think that this process and Detective Jett have

19  helped rebuild that trust that she has in law enforcement and

20  the criminal justice system.  So she told me the other day that

21  she is interested in maybe applying at Cynthiana PD one day,

22  but she's worried they wouldn't hire her because they know

23  about this situation.  And whether that is the case or not,

24  that is the anxiety that swirls around these young victims'

25  heads.

1    And Grace's other dream, joining the military, has also

2 been derailed.  After the indictment and before the trial,

3 Grace had already enlisted in the military.  And she had a date

4 to ship to basic training.

5    And so then after that -- she was actually supposed to

6 ship to basic training shortly after our trial.  And dealing

7 with the stress and the emotional fallout of the trial prep and

8 the trial process, she told her unit that she didn't feel

9 comfortable shipping at that time, that she still wanted to go,

10 but she couldn't go then.  And they administratively separated

11 her from the military.

12    And the things I just spoke about are really the more

13 tangible things.  You know, her victim impact statement talks

14 about the nightmares and the panic attacks and the struggles

15 that she's had emotionally.  You know, she's experienced a

16 false sense of shame and humiliation, the feeling of being

17 objectified.

18    And sitting here today and having to hear that Mr. Fields

19 showed these images to someone else just adds to that.  And she

20 is going to require years and years of healing to get over

21 this.  I have no doubt that she will, because she is an

22 exceptionally strong young woman.  But it's going to be hard

23 and it has been hard.

24    So in this allocution I focus on the defendant's conduct

25 and its impact it's had on the victim, because I think it

1    speaks to a lot of the 3553 factors, including the nature and

2    circumstances of the offense, the seriousness of the offense,

3    promotion for respect of law, just punishment and the need for

4    deterrence.

5        As for the history and characteristics of the defendant,

6    it is a statutory factor.  And I agree that unlike many

7    defendants who come into this court, Mr. Fields does not have a

8    long rap sheet.  And he was seemingly a reputable, contributing

9    member of society before all of this happened.  So it should be

10   weighed, but how much does it really count for when the

11   violation, when the conduct is as awful as it was here?  And

12   also when that status, that position in the community, was used

13   in the commission of the offense.

14       So yes, Grace was 17 when this happened.  She was not a

15   toddler, she was not a preteen.  But she was still a child.

16   She was still vulnerable.

17       You know, several months ago when I first got on this

18   case, I was telling a family member about the overall facts

19   about it.  And I won't say who that family member was, but he

20   was older.  He said, "Oh.  Well, that happened all the time

21   when I was in school."  Apparently one of his teachers had a

22   relationship with a 17-year-old there at the school.  And this

23   family of mine was minimizing it.

24       But then just a moment later he said the 17-year-old

25   turned around and killed herself the next year.  And I was

1    like, "Do you hear yourself?"

2         So I think there is a tendency to look at this victim's

3    age and say it's not as big of a deal.  But do we only care

4    about the most shocking cases?  The cases involving, you know,

5    bogeymen that coerce these children and only very young

6    children.  The law says no.

7         So Grace being 17 does not make this case not serious and

8    it doesn't mean that Mr. Fields' conduct was not harmful.  And

9    the fact that she is not two or 10 or 12 is actually accounted

10   for by the guidelines.  His guidelines range would be much

11   higher if she was prepubescent.  But she is not, so the

12   guidelines are appropriate.

13        In summary, the United States believes this is a serious

14   criminal offense.  It's not a local crime to be scoffed at and

15   it's not some sort of harmless byproduct of a midlife crisis.

16   And as long as we minimize the harm that is done to kids

17   Grace's age, people are going to keep abusing kids her age and

18   think that it's not a big deal.

19        So the United States asks for a sentence that will not

20   only specifically deter Mr. Fields, but one that would deter

21   other would-be abusers of 17-year-olds.

22        We believe that the guidelines here are appropriate, and

23   we ask that the Court impose the statutory maximum term of

24   imprisonment for each count.  We do leave it into the Court's

25   sound discretion as to whether to run those consecutively or

1    concurrently to achieve the total punishment.   But as the Court

2    noted earlier, Chapter 5 of the guidelines states that they

3    should be run consecutively to achieve the total punishment.

4         In complete candor to the Court, though, I spoke to the

5    minor victim earlier in the week, she did express to me that

6    she could see both ways and that she would not be upset with

7    the United States if he had both of his sentences run

8    concurrently.

9         To address some of the things that came up during

10   Mr. Spedding's allocution, and I think the Court did a good job

11   of addressing this -- and I note the Court's concerns about

12   that section of our sentencing memo and, you know, we'll change

13   that accordingly.

14        THE COURT:  Well, no.  It's just my view of it.  Of course

15   I know that's submitted with all the judges in the district, so

16   I'm sure some find it very helpful.  But it's just -- it tends

17   to pull everything back to the guidelines, and the guidelines

18   are just one factor to be taken into account.

19        And if we look at 3553(a)(6) as having any more weight

20   than any other section of the guidelines, aren't we really

21   saying ignore those other factors?  Because we've already

22   talked about the guidelines.  But then we also talk about the

23   guidelines in subsection (a)(6).  And there's just so much more

24   to a sentence than just the guidelines.

25        MS. MELTON:  Yes, Your Honor.

1        And you noted when you were speaking with Mr. Spedding

2   that many of the defendants that are described in this

3   sentencing memo did plead guilty.

4        So in terms of concerns for judicial economy, should we

5   preserve the benefit of pleading guilty?  And I submit that we

6   should.

7        And then in terms of general deterrence, do defendants

8   need to understand that two acts or two convictions are worse

9   than one.  And I think in cases of child exploitation

10  particularly, there is that need.

11       Your Honor, on the restitution, indigency, special

12  assessments, my understanding close to the time of the trial

13  was that Mr. Fields was trying to use the property in Corbin to

14  hire a new defense attorney.  So it's the United States' belief

15  that that property is still somewhat tied up in Mr. Fields'

16  bond in Bourbon Circuit, I believe.

17       However, it's the United States' understanding that he

18  does still own that property.  And that the description of the

19  assets and liabilities in the PSR is correct; therefore, we

20  submit that Mr. Fields is not indigent.

21       THE COURT:  What's the status of the pending state

22  charges?  They are referenced in the presentence report.

23  Again, we've had a couple of continuances since the report was

24  prepared.

25       Do you have any other information about those pending

1   charges?

2       MS. MELTON:   I do not, Your Honor.   When we were in plea

3   negotiations, the Commonwealth attorney was prepared to allow

4   him to plead guilty and have the sentence run concurrently.

5   Since he proceeded to trial, I'm not sure what their position

6   is on that at the moment.

7       However, since he is incarcerated, I would think that that

8   bond order and the liability on his property associated with

9   that is not needed anymore.   So I would assume that it would

10  revert back to his outright ownership.

11      In terms of the special assessment under 2259A, Your

12  Honor, I have to be candid and say that we did not include

13  notice of that in the defendant's indictment.   I attempted to

14  do some research as to whether that was a deal breaker in terms

15  of imposing that.   I cannot find any case law on it, probably

16  because the statute is more recent.

17      THE COURT:   Yes, ma'am.

18      MS. MELTON:   But I think it's safe to assume that, as with

19  other special assessments, that there might need to be notice

20  of that.   And so the United States just wanted to let the Court

21  know, and we would ask that the Court impose the $5,000 special

22  assessment that is noted.   And impose a fine that reflects the

23  seriousness of this case.   But we believe the safest course of

24  action with respect to 2259A would be to not impose an

25  assessment under that particular provision.

```
 1          THE COURT:  All right.

 2          MS. MELTON:  Thank you.

 3          THE COURT:  Oh.  You had indicated that there was an

 4   additional victim statement, and that the victim's mother also

 5   wished to make a statement to the Court.  I have received one

 6   victim statement that was attached to the presentence report.

 7          Is there a second statement?

 8          MS. MELTON:  No, Your Honor.  It's the same three-page,

 9   kind of single-spaced statement.

10          THE COURT:  Yes, ma'am.

11          MS. MELTON:  I do have a written statement from the

12   victim's mother, but I think she is planning to read that to

13   the Court today, so I don't think I need to submit it.

14          THE COURT:  All right.  Yes, ma'am.

15          MS. MELTON:  Are you ready to hear from her at this time?

16          THE COURT:  Yes, ma'am.

17          THE WITNESS:  May I remove my mask up here?

18          THE COURT:  Yes, you can.  Certainly.

19          THE WITNESS:  I did have a statement prepared, but

20   after -- I really never been to a trial.  I didn't know what to

21   expect.  And after hearing Mr. Fields' statements, I feel

22   like -- like -- I understand where he's coming from.  He's

23   talking about his children.  Well, his victim was my child.

24          And you know, it doesn't matter if he gets 60 years.  It

25   doesn't matter if he gets life.  It doesn't matter about the
```

1   money.   This is going to be with my daughter the rest of her

2   life.   He cost her a career in the military due to mental

3   instability.

4        You know, he's caused us to change our entire lives.   I

5   moved immediately.   I forced her to quit her job.   I mean, I

6   have a security system.   I have two major guard dogs.   And I

7   have an arsenal at my house because of fear.   That was before

8   he was retained.   Because Harrison County chose to release him

9   on some other minor charges.

10       I'm not a heartless person.   I mean, I was prepared to ask

11  for a little bit of mercy just because of his children and his

12  family.   But I'll tell you, that's a hard thing for me to do

13  right now.

14       The more I hear, the angrier I am.   And I have a lot of

15  hate in my heart for him right now.   And I hope with the end of

16  today, I can let that go.   I do feel like -- you know, I do

17  feel sympathy for his children and his mother and the rest of

18  his family.   But you know, he made his decision.

19       And the other part that bothers me the most, in his entire

20  statement not once did he admit guilt or did he apologize to

21  the victim.   And that right there makes me less convinced to

22  ask for mercy for him or for sentences to run concurrent.

23       But I hope that he spends every day that he does get

24  thinking about this decision and how many people it impacted.

25  Because it wasn't just my daughter.   It was our entire family,

1   it affects his family, and it affects him.   And I'm sorry that

2   one bad decision cost him that, but it was just that, his

3   decision.   Thank you.

4       THE COURT:   Thank you, ma'am.

5       Ms. Melton, any other information you would like to

6   provide?

7       MS. MELTON:   No, Your Honor.

8       THE COURT:   All right.   Thank you.

9       Mr. Spedding, as I indicated earlier, if you would like to

10  respond briefly to any of the government's arguments, or the

11  statements that have just been made by the victim's mother, you

12  can certainly do so.

13      MR. SPEDDING:   Your Honor, the only response would be to

14  address the Court's question about the pending state charges.

15  And as far as I know, they are still pending.   And I have not

16  talked to the Commonwealth's attorney about resolving those

17  after we had the initial discussions.

18      I believe the property we're talking about does secure the

19  bond in one of these cases.   I'm not confident that that will

20  be -- I don't think that they will just say, okay, we'll

21  release it, unless they dismiss those charges.

22      So I think -- I guess what I'm telling you, Judge, I think

23  the property is tied up and the cases are still pending.   One

24  of them, I don't believe -- in one county, it hasn't been

25  presented to the grand jury.   And the other county, it has been

 1   indicted and is pending.

 2        So that's really the only thing I wanted to address with

 3   Your Honor.

 4        THE COURT:  All right.  Thank you.

 5        Of course, I have been presented a lot of information with

 6   regard to what should be an appropriate sentence in this case.

 7   I need to go back and I need to first outline the factors that

 8   are to be considered, and then I am going to fill in some of

 9   the details with some of the factual information.  And I also

10   want to address some of the arguments that have been made.

11        Of course the attorneys know, they are aware that in

12   imposing a sentence here in this court, the Court begins with

13   the properly calculated guideline range.  We've had a lot of

14   discussions about what that range should be today through the

15   objections that have been addressed and resolved, but we have a

16   significant guideline range in this particular case.  It's

17   effectively the statutory maximum of 30 years for each count of

18   conviction.

19        Because the guidelines would provide otherwise for a life

20   term of incarceration, based upon the calculations that are

21   outlined in the presentence report, a total offense level of 43

22   is the highest that we get under guidelines.  And it's in

23   criminal history category I, but that still has a life term of

24   imprisonment as a guideline range.

25        Now, the statute would then reduce that down to 30 years

1   for each count of conviction, for a total of 60 years.  And of

2   course in federal court, we talk about months rather than

3   years, calculates out at 720 months.

4       Now, the defendant, of course, proceeded to trial, which

5   is his right and he should not apologize for proceeding to

6   trial because that ultimately is his determination to make.

7       The attorneys also know that there are certain advantages

8   if an individual enters a guilty plea.  And there are different

9   types of pleas that a person may enter, one that contains

10  recommendations about guideline calculations, one that would

11  contain a plea to one or several counts that are charged in a

12  case.  Many times individuals enter what's called open pleas

13  without a plea agreement.  The Court does not have any control

14  over that and should not.

15      That should be the person that's been charged, that should

16  be that person's decision after consulting with his attorney or

17  her attorney as to how to proceed in a case.

18      So the defendant did proceed to trial in the case and was

19  convicted of the two charges.  And these are serious charges.

20      Now, getting back to the guidelines, I do want to say one

21  thing about some of the arguments that have been made about the

22  guidelines.

23      The guidelines could have been higher with other

24  enhancements, but not really, because the guidelines would have

25  been backed down to 43 had there been other enhancements.  43

1    is the upper range.

2         But when we look at the guidelines and when we look at the

3    guidelines that apply to sex offenders or sex offenses, the

4    guidelines do have a number of enhancements for very valid

5    reasons.  The parties many times argue when we don't have a

6    real victim or a victim that's present in court that testifies

7    or that's suffered the offense, that these cases are victimless

8    crimes.

9         Now, this case really explains why that's not the case.

10   And it also explains how individuals, young people that are

11   victimized, suffer harm, suffer grievous harm, and that harm

12   stays with the person many times for a lifetime.

13        There have been made arguments over the years in law

14   journals, there's an article several years ago in an ABA

15   Journal about how onerous the federal guidelines are in these

16   type of offenses.  And there was a really good response that

17   was submitted that I quote and refer parties to very often in

18   these cases, that explains the purpose and the intent of the

19   different enhancements under these guidelines, under these

20   chapters.

21        The author is, her name is Alexandra Gelber.  And the

22   article is captioned, Response to A Reluctant Rebellion.  And

23   she goes through and she talks about all of these different

24   enhancements.

25        And she also talks about victims.  Because in many cases,

1    again, where we don't have an identifiable victim, the argument

2    is that these are just pictures.  But they are not pictures.

3    They are children.  Whether it's a two-year-old or ten-year-old

4    or a 17-year-old, they are children.

5         And Congress certainly understands that and understands

6    the harm.  I don't know if sometimes judges fully understand

7    that.  And maybe that explains, perhaps, why we have

8    disparities in sentencing when we look at the same type of

9    offenses involving these child offenses.

10        The attorneys are certainly aware of cases that come from

11   other states within this circuit in which judges have imposed

12   essentially a slap on the wrist for child production or child

13   distribution offenses, only to be reversed and remanded, and

14   only to impose the same sentence again.

15        So I think it's fair to say that different people look at

16   these cases very differently in terms of the harm that these

17   cases do.

18        That's not to say that a person that commits an offense

19   such as this is a devil.  We don't have angels and we don't

20   have devils.  We have humans that commit offenses, but they do

21   have consequences.

22        So we do start from the guideline range.  And the

23   guidelines in this case are properly calculated.  And certainly

24   in my opinion there can be challenges to the Court's

25   determination as to guidelines in a case, but the guideline

1   range in this matter is 720 months.

2       And the Court would get there by essentially imposing the

3   maximum penalty under Counts 1 and 2 and running those terms

4   concurrently.

5       But the question becomes whether that is an appropriate

6   sentence when we then look at the factors of Title 18, Section

7   3553.  And of course the attorneys have both argued their

8   respective positions as to how those particular factors do

9   apply in this particular case.

10      Now, those factors include the nature and circumstances of

11  the offense, as well as the history and the characteristics of

12  the person that's to be sentenced.

13      The Court also considers the need for the sentence to

14  reflect the seriousness of the offense, the need to promote

15  respect for the law, and to provide a just punishment for the

16  offense.

17      And then another factor that is certainly important in

18  this case, it's important in most cases here in federal court,

19  but that is the need to provide deterrence.  Deterrence is

20  twofold.  It's both specific deterrence for the defendant, but

21  it's also general deterrence for others that might be inclined

22  to commit a similar offense.

23      We also consider the need to protect the public from any

24  future crimes of the defendant.

25      Now, that particular factor is perhaps lessened when we

1    talk about hands-on offenses, as the Court imposes a lengthy

2    sentence.  Because if a defendant is looking at a 20-, 30-, 40-

3    or 60-year sentence, upon completion of that sentence, the

4    person presents a less likelihood of committing a hands-on

5    offense.  But that does not mean the person cannot commit

6    similar offenses.

7         I have an individual in Northern Kentucky that's on

8    supervision that's, I think, in his late 80s or early 90s.  And

9    every time he's released, he commits another offense.  And

10   pretty much dares the Court to impose the penalty because he's

11   just too old.  But I have not hesitated to do that when a

12   person violates a condition of supervision.  So age does have a

13   place in this world and a factor to be considered, but it does

14   not immunize an individual from punishment, obviously.

15        Now, the Court also considers rehabilitative factors.  And

16   I'm certainly pleased to hear the defendant does have a plan

17   for getting additional education and additional skills and

18   keeping occupied during what he understands will be a lengthy

19   term of incarceration.

20        He's also talked quite a bit about his family, his

21   children.  And I'm sure he loves his family and loves his

22   children very much.  And I'm sure that he's thinking now about

23   how he wants to be able to protect his children from the type

24   of predator that he has been in this particular case.

25        No one wants to see a small child, whether -- or older

1   child, whether they be two, 10 or 17, groomed or abused by an

2   older individual. It's difficult to be middle aged and know

3   that you're going to be serving a lengthy period of

4   incarceration and you will not be available to protect your

5   children while they are at vulnerable ages.

6        But again, I agree with the government that this victim

7   was also a vulnerable person. Not in the sense the guidelines

8   describe vulnerable victims that are subject to an enhancement,

9   but she's vulnerable. She's 17 years old, very impressionable.

10  So the fact that she's 17 does not provide for a discount for

11  the type of behavior in which the defendant involved himself.

12       There are other factors, of course. We talked about

13  policy statements. Some of those policy statements, and 5H and

14  5K of the guidelines, those have been addressed. But I look at

15  all of the guidelines in determining whether there are any

16  departures that would be appropriate in a particular case.

17       And then I also consider, of course, the need to avoid

18  unwarranted sentencing disparities or the need to avoid

19  unwarranted sentencing disparities among defendants with

20  similar records who have been found guilty of similar conduct.

21       Sometimes I refer to this as the lowest common denominator

22  argument. If we have two sentences imposed for a particular

23  offense in the country, let's say a judge in Arizona imposes a

24  below-guideline sentence, significantly below the guideline

25  sentence of the nature I described earlier. And the second

1    judge, let's say who's located Kentucky, would it be a

2    sentencing disparity for that judge to impose a guideline

3    sentence when this other judge, the first judge, went way below

4    the guidelines?  No, that would not be appropriate.

5        We have to look at all the information, all the

6    statistical information.  There may be a reason to depart under

7    this section.  But just because someone else does it doesn't

8    mean that a particular judge should be doing that.  The judge

9    should carry out his or her responsibility in evaluating all of

10   these factors in imposing an appropriate sentence and just not

11   do something because that's what the average is.

12       If we do something different than that, then perhaps we do

13   find ourselves with a system such as the state system, where

14   you have an individual that commits very serious offenses and

15   they get a slap on the wrist.  The type of individuals that

16   Mr. Fields just described in the Fayette County Detention

17   Center.

18       They can commit murder, rape, and various other offenses,

19   and it seems like it's a revolving door sometimes.  And I

20   certainly understand how a federal detainee can feel like he or

21   she is being treated differently.  But there are only certain

22   things that this Court can address and should address.  And the

23   sentences that are imposed by the state courts, that's not one

24   of those.

25       There are only certain things that this Court really has

1    the ability to address, and that is individuals that are coming

2    before the Court that have been convicted of very serious

3    offenses.

4        So with those factors in mind, I do want to go back

5    through some of the arguments that have been made in the

6    context of these statutory factors.  Of course they do include

7    the nature and circumstances of the offense and the history and

8    characteristics of the defendant.

9        Earlier I talked about the fact that the defendant

10   certainly proceeded to trial as was his right.  And he will not

11   be punished and should not feel like that he's being punished

12   by proceeding to trial.  That's what this Court is here for.

13   This Court is here to try cases and to resolve matters to the

14   extent that it can.

15       But the Court only addresses those cases that are

16   presented to it.  And the parties make decisions based on all

17   the information available as to whether they should proceed to

18   trial.  In this particular case, the jury listened to the

19   evidence and found the defendant guilty of two very serious

20   offenses.

21       When we look at the circumstances of the offense, they've

22   been discussed quite a bit today, I have discussed those as

23   well as the attorneys, I don't agree with some of the arguments

24   that are made.  I understand the reason for making the

25   argument.

1         But in terms of, for example, a departure based upon the

2    victim's role in the offense, I don't consider this victim to

3    be responsible for the offenses of conviction.  I do place

4    those squarely upon the defendant's shoulders.  And I certainly

5    understand the victim's mother's position when she says,

6    rightly so, that this defendant has really never accepted his

7    responsibility for the conduct in the case, never acknowledged

8    it, never indicated that he's sorry to the victim or to the

9    victim's family.  And both the victim and her family have

10   suffered as a result of his actions.

11        Again, this was a 17-year-old girl working in McDonald's

12   that had an interest in law enforcement.  She did indicate

13   through her testimony that she was afraid and wondered why the

14   defendant was approaching her the way that he did.

15        There's no explanation for what he did later, in terms of

16   taking videos.  And then as I made a finding that he shared the

17   video, but let's assume that the video that he shared or the

18   pictures that he shared with these three other individuals were

19   not of the victim.  Let's just assume they were of someone

20   else.  What does that say about these character letters that

21   have been submitted?  They say, for one thing, that I shouldn't

22   put a lot of faith in the character letters that were submitted

23   if this is the type of character that the defendant has, that

24   he wants to share this type of pornography with other

25   individuals.

1    But assuming that it's as I made a finding, at least one

2    of those images was of the victim, it says a lot more about the

3    defendant, that he would take the videos and photographs, send

4    those to himself and then share those with others.  That

5    completely undercuts the arguments about the defendant's good

6    character and reputation.

7    Perhaps the best letter, ironically, the best letter

8    submitted in terms of the defendant's character in favor of

9    mitigation is the one submitted by his ex-wife.  She's willing

10   to forgive a lot.  To forgive a lot based upon the defendant

11   and his relationship with his children.

12   There is information, however, that the defendant has been

13   a good employee over the years.  He has held reputable

14   positions and I do take that information into account,

15   certainly.

16   Counsel does acknowledge that the defendant made a

17   grievous mistake.  As I indicated, of course, he's not

18   apologized to the victim or the family, but counsel indicates

19   that he made a grievous mistake.  And it has severe

20   consequences.

21   And as the victim's mother has indicated, he has hurt a

22   lot of people.  He has hurt his own family.  He's hurt the

23   victim, and he's hurt the victim's family as well.

24   Mr. Spedding correctly quotes me from earlier or other

25   cases as indicating that perhaps the best indication of what

87

1    you're likely to do in the future is what you have done in the

2    past.   But people can make changes, and hopefully the defendant

3    will be able to make changes and will not repeat this type of

4    conduct going forward.   But I do consider his lack of criminal

5    history as an additional positive factor, as well as the

6    support he has from his family.   I certainly hope that

7    continues.

8        I also want to address briefly this issue again, the issue

9    of sentencing disparities under 3553(a)(6).

10       So there's no misunderstanding, I am familiar with many of

11   those cases that are referenced in the sentencing memo that has

12   been filed.   But again, my point that I raise with the

13   attorneys is that that's really looking at a snapshot, a very

14   small snapshot of a particular case.   There is a lot of

15   information that is not provided, mitigating factors, for

16   example, that are not provided, arguments that are made to the

17   Court at the time of sentencing.

18       If we strip all of those things away and just look at

19   those numbers, do we really need to even have sentencing

20   hearings where the parties can argue their respective positions

21   and try to convince the Court as to what a sentence should be?

22       And so there is some value to the information, but it is

23   of limited value to me when I look at the specific information

24   and I don't have more on a particular case.   But I do certainly

25   consider that information as one bit of information.

1          With regard to the issue of restitution, I appreciate the

2     United States advising me of the notice issue as to the one

3     statutory section on restitution.

4          The other statutory section on restitution -- there are

5     two, of course.  And the other statutory section, I believe,

6     would be appropriate for the Court to impose some restitution

7     in the case.  When I look at all of the factors that are to be

8     taken into account under -- 3014, I believe, is the statutory

9     section -- and I'll get back to that here in just a moment in

10    explaining the amount of restitution that I do believe is

11    appropriate in the case.

12         Turning to some of the defendant's arguments that have

13    been made.  Many times we have people that appear before the

14    Court for sentencing and they make arguments that they are

15    either a good person or they're not a bad person, but they are

16    a person.  People do engage in criminal conduct.  They do make

17    mistakes.

18         I consider this to be something more than a mistake.  It

19    was conduct that occurred for some period of time.  There was

20    thought that went into it.

21         I'm sure that if Mr. Fields had this to go back and do

22    over again, he would not hesitate for a millisecond to change

23    his conduct.  But unfortunately that's not one of the options

24    that we have.  He does have to live with the consequences.

25         He does understand that this Court is obligated to impose

```
 1   a significant sentence, but a significant sentence is warranted
 2   under the facts that are presented here.
 3       Talked a bit about the disparity of state versus federal
 4   sentences based on some of the comments that Mr. Fields made
 5   earlier, and I certainly do understand frustration and other
 6   feelings that individuals can have that are facing significant
 7   federal time in comparison with sentences that are imposed in
 8   the state system.
 9       Turning to the government's arguments.  I do agree with
10   many of the arguments that have been made, I have attempted to
11   address some of those in my comments on the defendant's
12   position and his arguments.
13       I think this case was certainly professionally presented.
14   I think everyone that -- I think that everyone that was present
15   in the courtroom appreciates the professionalism that was
16   displayed in a very difficult case on both sides of the ledger,
17   but by the government as well as by the defendant and his
18   counsel.
19       I have addressed previously, I believe, some of the
20   characteristics of the victim.  I'm not going to go into much
21   more detail, other than to say how sorry I am for a person that
22   has had these harmful things that have happened.  This is not a
23   victim that's looking for money.  This is a victim that just
24   wants to get her life back, and I hope that she'll be able to
25   do that very soon.  Time will certainly tell, but I'm hopeful
```

1    with strong character and help from her mother, that she will

2    be able to get her life going back in the right direction.

3        After I have considered all of the information in this

4    particular case, one of the factors that I have not yet

5    addressed, statutory factor, is that the sentence that's

6    imposed should be sufficient but it should not be greater than

7    necessary to comply with all the purposes that are outlined in

8    subsection (2) of 3553(a).

9        And when I look at the seriousness of the offense, and

10   this is a very serious offense, I consider the need to promote

11   respect for the law, and it was not shown here by the

12   defendant.  And I look at a just punishment and I also consider

13   the other factors, issues of deterrence and protecting the

14   public.  I agree with Mr. Spedding that it is not necessary to

15   impose a sentence of 720 months to meet those statutory

16   factors.

17       However, I do believe that a significant sentence is

18   necessary in the case.  And so what I will do in this matter,

19   for the reasons that I've explained, I'm going to impose the

20   sentence that will have the statutory maximum for each of the

21   counts, but I'm going to run the sentence partially consecutive

22   and partially concurrent, in a manner that will produce a total

23   term of incarceration of 420 months.

24       I believe, based upon all of the factors that I have

25   outlined and listed and discussed, that a lesser sentence would

1  unduly depreciate the seriousness of the offense and harm to

2  the victim.

3      I do not believe, however it's necessary to impose a

4  sentence above that number to meet the factors of 3553.  I

5  believe that, under the circumstances presented, a sentence

6  greater than 420 months, in terms of the term of incarceration,

7  would be unduly punitive when we look at the factors of 3553

8  and would not be a just punishment.

9      So in this case, the sentence that will be imposed will be

10  a variance of the guideline range.  The guideline range in this

11  case is 720 months.  So it will be a significant variance from

12  the guideline range, but it is one that I think meets all of

13  the factors of 3553, which has been outlined.

14      Now, in addition, I do think that while the defendant will

15  not be able to pay a significant fine in the case, but he will

16  be able to pay restitution.  And it is my determination that

17  this defendant is able to pay restitution, not under 2259(a),

18  but under 3014.  Let me go to that section.

19      Under section 3014, the section reads, "In general,

20  beginning on the date of enactment of the Justice for Victims

21  of Trafficking Act of 2015 and ending on September 30, 2021, in

22  addition to the assessment imposed under section 3013," which

23  is $100 per count of conviction, "the court shall assess an

24  amount of $5,000 on any non-indigent person or entity convicted

25  of an offense under" and it would include chapter 110.

1          Based upon the fact that the defendant -- it does appear

2    based upon information in the presentence report that he does

3    have property and net worth of approximately $41,000, I do

4    believe that he is able to pay the special assessment of $5,000

5    per count of conviction, for a total of $10,000.  And so that

6    special assessment will be included in the judgment, together

7    with the assessment of $100 per count under 3013, statutory

8    section 3013, for a total of $10,200.

9          I recognize that the property may be tied up on the state

10   proceedings that are currently pending.  We don't know the

11   outcome of those proceedings at this point.  The Court also

12   believes that the defendant, based upon the facts that are

13   presented at this time to this Court, you have the ability and

14   would not constitute a person that would be indigent under the

15   statutory section.  So that amount will be assessed.

16         Also I will advise the parties that because I'm assessing

17   restitution under the statutory section, I then consider the

18   factors of the guidelines section 5E1.2(d), and there are eight

19   enumerated factors listed as well as this summary statement

20   that "the fine should always be sufficient to ensure that the

21   fine, taken together with other sanctions imposed, would be

22   sufficiently punitive."

23         I believe in light of the restitution amount under the

24   statute, that to impose a fine would be unduly punitive in the

25   case so I will not be imposing a fine.  But I will advise the

1    parties that in the event that I had chosen not to impose

2    restitution, I would have imposed a similar fine of $10,000.

3    So I do believe that would be the appropriate monetary penalty

4    in the case.

5        And, again, the victim in this matter has not requested

6    restitution.

7        And then finally, I'll note again I have considered all

8    the information contained in the sentencing memos filed by the

9    parties, as well as the letters that were attached to the two

10   supplemental briefs and memos filed by the defendant.

11       So I'll announce the sentence of the Court at this time.

12       It will be the sentence of this Court, pursuant to the

13   Sentencing Reform Act of 1984, as modified by the decisions in

14   *Booker* and *Fanfan*, and I do believe the following sentence

15   would be sufficient but would not be greater than necessary to

16   comply with the purposes of Title 18, Section 3553(a):

17       Therefore, it will be the judgment of the Court that the

18   defendant, William Michael Fields Junior, will be committed to

19   the custody of the Bureau of Prisons for a term of 360 months

20   on each of Counts 1 and 2.  With regard to Count 2, 60 months

21   of that 360-month term will be consecutive to the term imposed

22   for Count 1, and 300 months of the sentence will be concurrent

23   with the sentence imposed for Count 1.

24       Now, upon release from incarceration, the defendant will

25   be placed upon supervised release -- excuse me.  That would

1    produce a total term of incarceration of 420 months.

2          Upon release from imprisonment, he will be placed upon

3    supervision for a term of 20 years on each of Counts 1 and 2 to

4    run concurrently to each other to produce a total term of

5    supervision of 20 years.

6          Within 72 hours of release from the custody of the Bureau

7    of Prisons, he must report in person to the probation office in

8    the district in which he is released.

9          While on supervised release, he may not commit another

10   federal, state, or local crime.  And must comply with the

11   mandatory and standard conditions adopted by the Court and that

12   will be set forth in the judgment and commitment order.

13         The drug testing condition that's ordinarily required by

14   Title 18 of the United States Code, Section 3553(a)(5) and

15   3563(a)(5) will be suspended based upon my determination that

16   the defendant poses a low risk of any future substance abuse.

17         I'll also impose the following special conditions:

18         The first is that Mr. Fields may not incur any credit

19   charges or open additional lines of credit without approval of

20   the probation office unless he is in compliance with an

21   installment payment schedule that may be set by subsequent

22   orders, in the event he is unable to pay the special

23   assessments that have been and will be announced.

24         The sex offender conditions will include those that are

25   often imposed in this district.  I do find that the following

1    are necessary and reasonable in this particular case.

2        First, Mr. Fields must participate in a program for

3    treatment of mental health and sexual disorders and must

4    undergo a sex offender risk assessment, psychosexual

5    evaluation, and/or other evaluation as needed.  And will be

6    subject to periodic polygraph examinations and computer voice

7    stress analysis testing.  That would be at the direction and

8    discretion of the probation office.

9        He must also follow the rules and regulations of the sex

10   offender treatment program as implemented by the probation

11   office.

12       Next, his residence and employment must be preapproved by

13   the probation officer and in compliance with state and local

14   law.

15       There will be a restriction on contact with minors.  He

16   may not frequent, volunteer, or work at places where children

17   under the age of 18 congregate.  That would include

18   playgrounds, parks, daycare centers, public swimming pools,

19   video centers, and video youth arcade facilities and similar

20   facilities, unless that is approved by the probation office.

21       He may not have any contact with the victim in this

22   particular matter.

23       Next, he may not associate or have verbal, written,

24   telephonic or electronic communication with any person under

25   the age of 18 without the permission of the probation office.

1    Now, this provision does not include persons under the age

2    of 18 such as ticket vendors, cashiers, waiters, and waitresses

3    and the like with whom he must deal to obtain ordinary and

4    usual commercial services.  And to the extent that there is any

5    question, it would not pertain to his children.  So he may

6    communicate with his children.

7         There will be a restriction on his use and possession of

8    materials.  He may not possess, view, listen to or go to

9    locations where any form of pornography, sexually stimulating

10   performances or sexually oriented materials, items or services

11   are available.

12        He may not possess or use a device capable of creating

13   pictures or videos without the approval of the probation

14   office.  And with regard to the use of any iPhone or smart

15   phone, he would have to have written approval of the probation

16   office before he could possess or use such a device.

17        He may not rent or use a post office box or storage

18   facility without the approval of the probation officer.

19        And he is required to register as a sex offender as

20   prescribed by state law.

21        There will be restrictions on his use of computers and

22   computer devices.  He may not possess or use a computer or any

23   device with access to any online computer service at any

24   location, including place of employment, without the prior

25   written approval of the probation office.  This would include

1    any internet service provider, bulletin board system or any

2    other public or private network or email system.

3        He must consent to the probation office conducting

4    unannounced examinations of his computer system, as well as any

5    internal or external storage devices, which may include the

6    retrieval and copying of all memory from the hardware and

7    software, as well as the removal of such systems for the

8    purpose of conducting a more thorough inspection.

9        And he must consent to having installed on his computer

10   any hardware or software to monitor his computer usage to

11   prevent access to particular materials.

12       And he must consent to periodic inspection of any

13   installed hardware and software to ensure that it is

14   functioning properly.

15       He must also provide the probation office with accurate

16   information about his entire computer system, and that would

17   include the hardware and software, as well as any internal or

18   external storage devices.

19       He must also provide all passwords used by him, and he

20   must abide by all rules of the computer restriction and

21   monitoring program.

22       I will also include a search condition based upon the

23   nature of the particular offenses of conviction.  The defendant

24   will be required to submit his person, as well as his

25   residence, office, vehicle or any property under his control to

1   a search conducted by the probation office.  The failure to

2   submit to a search would be grounds for revocation of

3   supervision.  And he must inform all residents that his

4   premises would be subject to a search according to this

5   condition.

6       He must also provide the probation office with access to

7   any requested financial information.  Now, this condition, I'll

8   advise the parties, is included as a means to allow the

9   probation office to monitor matters such as purchases of

10  electronics and peripheral devices, as well as access to any

11  internet service either subscribed to or accessed by the

12  defendant.

13      As I indicated earlier, based upon his current financial

14  situation, I will waive the fine requirement in the case after

15  considering the factors of 5E1.2(d).  But he will be ordered to

16  pay a special assessment of $5,000 per count of conviction

17  under Title 18, Section 3014, as well as $100 under 3013 for

18  each count of conviction, for a total of $10,200.  And that

19  will be due immediately.

20      But in the event the defendant is unable to pay that

21  special assessment or total assessment, then the Court will

22  establish an installment payment schedule upon his release from

23  incarceration.

24      But during the period of incarceration, he will be

25  required to make payments toward the assessment in accordance

1    with the Bureau of Prisons' Inmate Financial Responsibility

2    Program.

3        Inasmuch as the victim is not seeking restitution in the

4    case, the Court does not defer determination of restitution to

5    the victim under Title 18, Section 3664(d).

6        And then following this proceeding, the defendant will be

7    remanded back to the custody of the United States Marshal

8    pending designation for service of his sentence.

9        I will recommend to the Bureau of Prisons that the

10   defendant serve his period of incarceration at the location

11   closest to his home for which he would qualify, recognizing

12   that the Bureau of Prisons is obligated to make that placement

13   determination under Section 601 of the First Step Act of 2018,

14   but notwithstanding that statutory obligation, I will include

15   that as a recommendation as well.

16       That will be the judgment of the Court.

17       In just a moment, I will ask the clerk to advise

18   Mr. Fields of his appellate right.  Before I do that, I'll ask

19   the attorneys to state any objections that they might have,

20   first to the sentence that has been announced, and that will

21   include conditions of supervision.

22       Second would be any objections that the parties may have

23   under Sixth Circuit authority *United States versus Bostic*.

24   Now, under that decision from the Sixth Circuit, any objections

25   not previously raised should be raised at this time so that

 1   they may be addressed by the Court to be properly preserved for

 2   review on appeal.

 3       And then finally, if the parties would like the Court to

 4   make additional findings to support any of the determinations

 5   that have been announced during this proceeding, I will

 6   certainly do so, if requested.

 7       And, Ms. Melton, I'll begin with you on behalf of the

 8   government.

 9       MS. MELTON:  Thank you, Your Honor.  We don't have any

10   objections to the sentence or any *Bostic* objections.

11   Similarly, we do not request the Court make any additional

12   findings.

13       THE COURT:  Thank you.

14       Mr. Spedding.

15       MR. SPEDDING:  Your Honor, no objections that haven't been

16   previously made.  No request for any further *Bostic* findings,

17   and no request for any further findings at this time.

18       THE COURT:  All right.  Thank you.

19       Madam Clerk, would you please advise Mr. Fields of his

20   appellate rights?

21       THE CLERK:  Yes, Your Honor.

22       (The form entitled "Court's Advice of Right to Appeal" was

23   read aloud in open court by the clerk.)

24       THE COURT:  All right.  Thank you.

25       Mr. Fields, you are about to be handed what was just read.

1    If you would please take a moment to review your appellate

2    rights with counsel.  After you have assured yourself you

3    understand those rights, if you could please sign that original

4    document and there is a copy that you can keep for your

5    records.

6         Thank you.

7         Are there any issues to take up in the case, Ms. Melton,

8    on behalf of the government?

9         MS. MELTON:  No, Your Honor.

10        THE COURT:  Mr. Spedding?

11        MR. SPEDDING:  No, Your Honor.

12        THE COURT:  All right.  Thank you.  If there are no other

13   issues to be taken up in the case, we will be in recess.

14        (Proceedings concluded at 11:49 a.m.)

15

16                C E R T I F I C A T E

17        I, Linda S. Mullen, RDR, CRR, do hereby certify that

18   the foregoing is a correct transcript from the record of

19   proceedings in this above-entitled matter.

20

21   /s/Linda S. Mullen            January 14, 2021
     Linda S. Mullen, RDR, CRR     Date of Certification
22   Official Court Reporter

23

24

25